**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

State of Indiana,
    302 W. Washington Street
    IGCS – 5th Floor
    Indianapolis, IN 46204,

Indiana Department of Natural Resources,
    402 W. Washington Street
    Indianapolis, IN 46204,

State of West Virginia,
    State Capitol, Bldg 1, Room E-26
    Charleston, WV 25305,

West Virginia Department of Environmental
Protection,
    601 57th Street SE
    Charleston, WV 25304,

State of Alabama,
    501 Washington Avenue
    Montgomery, AL 36130,

Alabama Surface Mining Commission,
    P.O. Box 2390
    Jasper, AL 35502-2390,

State of Alaska,
    1031 W. 4th Avenue, Suite 200
    Anchorage, AK 99501,

Alaska Department of Natural Resources,
    550 West 7th Ave., Ste. 1360.
    Anchorage, AK 99501-3557,

State of Arkansas,
    323 Center Street, Suite 200
    Little Rock, AR 72201,

Commonwealth of Kentucky,
    700 Capital Avenue, Suite 118
    Frankfort, KY 40601,

No. 1:24-cv-01665

State of Louisiana,
   1885 N. Third Street
   Baton Rouge, LA 70804,

Louisiana Department of Energy and Natural
Resources,
   617 North Third Street
   Baton Rouge, LA 70802,

State of Montana,
   215 N. Sanders
   Helena, MT 59601,

State of North Dakota,
   600 E. Boulevard Ave Dept. 125
   Bismarck, ND 58505,

State of Ohio,
   30 East Broad Street, 17th Floor
   Columbus, OH 43215,

State of Texas,
   P.O. Box 12548 (MC 059)
   Austin, TX 78711-2548,

State of Utah,
   1594 West North Temple, Suite 300
   Salt Lake City, UT 84116,

Utah Department of Natural Resources,
   1594 W. North Temple, Ste 300
   Salt Lake City, UT 84116,

Commonwealth of Virginia,
   202 North 9th Street
   Richmond, VA 23219,

Virginia Department of Energy,
   3405 Mountain Empire Road
   Big Stone Gap, VA 24219,

State of Wyoming,
   109 State Capitol
   Cheyenne, WY 82002,

     Petitioners,

v.

Deb Haaland, in her official capacity as
Secretary of the Interior,
     1849 C Street NW
     Washington, D.C. 20240,

United States Department of the Interior,
     1849 C Street NW
     Washington, D.C. 20240,

Sharon Buccino, in her official capacity as
Principal Deputy Director of the Office of
Surface Mining Reclamation and
Enforcement,
     1849 C Street NW
     Washington, D.C. 20240,

Glenda H. Owens, in her official capacity as
Deputy Director of the Office of Surface
Mining Reclamation and Enforcement,
     1849 C Street NW
     Washington, D.C. 20240,

Office of Surface Mining Reclamation and
Enforcement,
     1849 C Street NW
     Washington, D.C. 20240,

     Respondents.

## PETITION FOR JUDICIAL REVIEW

     Pursuant to 30 U.S.C. § 1276, Petitioners State of Indiana, Indiana Department of Natural

Resources, State of West Virginia, West Virginia Department of Environmental Protection, State

of Alabama, Alabama Surface Mining Commission, State of Alaska, Alaska Department of Natural

Resources, State of Arkansas, Commonwealth of Kentucky, State of Louisiana, Louisiana

Department of Energy and Natural Resources, State of Montana, State of North Dakota, State of

Ohio, State of Texas, State of Utah, Utah Department of Natural Resources, Commonwealth of

Virginia, Virginia Department of Energy, and State of Wyoming, petition the Court for review of the final agency action by Respondents Deb Haaland, in her official capacity as Secretary of the Interior, United States Department of the Interior, Sharon Buccino, in her official capacity as Principal Deputy Director of the Office of Surface Mining Reclamation and Enforcement, Glenda H. Owens, in her official capacity as Deputy Director of the Office of Surface Mining Reclamation and Enforcement, and Office of Surface Mining Reclamation and Enforcement, to obtain judicial review of the national rulemaking entitled "Ten-Day Notices and Corrective Action for State Regulatory Program Issues," 89 Fed. Reg. 24,714 (Apr. 9, 2024) ("Final Rule"), attached as Exhibit 1. As Petitioners will show, the Final Rule exceeds the Secretary's statutory authority, is arbitrary, capricious, an abuse of discretion, and is otherwise inconsistent with law. Petitioners ask that this Court declare unlawful and vacate the Final Rule and grant temporary relief pending the outcome of this litigation.

## INTRODUCTION

1.     In recognition of States' superior expertise and knowledge of local mining operations, the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "Act") exhibits extraordinary deference to the States. It provides for States with federally approved regulatory programs to assume *exclusive* jurisdiction over the regulation of surface coal mining and reclamation operations, except in a few specific areas. Under the Act, decisions about permitting, bonding, and the like are for States—and States alone—to make. States also occupy the front-line role of inspecting mining sites and enforcing regulatory requirements.

2.     The Secretary's role under the Act is limited. Section 521 of the Act gives the Secretary two principal oversight tools. First, it authorizes the Secretary to issue a notice—called a ten-day notice—to State regulatory authorities in the event the Secretary receives information

that provides reason to believe a regulatory violation exists. That notice process is designed to address site-specific violations, such as a mining operator's violation of a permit requirement, and triggers an obligation for States to take appropriate action to correct the violation or show good cause for failure to do so within ten days. It, however, still gives States the primary responsibility for investigating and redressing potential violations. Second, the Act authorizes the Secretary to take over a state regulatory program in the event the State itself fails to enforce its program—but only if the Secretary follows specific procedures and makes specific findings.

3.    Consistent with the extraordinary deference that the Act affords to States, past Secretaries have recognized the limited federal role in issuing ten-day notices. Past Secretaries have conceded that ten-day notices cannot be issued to correct alleged problems with a State's overall administration of its program or alleged permit defects. The Secretary also previously recognized the importance of contacting and consulting with State regulatory authorities before issuing ten-day notices, recognizing that state regulators—which visit mining sites at least once per month—may have critical information that may establish or disprove the alleged violation. And the Secretary previously has acknowledged that States may need weeks or even months to undertake more complex investigations, which may be impossible during winter months.

4.    In the recently issued Final Rule, however, the Secretary proposes to overthrow the Act's deference to States. That rule subjects state decisions over which the Act affords States exclusive jurisdiction, such as permitting decisions, to federal oversight through ten-day notices. The Final Rule seeks to make the federal government the regulator of first resort in other ways too. It discards requirements that citizens contact state regulators with concerns before contacting the federal government. It imposes inflexible, arbitrary timelines on States to complete complex investigations without regard for facts on the ground, setting up federal regulators to swoop in.

And the Final Rule illogically requires the Secretary to blind herself to information in States' possession in determining whether there is reason to believe that a violation exists, even if that information could establish beyond doubt that none exists.

5.    The Final Rule is both contrary to law and arbitrary. It should be set aside.

**PARTIES**

6.    Petitioner State of Indiana is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Indiana, except as provided in 30 U.S.C. § 1253(a). Indiana commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Indiana is a member, and is aggrieved by the Final Rule. The Indiana Attorney General has authority to bring this action on behalf of the State of Indiana. Ind. Code §§ 4-6-1-6, 4-6-2-1, 4-6-3-2.

7.    Petitioner Indiana Department of Natural Resources ("Indiana DNR") is an agency of the State of Indiana responsible for implementing and enforcing the SMCRA within the State of Indiana. Ind. Code §§ 14-34-1-3, 14-34-2-3, 14-34-2-4. Indiana DNR commented on what became the Final Rule and is aggrieved by it. The Indiana Attorney General has authority to bring this action on behalf of Indiana DNR. Ind. Code §§ 4-6-1-6, 4-6-2-1, 4-6-3-2.

8.    Petitioner State of West Virginia is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within West Virginia, except as provided in 30 U.S.C. § 1253(a). West Virginia commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which West Virginia is a member, and is aggrieved by the Final Rule. As West Virginia's chief legal officer, *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 107 (W. Va. 2002), the West Virginia Attorney

6

General has authority to bring this action on behalf of the State of West Virginia. *See* W. Va. Code § 5-3-2.

9.      Petitioner West Virginia Department of Environmental Protection ("West Virginia DEP") is an agency of the State of West Virginia responsible for implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 within the State of West Virginia. W. Va. Code § 22-3-2(c). West Virginia DEP commented on what became the Final Rule and is aggrieved by it. As West Virginia's chief legal officer, *Burton*, 569 S.E.2d at 107, the West Virginia Attorney General has authority to bring this action on behalf of West Virginia DEP. *See* W. Va. Code § 5-3-2.

10.     Petitioner State of Alabama is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Alabama, except as provided in 30 U.S.C. § 1253(a). Alabama commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Alabama is a member, and is aggrieved by the Final Rule. The Alabama Attorney General has authority to bring this action on behalf of the State of Alabama. Ala. Code § 36-15-1.

11.     Petitioner, the Alabama Surface Mining Commission ("ASMC") is an agency of the State of Alabama responsible for implementing and enforcing the SMCRA within the State of Alabama. Ala. Code § 9-16-71(b). The ASMC commented on what became the Final Rule and is aggrieved by it. The Attorney General of the State of Alabama has the authority to bring this action on behalf of the ASMC.

12.     Petitioner State of Alaska is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Alaska, except as provided in 30 U.S.C. § 1253(a). Alaska commented on what became the Final Rule through comments

submitted by the Interstate Compact Mining Commission, of which Alaska is a member, and is aggrieved by the Final Rule.  The Alaska Attorney General has authority to bring this action on behalf of the State of Alaska pursuant to AS 44.23.020.

13.    Petitioner Alaska Department of Natural Resources (Alaska DNR) is an agency within the executive branch of the State of Alaska whose responsibilities include, without limitation, implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 within the State of Alaska. Alaska DNR fulfills such responsibilities pursuant to the Alaska Surface Coal Mining Control and Reclamation Act (ASCMCRA), AS 27.21.  Alaska DNR commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Alaska is a member, and is aggrieved by the Final Rule. Additionally, Alaska DNR submitted its own comments to OSMRE by letter dated June 26, 2023. The Alaska Attorney General has authority to bring this action on behalf of Alaska DNR pursuant to AS 44.23.020

14.    Petitioner State of Arkansas is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Arkansas, except as provided in 30 U.S.C. § 1253(a). Arkansas commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Arkansas is a member, and is aggrieved by the Final Rule.  The Arkansas Division of Environmental Quality (Arkansas DEQ) is an agency of the State of Arkansas responsible for implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 within the State of Arkansas. Ark. Code Ann. § 15-58-102(3); *see generally id.* § 15-58-101 et seq.  The Arkansas Attorney General has authority to bring this action on behalf of the State of Arkansas. Ark. Code Ann. § 25-16-703.

15.     Petitioner Commonwealth of Kentucky is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Kentucky, except as provided in 30 U.S.C. § 1253(a). Kentucky commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Kentucky is a member, and is aggrieved by the Final Rule. And Kentucky's Department for Natural Resources ("Kentucky DNR") also commented on what became the Final Rule, further explaining how Kentucky is aggrieved by it. The Kentucky Attorney General has authority to bring this action on behalf of the Commonwealth of Kentucky. Ky. Rev. Stat. § 15.020(1), (3).

16.     Petitioner State of Louisiana is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Louisiana, except as provided in 30 U.S.C. § 1253(a). Louisiana commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Louisiana is a member, and is aggrieved by the Final Rule. The Louisiana Attorney General has authority to bring this action on behalf of the State of Louisiana. La. Const. art. IV, sec. 8.

17.     Petitioner Louisiana Department of Energy and Natural Resources ("Louisiana DENR") is an agency of the State of Louisiana responsible, through its Office of Conservation ("LOC") for implementing and enforcing the Louisiana Surface Mining and Reclamation Act of 1977 within the State of Louisiana. La. R.S. 30:901, *et seq*. Louisiana DENR commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission and is aggrieved by the Final Rule. The Louisiana Attorney General has authority to bring this action on behalf of Louisiana DENR. La. Const. art. IV, sec. 8.

18.     Petitioner State of Montana is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Montana, except as provided

in 30 U.S.C. § 1253(a). Montana commented on what became the Final Rule in Docket ID: OSM-2022-0009 and through comments submitted by the Interstate Compact Mining Commission, of which Montana is a member, and is aggrieved by the Final Rule. This action is brought on behalf of Montana by Attorney General Austin Knudsen, who is legally authorized as Chief Legal Officer of the State to sue on its behalf.  *See* Mont. Const. art. VI. §4(4).

19.     Petitioner State of North Dakota is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within North Dakota, except as provided in 30 U.S.C. § 1253(a). North Dakota commented on the Final Rule through comments submitted by the Interstate Compact Mining Commission and is aggrieved by the Final Rule. The North Dakota Attorney General has authority to "[i]nstitute and prosecute all actions and proceedings in favor or for the use of the state." N.D.C.C. § 54-12-01(2).

20.     Petitioner State of Ohio is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Ohio, except as provided in 30 U.S.C. § 1253(a). Ohio commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Ohio is a member, and is aggrieved by the Final Rule. The Ohio Attorney General, as Ohio's chief law officer, has authority to bring this action on behalf of the State of Ohio. Ohio Rev. Code § 109.02.

21.     Plaintiff State of Texas is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development of natural resources in the State, including the exercise of exclusive jurisdiction over surface coal mining and reclamation operations, except as provided in 30 U.S.C. § 1253(a). Texas commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Texas is a member, and is aggrieved by the Final Rule. Ken Paxton is the

Attorney General of Texas. Attorney General Paxton represents Texas in civil litigation and is Texas's chief legal officer. *Perry v. Del Rio*, 67 S.W.3d 85, 92 (Tex. 2001).

22.     Petitioner State of Utah is a sovereign State with exclusive jurisdiction over the regulation of surface coal mining and reclamation operations within Utah, except as provided in 30 U.S.C. § 1253(a). Utah commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Utah is a member, and is aggrieved by the Final Rule. The Utah Attorney General has authority to bring this action on behalf of the State of Utah. Utah Code § 67-5-1.

23.     Petitioner Utah Department of Natural Resources ("Utah DNR") is an agency of the State of Utah responsible for implementing and enforcing the SMCRA within the State of Utah. Utah Code § 40-10-2. Utah DNR commented on what became the Final Rule through the Interstate Compact Mining Commission and is aggrieved by it. The Utah Attorney General has authority to bring this action on behalf of Utah DNR. Utah Code § 67-5-1.

24.     Petitioner the Commonwealth of Virginia is a sovereign State that holds exclusive jurisdiction (primacy) over the regulation of surface coal mining and reclamation operations on non-federal and non-Indian lands within its borders, except as provided in 30 U.S.C. § 1253(a). Virginia commented on what became the Final Rule through comments submitted by the Interstate Compact Mining Commission, of which Virginia is a member. Va. Code § 45.2-200 et seq.  Virginia is aggrieved by the Final Rule.  The Virginia Attorney General has authority to bring this action on behalf of the Commonwealth of Virginia. Va. Code § 2.2-513.

25.     Petitioner the Virginia Department of Energy is an agency of the Commonwealth of Virginia responsible for implementing and enforcing the Surface Mining Control and Reclamation Act of 1977 within the Commonwealth of Virginia. See Va. Code § 45.2-1000. The

Virginia Attorney General has authority to bring this action on behalf of the Virginia Department of Energy. Va. Code § 2.2-513.

26. Petitioner State of Wyoming is a sovereign State of the United States of America. The Wyoming Department of Environmental Quality ("Wyoming DEQ") is a Wyoming agency charged with implementing and enforcing the SMCRA within the State of Wyoming. *See* Wyo. Stat. Ann. § 35-11-401 *et seq*. Wyoming DEQ commented on what became the Final Rule and is aggrieved by it. Wyoming is also a member of the Interstate Mining Compact Commission, which also commented on what became the Final Rule. Bridget Hill is the Attorney General of the State of Wyoming. She is authorized by Wyoming law to sue on the State's behalf. *See* Wyo. Stat. Ann. § 9-1-603. Her offices are located at 109 State Capitol, Cheyenne, Wyoming.

27. Respondent Deb Haaland is the Secretary of the Interior and is responsible for administering the Surface Mining Control and Reclamation Act of 1977 and promulgating rules under it through the Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSMRE" or "OSM"). 30 U.S.C. § 1211(c). The Final Rule is a final agency action by the Secretary.

28. Respondent United States Department of the Interior is an agency of the United States of which OSMRE is a part. 30 U.S.C. § 1211(a).

29. Respondent Sharon Buccino is the Principal Deputy Director of OSMRE, which currently lacks a Director.

30. Respondent Glenda H. Owens is the Deputy Director of OSMRE, which currently lacks a Director.

31. Respondent Office of Surface Mining Reclamation and Enforcement is an office within the Department of the Interior and through which the Final Rule was promulgated.

## JURISDICTION AND VENUE

32.     This petition for review concerns "national rules or regulations" by the Secretary, 30 U.S.C. § 1276(a)(1), and arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, giving this Court jurisdiction under 28 U.S.C. § 1331 and 30 U.S.C. § 1276(a)(1). *See Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 707 (D.C. Cir. 2008).

## STATUTORY AND REGULATORY BACKGROUND

### I.     The Surface Mining Control and Reclamation Act of 1977 Provides for States To Obtain Exclusive Jurisdiction over Surface Coal Mining and Reclamation

33.     Congress enacted the Surface Mining Control and Reclamation Act of 1977 ("SMCRA" or "Act") to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). In establishing that program, Congress determined that, "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing" the program "should rest with the States." *Id.* § 1201(f).

34.     "[T]he Surface Mining Act establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981). "[I]n contrast to other 'cooperative federalism' statutes," however, "SMCRA exhibits extraordinary deference to the States." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293–94 (4th Cir. 2001). It provides for States with federally approved regulatory programs to assume "*exclusive* jurisdiction over the regulation of surface coal mining and reclamation operations," except as specifically provided in 30 U.S.C. §§ 1271 and 1273 and subchapter IV of Title 30, Chapter 25. 30 U.S.C. § 1253(a) (emphasis added).

13

35.     To obtain exclusive jurisdiction (or, as it is sometimes called, "primacy"), States must demonstrate that they have a "State program . . . capab[le] of carrying out" the Act and "meeting its purposes." 30 U.S.C. § 1253(a). Meeting that standard requires States to demonstrate (among other things) that they can run an effective permitting system, that they provide for sanctions for statutory and regulatory violations, and that they have "sufficient administrative and technical personnel" to regulate surface coal mining and reclamation operations. *Id.*; *see id.* § 1272. The Secretary may not approve a state program without determining "that the State has the legal authority and qualified personnel necessary for the enforcement of the environmental protection standards." *Id.* § 1253(b)(4).

36.     Once a state program has been approved, the State regulatory authority "exercises front-line supervision, and the Secretary will not intervene unless its discretion is abused." *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d 514, 523 (D.C. Cir. 1981) (en banc). For example, the State regulatory authority is responsible for issuing permits to operators, 30 U.S.C. §§ 1256, 1260; ensuring bond requirements are met by permittees, *id.* § 1259; and inspecting mining sites, *id.* § 1267(c).

## II.     Indiana, West Virginia, and Other Petitioner States Have Obtained Exclusive Jurisdiction over Surface Coal Mining and Reclamation Operations

37.     Indiana obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1983. It runs a Title IV Abandoned Mine Land ("AML") program as well, which has won numerous national and regional awards. As OSMRE's 2023 Annual Evaluation Report observed, Indiana DNR "is successfully implementing both its Regulatory and AML Programs." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Indiana for 2023, at 12, https://odocs.osmre.gov/ (select "Indiana" in States and Tribes and "2023" in Evaluation Year). Indiana DNR "administers its

program in a way that effectively protects citizens and the environment from adverse impacts resulting from surface coal mining activities." *Id*. at 13.

38.     West Virginia obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1981. Like Indiana, West Virginia also runs a successful Abandoned Mine Land Fund, which it has broadly used to reclaim and restore areas affected by past mining. OSMRE has found that West Virginia is successfully implementing its regulatory and AML programs; as relevant here, West Virginia DEP "generally takes appropriate action when it observes a violation," largely obviating the need for OSMRE to issue the sort of Ten-Day Notices implicated by the Final Rule.  2022 West Virginia Department of Environmental Protection Annual Evaluation Report, at 18, https://odocs.osmre.gov/ (select "West Virginia" in States and Tribes and "2022" in Evaluation Year).  OSMRE and West Virginia have also signed a performance agreement explaining how OSMRE will continue to assist and provide limited oversight to West Virginia DEP in administering the program in 2024 and 2025.

39.     Alabama obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1981. Alabama also runs a successful Abandoned Mine Land Fund through the Alabama Department of Labor, a sister state agency to ASMC. In its 2023 Annual Evaluation Report, OSMRE found "that the ASMC and ADOL are successful in implementing both regulatory and AML programs." 2023 Annual Evaluation Report for the Regulatory and Abandoned Mine Land Programs Administered by the State of Alabama at 13, https://odocs.osmre.gov (select Alabama in State and Tribes and "2023" in Evaluation Year). OPMRE further found that "The ASMC continues to ensure all lands are successfully reclaimed that are affected by surface mining operations" prior to releasing bond liability after operations. *Id.* at 20.

40.     Alaska obtained exclusive jurisdiction over surface coal mining and reclamation operations in or about 1983. Like other petitioners, Alaska runs both a successful Coal Regulatory Program and a successful Abandoned Mine Land Reclamation Program, which it has broadly used to reclaim and restore areas affected by past mining.  OSMRE has found that Alaska is successfully implementing both its regulatory and AML programs. As stated in OSMRE's 2023 Annual Evaluation Report for the Regulatory Program Administered by The Alaska Division of Mining Land and Water (DMLW): "Once again, OSMRE finds that DMLW is successful in implementing its regulatory program." Further, as stated in OSMRE's 2023 Annual Evaluation Report for the Abandoned Mine Land Program Administered by the State of Alaska: "Overall, OSMRE finds that AAMLRP is successfully implementing its approved AML program, continues to reclaim high priority AML problems, provides effective stewardship of grant funds, and maintains open and productive lines of communication and cooperative relationships." For both reports, *see* https://odocs.osmre.gov/ (select "Alaska" in States and Tribes and "2023" in Evaluation Year).

41.     Kentucky obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1982. It also runs a Title IV AML program. As OSMRE's 2023 Annual Evaluation Report observed, Kentucky DNR's "implementation of its regulatory program continues to support the intent of SMCRA." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Kentucky for 2023, at 5, https://odocs.osmre.gov/ (select "Kentucky" in States and Tribes and "2023" in Evaluation Year). It also observed that OSMRE issued no ten-day notices to Kentucky DNR in 2023 as a result of any citizen complaints that Kentucky DNR received. *Id.* at 7.

42.     Montana's program was determined by the Secretary to be "capable of carrying out" SMCRA and "meeting its purposes."  30 U.S.C. § 1253(a); *see id.* § 1253(b)(4). In 1980, the

Case 1:24-cv-01665-ABJ   Document 1   Filed 06/07/24   Page 17 of 51

Montana Program was approved, and Montana assumed primacy for the regulation of coal mining and reclamation operations on non-Federal and non-Indian lands within its borders. OSMRE's most recent report, evaluation year 2023, on Montana's program confirmed Montana had no regulatory program problems and found Montana "takes citizen complaints seriously."   In all instances, OSRME found "Montana DEQ appropriately responded to complainants in a timely manner consistent with applicable rules" (p. 12, https://odocs.osmre.gov/ (select "Montana" in States and Tribes and "2023" in Evaluation Year).

43.     North Dakota similarly obtained jurisdiction over surface coal mining and reclamation operations in 1980.  "With that approval, the State of North Dakota assumed primary authority for regulating surface mining activities within the State.  The North Dakota Public Service Commission, through the Reclamation Division, administers the permanent regulatory program."  Annual Regulatory Performance Agreement for the North Dakota Public Service Commission Reclamation Program for Evaluation Year 2023 at 1, https://odocs.osmre.gov/ (select "North Dakota" in States and Tribes and "2023" in Evaluation Year).

44.     Ohio obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1982. *See S. Ohio Coal Co. v. Off. of Surface Min., Reclamation & Enf't, Dep't of Interior*, 20 F.3d 1418, 1421 (6th Cir. 1994). It also runs an Abandoned Mine Land program that successfully reclaimed 4,403 acres in 2023. Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the Department of Natural Resources and Division of Mineral Resources Management of Ohio for 2023, at 14, https://odocs.osmre.gov/ (select "Ohio" in States and Tribes and "2023" in Evaluation Year).  OSMRE also found that Ohio "manages the State's AML Program effectively", "reviews and monitors contractor performance on a regular basis to ensure that projects meet the goals and objectives of the AML Program", and

"[r]outinely … coordinates AML projects with" federal, "state, county, and regional agencies." *Id.* at 26.

45.     The Railroad Commission of Texas ("RRC") has assumed, pursuant to the SMCRA, "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations in the state[.]" Tex. Nat. Res. Code § 134.002.  In this role, the RRC protects the state's public health and safety, environment, and natural resources through the oversight and regulation of exploration, mining, and reclamation activities in Texas. *Id.* at § 134.003. Similar to other Petitioner States, Texas—through the RRC's Surface Mining and Reclamation Division—also runs a successful Abandoned Mine Land Fund that has reclaimed 2,768 acres of abandoned surface mines and closed 426 dangerous abandoned underground mine openings as of early 2018. OSMRE has found that Texas, through the RRC, is administering its regulatory and AML programs "in accordance with the state statute and regulations as approved by the Secretary of the Interior" and observed zero violations at the nine joint oversight inspections conducted in 2023.  2023 Texas Annual Evaluation Report, at i, 30 https://odocs.osmre.gov/ (select "Texas" in States and Tribes and "2023" in Evaluation Year); *see also id.* at 11 ("Information gathered from [the inspections] shows how well Texas' program is ensuring environmental protection, reclamation success, and prevention of off-site impacts."). Texas has not received a ten-day notice from OSMRE since 2013. Further, as recently as October 2023, Texas has worked collaboratively with OSMRE to revise its existing abandoned mine land reclamation plan and regulations in response to requests from OSMRE. 88 Fed. Reg. 64810. These successes highlight the unnecessary nature of the Final Rule.

46.     Utah obtained exclusive jurisdiction over surface coal mining and reclamation operations in 1981. Like Indiana and West Virginia, Utah also runs a successful Abandoned Mine Reclamation Program, which it has broadly used to reclaim and restore areas affected by past

mining. OSMRE has found that Utah is successfully implementing its regulatory and AMR programs. As relevant here, Utah DNR "continues to effectively administer its approved program, achieving the regulatory, reclamation, and public and environmental protection goals of the Surface Mining Control and Reclamation Act of 1977 (SMCRA)." Annual Evaluation Report for the Coal Regulatory Program Administered by the Utah Division of Oil, Gas and Mining for 2023, at 2, https://odocs.osmre.gov/ (select "Utah" in States and Tribes and "2023" in Evaluation Year). "2023 marks the 42nd year since the State of Utah achieved primacy under SMCRA. The maturation of the program has helped protect the public and minimize environmental impacts within the Utah coalfields. Over the past year OSMRE monitored [Utah DNR's] performance in meeting the goals and objectives of the approved Utah program. Once again, OSMRE finds that [Utah DNR] is successfully implementing its approved program." *Id.* at 9.

47.     Virginia regained primacy over the regulation of surface coal mining and reclamation operations in 1981.  Virginia also runs a successful Abandoned Mine Reclamation Fund, which it has broadly used to reclaim and restore areas affected by past mining.  OSMRE has found that Virginia is successfully implementing its regulatory and AML programs; as relevant here, the Virginia Department of Energy "generally takes appropriate action when it observes a violation," largely obviating the need for OSMRE to issue the sort of Ten-Day Notices implicated by the Final Rule. 2023 Virginia Annual Evaluation Report, at 23 (select "Virginia" in States and Tribes, and "2023" in Evaluation Year, and "Annual Evaluation Reports" under Category). OSMRE and the Virginia Department of Energy have also signed a performance agreement explaining how OSMRE will continue to assist and provide limited oversight to the Virginia Department of Energy in administering the program in 2024 and 2025.

48.     Wyoming obtained exclusive jurisdiction over surface coal mining and reclamation operations on November 26, 1980. Like West Virginia and Indiana, Wyoming runs a Title IV Abandoned Mine Land program as well, which reclaims and restores areas affected by past abandoned mines. As OSMRE's 2023 Annual Evaluation Report observed, Wyoming DEQ "continues to administer an efficient and successful AML program as set forth in Section 102 of SMCRA." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Wyoming for 2023, at 10, https://odocs.osmre.gov/ (select "Wyoming" in States and Tribes and "2023" in Evaluation Year).

## III.    The Act's Provisions for Oversight of State Regulatory Authorities

49.     In Indiana, West Virginia, and other States with exclusive jurisdiction over surface coal mining and reclamation operations, the Secretary retains an oversight role. SMCRA gives the Secretary authority to conduct inspections and to obtain records "to evaluate the administration of approved State programs." 30 U.S.C. § 1267(a)–(b). SMCRA also gives the Secretary a role in responding to reports of potential violations, as outlined in Section 521 of SMCRA.

50.     Section 521(a) "addresses individual violations by a specific permittee." *Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1232 (10th Cir. 2013). It provides that, "[w]henever, on the basis of any information available to him, including receipt of information from any person, the Secretary has reason to believe that any person is in violation of any requirement of this chapter or any permit condition required by this chapter, the Secretary shall notify the State regulatory authority." 30 U.S.C. § 1271(a)(1). "Person" is defined as any "individual, partnership, association, society, joint stock company, firm, company, corporation, or other business corporation." *Id.* § 1291(19); *see id.* § 1291(22), (26) (providing separate definitions for "regulatory authority" and for "State regulatory authority").

20

51.     Receipt of a Section 521(a) notice from the Secretary triggers an obligation for the State regulatory authority to "take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary" within 10 days. 30 U.S.C. § 1271(a)(1). Notices that result in a federal inspection must "set forth with reasonable specificity the nature of the violation and the remedial action required, the period established for abatement, and a reasonable description of the portion of the surface coal mining and reclamation operation to which the notice . . . applies." *Id.* § 1271(a)(5).

52.     If the State regulatory authority fails to take adequate action or show good cause, the Secretary must order a "Federal inspection of the surface coal mining operation at which the alleged violation is occurring unless the information available to the Secretary is a result of a previous Federal inspection of such surface coal mining operation." 30 U.S.C. § 1271(a)(1). "The ten-day notification period" is waived only if "the person informing the Secretary provides adequate proof that an imminent danger of significant environmental harm exists and that the State has failed to take appropriate action." *Id.* If a federal inspection is carried out, the complainant has a right to "accompany the inspector during the inspection." *Id.*

53.     Section 521(b) provides a different enforcement route for situations in which "the Secretary has reason to believe that violations of all or any part of an approved State program result from a failure of the State to enforce such State program or any part thereof effectively." 30 U.S.C. § 1271(b). In that situation, the Secretary must, "after public notice and notice to the State, hold a hearing thereon in the State within thirty days of such notice." *Id.* "If as a result of said hearing the Secretary finds that there are violations and such violations result from a failure of the State to enforce all or any part of the State program effectively, and if he further finds that the State has not

adequately demonstrated its capability and intent to enforce such State program," the Secretary must take over responsibility for enforcing permit conditions and issuing permits. *Id.*

## IV.     The Secretary's Prior Implementation of Section 521

54.     The Secretary, acting through OSMRE, originally promulgated regulations regarding ten-day notices and state regulatory program issues in 1979. 44 Fed. Reg. 14902 (Mar. 13, 1979). Under the original regulations, the provisions addressing ten-day notices provided for federal inspections of mining sites for a potential violation if the state regulatory program failed to act or show good cause after receiving the ten-day notice from OSMRE. *Id.* at 15459. The regulations did not provide for ten-day notices to be issued in response to complaints about permitting decisions or other issues related to State regulatory authorities' administration of programs. *See id.* at 14902, 14943 (reference to provisions in 30 C.F.R. Part 733 that allow for revisions to permits in the event the federal authorities takeover a state regulatory program); *id.* at 15299–15300 (discussion regarding comments raised related to citizens participating in inspections at mine sites as result of complaint and need for federal inspector to obtain a warrant prior to inspection).

55.     Later amendments maintained that distinction between ten-day notices and programmatic issues. *See, e.g.*, 47 Fed. Reg. 35620, 35628 (Aug. 16, 1982) (changes to the regulations to provide for persons submitting a complaint or request for inspection to OSMRE to also contact the State regulatory authority prior to or in conjunction with the submission to OSMRE); 53 Fed. Reg. 26728, 26730, 26734 (July 14, 1988). As the Secretary explained in 2007, "Congress did not intend for OSM to second guess a State's permitting decisions." 72 Fed. Reg. 68000, 68025 (Dec. 3, 2007). "Instead, the Secretary of the Interior's ultimate power over a State's lax implementation of its permitting provisions is set out in section 521(b) of the Act. The

Secretary's power under section 521(b) includes taking over an entire State permit-issuing process." *Id.* (internal citations omitted). Absent a federal takeover, however, "permit decisions and any appeals are solely matters of the state jurisdiction in which OSM plays no role." *Id.* (internal citation omitted).

56.    In providing that explanation, the Secretary observed that OSM had previously declined to conduct a federal inspection "where the citizen's group was dissatisfied with a State regulatory authority's decision to issue a coal mining permit." 72 Fed. Reg. at 68024. In a 2005 letter from the Assistant Secretary, OSM had explained that inspecting a state-issued permit would be contrary to law: "'OSM intervention at any stage of the state permit review and appeal process would in effect terminate the state's exclusive jurisdiction over the matter and [would frustrate SMCRA's] careful and deliberate statutory design.'" *Id.*

57.    In a 2020 rule designed to clarify regulations relating to ten-day notices (the "2020 Rule"), the Secretary again emphasized that ten-day notices relate to violations rather than issues with the administration of state permitting programs. As the Secretary explained, "Congress differentiated these site-specific enforcement actions [taken under 30 U.S.C. 1271(a)] from the type of actions that OSMRE may take under the State regulatory program enforcement provisions of 30 U.S.C. 1271(b), which are aimed at ensuring that a State regulatory authority is properly enforcing its approved State program." 85 Fed. Reg. 75150, 75151 (Nov. 24, 2020) (Exhibit 2).

58.    The 2020 Rule also clarified a variety of procedures relating to ten-day notices to protect state primacy and to ensure the efficient resolution of complaints. Relevant here, the 2020 Rule directed citizens submitting complaints to contact the State regulatory authority before OSMRE, explaining that "including a State regulatory authority early in the process is advantageous to both the State regulatory authority and OSMRE because it reduces duplicative

efforts to address potential violations." 85 Fed. Reg. at 75157. "In OSMRE's experience," the Secretary stated, "when a citizen first contacts the State regulatory authority, violations are often promptly and effectively resolved without OSMRE's direct involvement." *Id.*

59.     The 2020 Rule also made clear that OSMRE should consider information that is "readily" available to it, including information from the State regulatory authorities before issuing a ten-day notice. 85 Fed. Reg. at 75151. Again, experience had taught the Secretary that considering information readily available from State regulatory authorities—the authorities that "know[] [their] specific permits best"—would foster a more efficient and effective enforcement process. *Id.* at 75157–58. The Secretary cited an example in which failing to consider readily available information from a State regulatory authority had led to wasteful and duplicative efforts. "[H]ad the State regulatory authority provided all 'readily available information' to OSMRE up front, both OSMRE and the State regulatory authority could have better understood the alleged violations, cooperated effectively, and spent valuable time and resources addressing the alleged violations and not simply generating duplicative paperwork." *Id.*

60.     The 2020 Rule also clarified what would constitute taking "appropriate action" in response to a ten-day notice and showing "good cause" for failing to redress the complaint within that time. 30 U.S.C. § 1271(a)(1). Under the 2020 Rule, a State regulatory authority could demonstrate good cause by showing that it "has initiated an investigation into a possible violation and as a result has determined that it requires a reasonable, specified additional amount of time to determine whether a violation exists." 85 Fed. Reg. at 75190–91. In recognition that investigations are "often complicated and fact-specific," the 2020 Rule declined to impose an upper limit on what constitutes a "reasonable time." *Id.* at 75178. Instead, the 2020 Rule permitted OSMRE to use its

discretion to "determine how long the State regulatory authority should reasonably be given to complete its investigation of the possible violation." *Id.* at 75191.

61.     The 2020 Rule also provided further details on how the process to address regulatory issues or take over a state program should be accomplished including by establishing action plans for "early identification and corrective action to address" regulatory issues in state programs. 85 Fed. Reg. at 75151. In recognition that "citizens sometimes identify State regulatory program issues in citizen complaints under section 521(a)," the 2020 Rule provided that an "appropriate action" by a State regulatory authority in response to a ten-day notice could be to propose a "corrective action plan[] to address State regulatory program issues." *Id.* at 75183. It provided for a 180-day window between the identification of a state programmatic regulatory issue and the development of an action plan. *See id.* at 75184.

**IV.     The Secretary Issues the Final Rule**

62.     On April 25, 2023, a little more than two years after the Secretary issued the 2020 Rule, the Secretary proposed an overhaul of regulations relating to ten-day notices. 88 Fed. Reg. 24944 (Apr. 25, 2023) (Exhibit 3). The Secretary cited "SMCRA's legislative history" and "experience implementing the rule for more than two years." *Id.* at 24946. That proposed ruling making culminated in the Final Rule challenged in this petition. 89 Fed. Reg. 24714 (Apr. 9, 2024).

63.     The new rule reverses course and amends the ten-day notice regulations to permit OSMRE to issue a notice to a state program for a programmatic issue, rather than the historic use of ten-day notices for potential violations at mining sites. Specifically, the Final Rule amends the definition of "state regulatory program issue" to state that "[s]tate regulatory program issues will be considered as possible violations and will initially proceed, and may be resolved" using the ten-day notice procedures outlined in 30 C.F.R. Part 842. 89 Fed. Reg. at 24734 (codified at 30 C.F.R.

§ 733.5). According to the Final Rule, a State regulatory authority may now be considered a "person" capable of violating Section 521(a). *Id.* at 24716. This change means that anything that OSMRE historically would have addressed under Section 521(b) and its implementing regulations in Part 733 can now be addressed through a ten-day notice to the State regulatory authority under Section 521(a) and implementing regulations in Part 842. According to the Secretary, a ten-day notice now may be issued for "all violations, including permit defects." 89 Fed. Reg. at 24716.

64.     While expanding the category of actions subject to ten-day notices to include actions taken by State regulatory authorities, the Final Rule simultaneously calls for OSMRE to disregard potentially important information that can be readily obtained from them. The Final Rule "limits" what OSMRE will consider in determining whether it has "reason to believe" that a potential violation has occurred to (1) the citizen complaint; (2) the information in OSMRE's files at the time OSMRE is made aware of the potential violation; and (3) publicly available electronic information. 89 Fed. Reg. at 24715, 24724 (codified at 30 C.F.R. §§ 842.11(b)(1)(i) and 842.11(b)(2)). The Final Rule eliminates the provision of the 2020 Rule that authorized consideration of information that could be readily obtained from a State regulatory authority. It now requires OSMRE to issue a ten-day notice *before* considering any information that could be readily obtained from a State regulatory authority, even if that information would "definitively disprove the existence of a violation." *Id.* at 24715.

65.     Under the Final Rule, moreover, citizens submitting complaints are no longer required to notify the State regulatory authority about a potential violation before contacting OSMRE or to explain why the citizen believes that the State regulatory authority has not taken appropriate action. 89 Fed. Reg. at 24717–18. Although the Final Rule concedes that State regulatory authorities are "more acquainted with conditions on the ground for permits that [they]

ha[ve] issued" and are "typically in the best position to quickly determine and, if necessary, act on the merits of a citizen complaint," it allows citizens to skip over State regulatory authorities. *Id.* at 24718. "[A]ll citizen complaints will be considered as requests for a Federal inspection." *Id.*

66.     Despite requiring all complaints to be construed as requests for a Federal inspection, the Final Rule curtails how State regulatory authorities may respond. Under Section 521(a), a State regulatory authority must take "appropriate action" within ten days or show "good cause" for failing to do so. 30 U.S.C. § 1271(a)(1). The Final Rule redefines "appropriate action" to eliminate one of the ways in which State regulatory authorities could respond under the 2020 Rule. 89 Fed. Reg. at 24718–19. Specifically, it provides that an appropriate action no longer "include[s] OSMRE and the State regulatory authority immediately and jointly initiating steps to implement corrective action to resolve any issue that the authorized representative and applicable Field Office Director identify as a State regulatory program issue as defined in 30 CFR part 733."

67.     Instead, the Rules insert similar language in 30 C.F.R. § 842.11(b)(1)(ii)(B)(4)'s examples of what constitutes "good cause" for a regulatory body to not take action in response to a ten-day notice while also including a 30-day time limit for a State to complete any investigation into a potential violation for a showing of "good cause" with discretion to extend the time to 90 days for complex cases. 89 Fed. Reg. at 24717, 24731. The Final Rule also states that OSMRE will execute an action plan within 60 days of identification of a state programmatic regulatory issue and a 365-day limit for the completion of all actions required in the plan. *Id.* at 24731. This change means that a State could be required to address the same issue through the ten-day notice procedure under Part 842 and an action plan under Part 733 of 30 C.F.R.

V.      **The Administrative Procedure Act**

68.     The APA governs the process by which an agency can adopt a rule through notice and comment rulemaking, among other provisions. 5 U.S.C. § 551, et seq.

69.     The APA requires a notice of proposed rulemaking to include the terms of substance of the proposed rule or a description of the subjects and issues involved, including data relied upon by the agency in proposing a new rule. *See* 5 U.S.C. § 553.

70.     When proposing a rule, the agency must provide an explanation of the evidentiary and technical basis for the rule "in a form that allows for meaningful comment." *Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1181 (D.C. Cir. 1994). Thus, OSMRE must provide the information it relied on in drafting the Final Rule.

71.     This requirement provides the public with the opportunity to offer meaningful comment during the rulemaking process and holds the agency accountable by revealing the reasoning behind proposing the rule.

72.     If a reviewing court finds that the agency's action is arbitrary or capricious, unconstitutional, in excess of statutory authority, or without observance of procedure required by law, the APA dictates that the court must set aside such action. 5 U.S.C. § 706(2).

**THE FINAL RULE'S ADVERSE IMPACTS ON PETITIONERS**

73.     The Final Rule adversely impacts Petitioners, inflicting irreparable harm on them. First, the Final Rule allows federal actors to intrude into areas over which SCMRA gives States exclusive jurisdiction. It subjects state programs and state permitting and bonding decisions to ten-day notices, subordinating state decisionmaking processes to federal oversight and circumventing the statutory processes for a federal takeover of state programs in Section 521(b). The Final Rule, moreover, erodes state primacy in countless other ways, including by allowing citizens to bypass

State regulatory authorities and giving State regulatory authorities no opportunity to provide important information that could eliminate the need for a ten-day notice. Through and through, the Final Rule reflects a conviction that OSMRE—not State regulatory authorities—should have a leading role in addressing citizen complaints. It inflicts irreparable sovereign injury.

74.     Second, the Final Rule will increase burdens on State regulatory authorities in multiple ways. By subjecting more aspects of state programs to ten-day notices, preventing consideration of information from State regulatory authorities, and removing requirements to contact State regulatory authorities before OSMRE, the Final Rule threatens to increase the number of ten-day notices issued to State regulatory authorities. For example, under the Final Rule, nothing prevents out-of-state complainants with no firsthand knowledge of mining operations in a State from challenging state permitting decisions and prompting the issuance of ten-day notices.

75.     The Final Rule removes requirements that decrease wasteful and duplicative efforts as well, such as provisions that direct citizens contact State regulatory authorities in the first instance and that authorize OSMRE to consider readily available information from State regulatory authorities. Under the Final Rule, State regulatory authorities will be required to devote time and resources to responding to notices on compressed timetables that could have been more efficiently resolved under the 2020 Rule. Responding to additional ten-day notices will inflict irreparable harm on Petitioners, requiring them to increase their expenditure of time and resources.

76.     Third, the Final Rule reduces the flexibility that States need in investigating, evaluating, and redressing complaints. It imposes accelerated, arbitrary timelines on State regulatory authorities while subjecting OSMRE to no corresponding deadlines for evaluating citizen complaints and responses to ten-day notices from State regulatory authorities, ensuring that States—not OSMRE—bear the brunt. The Final Rule then exacerbates the issue by disallowing

use of state action plans as a permissible way to redress issues resulting from systematic programmatic issues, depriving State regulatory authorities of the 2020 Rule's protections.

77.     Fourth, the changes wrought to the Final Rule will adversely impact States, their industry, and their citizens. Subjecting individual permit decisions to ten-day notices will inevitably lead to permitting delays that could last months or years. Permit delays in turn will impact coal mining operations, risking making those operations inefficient or uneconomic. That would be contrary to Congress's determination that a healthy coal mining industry is essential to the "economic well-being, security, and general welfare of the Nation." 30 U.S.C. § 1201(j).

78.     A stay of the Final Rule would not adversely affect the public health or safety or cause significant imminent environmental harm. To approve programs in the Petitioner States, the Secretary had to determine that the programs are "capab[le] of carrying out" SMCRA and "meeting its purposes." 30 U.S.C. § 1253(a); *see id.* § 1253(b)(4). Petitioners have proven themselves capable of carrying out and meeting the purposes of SMCRA. And the facts on the ground have confirmed that States are effectively carrying out SMCRA's objectives.

79.     For example, OSMRE's most recent report on Indiana's program confirms the Indiana program's effectiveness. It observes that Indiana DNR "administers its program in a way that effectively protects citizens and the environment from adverse impacts resulting from surface coal mining activities." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Indiana for 2023, at 13, https://odocs.osmre.gov/ (select "Indiana" in States and Tribes and "2023" in Evaluation Year). Indiana has not received a ten-day notice from OSMRE since 2016.

80.     Likewise, OSMRE reports (in its most recent evaluation of West Virginia DEP's program, covering July 2021 through June 2022) that West Virginia DEP investigated 200 citizen

complaints within two days of receipt of the complaint and another 390 Abandoned Mine Lands-related citizen complaints within two days of receipt. WVDEP achieved a 99% success rate in its role as inspector of permits for both partial and complete inspection requirements. For all violations encountered by OSMRE, the agency found that "[t]he WVDEP took appropriate action regarding all violations." And OSMRE found that West Virginia DEP's program is meeting the overarching goal of SMCRA in "effectively fostering reclamation success on lands impacted by surface coal mining." West Virginia DEP is also party to a Performance Agreement for Evaluation Years 2024 and 2025 with OSMRE. This Performance Agreement sets out a cooperative framework for OSMRE to discharge its oversight responsibilities that does not involve the radical departure from OSMRE's statutorily cabined role present in the Final Rule. The Performance Agreement includes provisions and commitments by OSMRE's Charleston, West Virginia Field office and West Virginia DEP "to continuously interact[] with citizen, environmental, and industrial organizations."

81.     Likewise, OSMRE's most recent report on Kentucky's program confirms its effectiveness. The report was clear that Kentucky DNR's "implementation of its regulatory program continues to support the intent of SMCRA." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Kentucky for 2023, at 5, https://odocs.osmre.gov/ (select "Kentucky" in States and Tribes and "2023" in Evaluation Year). In fact, in 2023, despite Kentucky DNR receiving 448 new citizen complaints alleging a violation, OSMRE issued zero ten-day notices to Kentucky DNR. *Id.* at 7. And since the 2020 Rule required OSMRE to consider information from the State regulator, Kentucky DNR has received an average of only 0.6 ten-day notices per year.

82.     OSMRE's most recent report on Louisiana's program confirms the Louisiana program's effectiveness. It observes that "[t]his year marks the 43rd anniversary of the primacy program and the 37th anniversary of the AML program in the State of Louisiana. This year also marks the 33rd anniversary of Louisiana certifying that all coal/lignite related AML problems were reclaimed with concurrence by the OSMRE. The maturation of the program has helped protect the public and minimize environmental impacts within the Louisiana coalfields." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Programs Administered by the State Regulatory Authority of Louisiana for 2023, OSMRE, at 9, available at https://odocs.osmre.gov/ (select "Louisiana" in States and Tribes and "2023" in Evaluation Year). OSMRE further stated that "[o]ver the past year, the OSMRE monitored the LOC's performance in meeting the goals and objectives of the approved State program. Once again, the OSMRE finds that the LOC is successful in implementing both its regulatory and AML programs." *Id.* Furthermore OSMRE found that "[t]he LOC met the permitting process challenges in an effective and timely manner. The LOC continues to successfully administer its regulatory program and historically meets the mine inspection frequency for each operation as specified in the Louisiana Surface Mining Regulations. Conditions on the mine sites were adequately documented during these inspections. The LOC continues to be effective in protecting the environment and public from off-site impacts resulting from surface coal mining and reclamation operations." *Id.* at 10. Finally, Louisiana cannot find record of having ever received a ten-day notice from OSMRE and knows it has not received a ten-day notice from OSMRE since at least 2016.

83.     Similarly, OSRME views North Dakota as having "an effective program with no issues in need of corrective action." Annual Evaluation Summary Report for the North Dakota Public Service Commission Regulatory Program for Evaluation Year 2023 at i, *see also id.* at 8-9

("The NDPSC staff continues to implement the program in a professional, cooperative, and fair manner … The NDPSC has the necessary technical expertise for carrying out its functions to ensure that all the requirements of SMCRA are met."); *id.* at 20 ("No Ten-Day Notices (TDNs) or Cessation Orders (COs) were issued by the OSMRE during EY2023"), https://odocs.osmre.gov/ (select "North Dakota" in States and Tribes and "2023" in Evaluation Year).

84.     OSMRE's 2023 report on Ohio's program also confirms that Ohio's program is "capable of carrying out" SMCRA and "meeting its purposes." 30 U.S.C. § 1253(a); see id. § 1253(b)(4). The report notes that Ohio "manages the State's AML Program effectively" and takes measures "to ensure projects meet the goals and objectives of the AML Program." Annual Evaluation Report for the Regulatory and Abandoned Mine Land Program Administered by the Department of Natural Resources and Division of Mineral Resources Management of Ohio for 2023, at 14, https://odocs.osmre.gov/.

85.     Similar to Indiana, OSMRE's most recent report on Utah's program confirms the Utah program's effectiveness. OSMRE states that Utah DNR "continues to effectively administer its approved program, achieving the regulatory, reclamation, and public and environmental protection goals of the Surface Mining Control and Reclamation Act of 1977 (SMCRA)." Annual Evaluation Report for the Coal Regulatory Program Administered by the Utah Division of Oil, Gas and Mining for 2023, at 2, https://odocs.osmre.gov/ (select "Utah" in States and Tribes and "2023" in Evaluation Year). Moreover, as if 2023, OSMRE has found that "[Utah DNR] is successfully implementing its approved program." *Id*. at 9. Utah has not received a ten-day notice from OSMRE since 2016.

86.     OSMRE's most recent report on Virginia's program confirms the Virginia program's effectiveness as well. It observes that the Virginia Department of Energy "generally

33

takes appropriate action when it observes a violation." 2023 Virginia Annual Evaluation Report, at 23 (select "Virginia" in States and Tribes, and "2023" in Evaluation Year, and "Annual Evaluation Reports" under Category). The Virginia Department of Energy has not received a ten-day notice from OSMRE since August 21, 2018.

## CAUSES OF ACTION

### Count 1 – The Final Rule's Extension of Ten-Day Notices to Complaints Concerning State Regulatory Programs, Permitting Decisions, and Similar Issues Is Contrary to Law

87.     Petitioners adopt by reference the previous paragraphs.

88.     The Final Rule is contrary to law. As described above, SMCRA Section 521(a) provides for the issuance of ten-day notices in response to site-specific violations by operators. Ten-day notices can only issue if a "person is in violation of any requirement of this chapter or any permit condition required by this chapter." 30 U.S.C. § 1271(a)(1). "Person" does not include State regulatory authorities. *Id.* § 1291(19). A ten-day notice cannot be issued if OSMRE believes that a State regulatory authority is potentially committing a violation, including by granting permits with alleged defects or allegedly making improper bonding determinations.

89.     Section 521(a) also makes clear, ten-day notices are only appropriate for the types of alleged violations that can be detected by a physical "Federal inspection of the surface coal mining operation at which the alleged violation is occurring." 30 U.S.C. § 1271(a)(1). That text precludes the use of ten-day notices to address systemic issues with state regulatory programs, alleged defects in permitting and bonding decisions made by State regulatory authorities, and similar state-level issues. Alleged violations that inhere in permitting paperwork issued by State regulators before mining has started cannot be observed by physically inspecting a mining site.

90.     By contrast, Section 521(b) provides a distinct path for addressing programmatic issues with the state regulatory programs. That provision is directed at situations in which the

Secretary has "reason to believe that violations of all or any part of an approved State program result from the failure of the State to enforce such State program or any part thereof effectively." 30 U.S.C. § 1271(b). It provides specific procedural steps that the Secretary must follow to withdraw from States their exclusive regulatory authority over the permitting process. *See id.* The Secretary does not have the authority to create new steps for addressing state regulatory program issues or circumvent the processes Congress established for withdrawing permitting authority.

91.    If a ten-day notice is issued for a potential permit defect during the permitting process, then the State would be engaging in the process of responding to the ten-day notice while the permit may continue to be addressed through the administrative and judicial review process available pursuant to state regulations. This transforms the Secretary and OSMRE from an oversight role to a co-regulator with the State regulatory body, derogating Congress's decision to vest "exclusive jurisdiction" with the States except as specifically provided elsewhere in SMCRA. 30 U.S.C. § 1253(a). The Secretary's determination that possible defects in permits issued by the State regulatory body would be subject to ten-day notices is contrary to law.

**Count 2 – The Final Rule's Extension of Ten-Day Notices to Complaints Concerning State Regulatory Programs, Permitting Decisions, and Similar Issues Is Arbitrary and Capricious**

92.    Petitioners adopt by reference the previous paragraphs.

93.    The Secretary's decision in the Final Rule to make systematic issues with state programs, permitting issues, and other program-level issues the basis for a ten-day notice constitutes a reversal of years of regulation. For example, in 2007, the Secretary took the position that SMCRA does not allow federal authorities to "second guess a State's permitting decisions," citing a 2005 letter in which the Assistant Secretary stated that in a "primacy state, permit decisions and any appeals are solely matters of the state jurisdiction in which OSM plays no role." 72 Fed. Reg. at 68025. Similarly, in 2020, the Secretary clarified that only "site-specific enforcement

actions" may be addressed through the ten-day notice program. 85 Fed. Reg. at 75151. Section 521(b)'s separate standard, the Secretary explained, is aimed at ensuring "a State regulatory authority is properly enforcing its approved State program." *Id.* Quite simply, the Secretary has recognized that permitting and site-specific *enforcement* are distinct processes.

94.     In the Final Rule, the Secretary does not articulate a reasonable explanation for her sudden change of position. The Final Rule relies on the position that ten-day notices are an exception to the exclusive jurisdiction of state regulatory programs. 89 Fed. Reg. at 24719. This assertion ignores that any exception is limited by Section 521's text.

95.     The Final Rule, moreover, does not provide a reasoned explanation for how the Secretary's newfound position "best comport[s] with SMCRA." 89 Fed. Reg. at 24721. SMCRA requires the approved State regulatory body to issue permits and provide an administrative process for review of those decisions. It does not provide for federal second-guessing of permitting.  And the Secretary has not suggested that current problems in the way the system is presently administered justify a complete reconfiguration of the States' roles—even if the SMCRA allowed for it.

96.     As discussed above, Section 521(a) addresses the ten-day notice program to alleged violations by a "person" that can be identified with a physical inspection of a specific mining site. The Final Rule does not grapple with those requirements. In fact, the Final Rule rewrites the statutory definition of "person" by stating that a "person" can include the State regulatory authority administrating a state program. 89 Fed. Reg. at 24716.

97.     Precedent is against the Secretary as well. The cases cited in the 2005 letter referenced by the Secretary make it clear that SMCRA provides exclusive jurisdiction to State regulatory agencies if the program is approved, including the issuance of permits. The Secretary's

new assertion that 2005 letter "goes beyond the holdings" of those cases, 89 Fed. Reg. at 24721, is simply incorrect. It ignores their reasoning.

98.    The Secretary's claim that there will be an earlier identification and resolution of issues by allowing OSMRE to use ten-day notices to address programmatic issues with a state regulatory body is an arbitrary decision that does not consider the differences between resolutions of ten-day notices for potential violations at mining sites and state programmatic issues that may include program amendments through legislative revisions or state rulemaking.

99.    The Secretary also overlooked the delays that using ten-day notices to address permitting decisions will cause and the corresponding burdens on State regulatory authorities. As commenters pointed out, discussions over permitting decisions can take months and involve the exchange of hundreds of pages of information. Subjecting permitting decisions to federal review does not serve the purpose of the ten-day notice provisions—to cause violations to be expeditiously corrected. Instead, it diverts state resources from ensuring compliance to responding to ten-day notices from OSMRE.

100.    This revision is not rational and there is no satisfactory explanation for the change in position. *See Motor Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted) ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'").

**Count 3 – The Shortened Timeframes for the Creation of Solutions for Purported Programmatic Issues and Development of an Action Plan Are Contrary to Law**

101.    Petitioners adopt by reference the previous paragraphs.

102.   As outlined above, OSMRE will be using ten-day notices and action plans simultaneously to resolve any issues related to State regulatory programs; thus, making action plans redundant.

103.   A ten-day notice will require a resolution or a plan for resolution of any violation or programmatic issue within ten days. This shortened period will not permit a State regulatory body sufficient time to even develop a solution for a possible programmatic issue.

104.   Providing States an illusory opportunity for self-correction will result in OSMRE's proposed solutions being the only option for State regulatory bodies because of the shortened timeframe to respond to a ten-day notice, which is contrary to the exclusive jurisdiction provided to State regulatory bodies pursuant to SMCRA.

105.   Moreover, the 365-day limit for completing any actions required by OSMRE in an action plan is contrary to law.

106.   The 365-day limit will not provide sufficient time for all tasks that must be completed in an OSMRE action plan depending on the circumstances of the plan, such as administrative rulemaking that may take longer than a year, potential litigation over a proposed change, or program amendments that would require a State legislature to be in session and able to pass needed legislation during that time, as well as, receiving approval of the amendments by OSMRE that has historically taken years.

**Count 4 – The Shortened Timeframes for the Creation of Solutions for Purported Programmatic Issues and Development of an Action Plan Are Arbitrary and Capricious**

107.   Petitioners adopt by reference the previous paragraphs.

108.   The Secretary provides no rationale for setting the 365-day limit for completing all tasks in an OSMRE action plan.

109.    As outlined above, the arbitrary deadline of 365 days to complete an OSMRE action plan fails to consider items that may be included in an action plan and the amount of time needed to accomplish those tasks.

110.    The Secretary acknowledges that "final resolution of an issue could exceed one year" but promulgated a Rule that still sets a 365-day deadline for completion of items in an action plan. 89 Fed. Reg. at 24717.

111.    The Secretary's proposed solution is to simply include items in the action plan that can be accomplished within a year's time; however, this can result in an incomplete action plan, or an action plan does not accomplish the necessary items to address a state regulatory programmatic issue.

112.    The Final Rule is arbitrary and capricious to include a time limitation for States to accomplish tasks that the Respondent acknowledges cannot be met for all potential items that could be included on an OSMRE action plan.

**Count 5 – The Final Rule's Prohibition on Considering Readily Available Information from State Regulatory Authorities Is Contrary to Law**

113.    Petitioners adopt by reference the previous paragraphs.

114.    The limitation of items that OSMRE can consider in determining whether it has "reason to believe" there is a potential violation to issue a ten-day notice is contrary to the law.

115.    Section 521(a) directs the Secretary to determine whether there is "reason to believe any person is in violation" on "the basis of *any information* available to him." 30 U.S.C. § 1271(a) (emphasis added). It does not preclude the Secretary from considering information readily available from State regulatory authorities.

116.    The Final Rule, however, prohibits OSMRE from obtaining and considering information from the State regulatory authorities—the very entities that would have up-to-date

39

information about the potential violation as the State regulatory authorities are required to conduct at least a partial inspection per month at permit sites.

117.   There is no textual basis for permitting consideration of some information not already in OSMRE's files, such as information from the internet, while prohibiting consideration of information that can be obtained just as easily from State regulatory authorities.

**Count 6 – The Final Rule's Prohibition on Considering Readily Available Information from State Regulatory Authorities Is Arbitrary and Capricious**

118.   Petitioners adopt by reference the previous paragraphs.

119.   The Final Rule's limitation on the information that OSMRE can use to determine whether there is "reason to believe" there is a potential violation to issue a ten-day notice is arbitrary and capricious.

120.   Previously, the Secretary determined that OSMRE should consider any information that is "readily" available to it, including information from the State regulatory authorities, before issuing a ten-day notice. 85 Fed. Reg. at 75151. Years of experience had shown that considering information from State regulatory authorities would lead to a more efficient and effective enforcement process, preventing wasteful and duplicative efforts. *Id.* at 75157–58.

121.   Although the Secretary still concedes that State regulatory authorities are "more acquainted with conditions on the ground for permits that it has issued" and may have information that "definitively disprove[s] the existence of a violation," the Final Rule arbitrarily precludes OSMRE from considering information from State regulatory authorities in determining whether there is "reason to believe" a violation exists. 89 Fed. Reg. at 42715, 42718. It instead directs OSMRE to consider what is potentially lower quality information.

122.   The Final Rule asserts that there were some occasions where it took more than 30 days for a State regulatory authority to provide information to OSMRE as the reason to limit the

items to be considered. 89 Fed. Reg. at 24715. But that rationale does not explain why OSMRE should be prohibited from considering readily available information from States when that information could provide needed information or context. And the Final Rule's purported concern over enforcement delays ignores that OSMRE has admitted responsibility for some of the delays.

123.    Nor did the Secretary adequately consider alternatives. If OSMRE had experienced delays in obtaining information from the State regulatory bodies, then it could move forward with a determination on the information that it had available or set forth an internal deadline for information. Or OSMRE could expedite the entire enforcement process by setting internal deadlines for evaluating complaints. It is arbitrary and capricious to bar any efforts to obtain information from a State regulatory authority relevant to the decisionmaking process.

**Count 7 - Eliminating the Requirement for Citizens To Notify the State and Explain Why They Believe the State Has Not Acted Is Arbitrary and Capricious**

124.    Petitioners adopt by reference the previous paragraphs.

125.    The Final Rule's elimination of the requirements that citizens notify the State regulatory body of the violation and the reason that they believe that the State has failed to act is arbitrary and capricious.

126.    As the 2020 Rule observed, the Secretary has required citizens to contact State regulatory authorities before or simultaneously with a request to OSMRE since at least 1982. 85 Fed. Reg. at 75157. That requirement reflects that, in "OSMRE's experience and based upon data acquired by 43 years of implementing SMCRA" has shown that "if citizens contact the State initially, most problems will be resolved satisfactorily without the need for intrusion by the federal government." *Id.* at 75167. In the Final Rule, however, the Secretary eliminated that longstanding requirement without giving a reasonable explanation for the change in position.

41

127.    The Secretary claims that these provisions are too burdensome to the citizens; however, it is not burdensome to share concerns about a potential violation with the State regulatory body who has exclusive jurisdiction and would be able to quickly address any issue. The citizen may submit the same information to the State regulatory authority as OSMRE. Nor, as the Secretary previously recognized, does stating why a citizen believes a State regulatory authority has failed to take appropriate action require a citizen to be versed in the law.

128.    The Secretary also asserted that there have been (unidentified) instances in which "citizens were hesitant to contact" the State regulatory authority. 89 Fed. Reg. at 24717. But the Secretary did not explain why that purported concern justifies eliminating the requirement for all citizens or why it could not be addressed by allowing citizens to articulate good cause for not contacting the State regulatory authority. The Secretary's abstract concern that some, unquantified number of citizens may be hesitant to submit a complaint to the State regulatory body is not a sufficient basis for eliminating over 40 years of precedent.

129.    The Secretary failed to consider other important factors as well. State regulatory authorities are able to most quickly and efficiently resolve citizen complaints due to their familiarity with local sites, which eliminates the need for federal intrusion. By contrast, a citizen sending information regarding a potential violation solely to the federal government will result in delay in resolving any possible violation as OSMRE will have to review the information to determine whether it has "reason to believe" that there is a potential violation and then transmit the ten-day notice to the State regulatory body. In that time, a potential violation could be corrected by the State regulatory body if the citizen had previously contacted the State.

130.    The information regarding why the citizen believes the State has failed to act would also provide beneficial information to OSMRE that can be used to determine whether there is

"reason to believe" that a potential violation exists warranting a ten-day notice and assist OSMRE in overseeing the State regulatory programs.  The Secretary could have considered alternatives to eliminating any requirement to contact the State regulatory authority about a potential violation when the goal of ten-day notices is to quickly resolve any violations.

**Count 8 – Shortened Timelines for State Regulatory Authorities To Conduct Investigations To Show "Good Cause" Is Contrary to Law**

131.    Petitioners adopt by reference the previous paragraphs.

132.    The Final Rule imposes arbitrary timelines on investigations that are contrary to law. Section 521(a) provides allows a State regulatory authority to "show good cause" for failure to take appropriate action within ten days of receiving a ten-day notice. 30 U.S.C. § 1271(a)(1). So long as the good cause standard is met, Section 521 does not require a State regulatory authority to complete its investigation and take appropriate action within a certain amount of time.

133.    By contrast, the Final Rule provides that an investigation by a State regulatory authority related to a ten-day notice should take no longer than 30 days (providing discretion to extend to 90 days for complex matters). It does not allow the timeline to be extended past the deadlines set in the Final Rule even if good cause exists.

134.    The Final Rule's across-the-board deadline for all State investigations conflicts with Congress's expressly declared intent to provide States more discretion and time depending on the specific factual circumstances of a particular potential violation.

**Count 9 - Shortened Timelines for State Regulatory Authorities To Conduct Investigations To Show "Good Cause" Is Arbitrary and Capricious**

135.    Petitioners adopt by reference the previous paragraphs.

136.    As set forth above, the Final Rule set arbitrary time limits for a State regulatory authority to conduct any investigation to show "good cause" for failure to act in response to a ten-

day notice. These arbitrary time limits fail to acknowledge that many of the potential violations, such as blasting damage, subsidence damage, or diminished quality or quantity of well water, often take much more than 90 days to conduct a thorough investigation. Other factors beyond a State regulatory authority's control may extend the timeline for an investigation as well. For instance, winter weather may impede investigations, requiring that they take place after snows have melted.

137.    Evidence must be available to substantiate any action that is taken as many enforcement actions against mining companies result in litigation through an appeal. The discretion provided to OSMRE in the 2020 Rule for determining the reasonableness of the length of an investigation was reasonable.

138.    There was no adequate rationale provided for setting the arbitrary time limit and removing the discretion previously provided. The Secretary stated the language from the previous version of the regulation "had the potential to allow violations to remain unabated for an open-ended amount of time." 89 Fed. Reg. at 24717.  The Secretary could have addressed that concern merely by probing the States' justifications for asserting good cause rather than implementing an across-the-board, inflexible time bar.

139.    There is no indication that the Secretary's concern about the potential of the previous regulation occurred during the time the regulation was in place. Without any concrete examples, it appears to be a theoretical concern. It is arbitrary and capricious to change a regulation based on a hypothetical concern when there is no showing of any delays or violations that remained unabated while the previous regulation was in effect.

**Count 10 – Eliminating Action Plans as an "Appropriate Action" Is Contrary to Law**

140.    Petitioners adopt by reference the previous paragraphs.

141.    The deletion of the second sentence from the previous version of 30 C.F.R. § 842.11(b)(1)(ii)(B)(3) detailing what constitutes an "appropriate action" under 30 U.S.C. §1271(a) by a State regulatory program in response to a ten-day notice and placing similar language in the provision related to what is considered "good cause" would mean that an action plan would not be considered "appropriate action."

142.    However, actions that a State is going to take as part of an action plan should be considered "appropriate action," as the State is taking some sort of action.

143.    OSMRE only determines whether there is "good cause" when a State fails to act, and an action plan means that there is some action by the State regulatory body.

144.    It is contrary to law to consider an action plan as "good cause" for a State regulatory body's failure to act when an action plan means the State is taking "appropriate action." The reinterpretation of plain statutory text looks to be an effort by OSMRE to subject more state action to its arbitrary "good cause" time bar.

## Count 11 – Eliminating Action Plans as an "Appropriate Action" and Imposing a 365-Day Time Limit Is Arbitrary and Capricious

145.    Petitioners adopt by reference the previous paragraphs.

146.    As stated above, the Rule moves action plans from what is considered "appropriate action" in the regulations to a provision that is used to determine whether there is "good cause" for a state's failure to act.

147.    The Secretary asserts that an action plan does not resolve violations and thus cannot be considered "appropriate action" by a State in response to a ten-day notice. 89 Fed. Reg. at 24718. This reasoning is, of course, circular because the action plans are used to resolve state regulatory program issues, which under the Final Rule are subject to ten-day notices.

45

148.    Moreover, an action plan is taking some sort of action and therefore, should be considered by OSMRE as "appropriate action," rather than as a potential "good cause" for the state's failure to act.

**Count 12 – The Final Rule's Subordination of States to the Federal Government Is Contrary to Law**

149.    Petitioners adopt by reference the previous paragraphs.

150.    As discussed above, "SMCRA exhibits extraordinary deference to the States." *Bragg*, 248 F.3d at 293–94. It provides for States with federally approved regulatory programs to assume "*exclusive* jurisdiction over the regulation of surface coal mining and reclamation operations," except as specifically provided in 30 U.S.C. §§ 1231–45, 1271 and 1273. 30 U.S.C. § 1253(a) (emphasis added).

151.    In provision after provision, however, the Final Rule seeks to subordinate State regulatory authorities to OSMRE. It allows the federal government to intrude into state permitting decisions subject to States' exclusive jurisdiction, circumvents required processes for addressing systematic issues with state programs, and gives States a second-tier role in responding to complaints. That inversion of the federal-state relationship is contrary to SMCRA's design.

152.    The Final Rule raises Tenth Amendment concerns as well. It would convert SMCRA from a federalism-first structure, by which a State voluntarily assumes regulatory responsibility, to an unconstitutional commandeering of state resources, by which state executive officers will be required to allocate time at the direction of OSM. *See Printz v. United States*, 521 U.S. 898, 925 (1997) (noting that the Court had sustained SMCRA against constitutional challenge "only after assuring ourselves that [it] did not require the States to enforce federal law.").

**Count 13 – The Secretary's Failure To Provide a Federalism Impact Statement Is Arbitrary and Capricious**

153.    Petitioners adopt by reference the previous paragraphs.

154.    Executive Order No. 13132, issued by President Clinton on August 4, 1999, addresses the way federal agencies should consider federalism issues when promulgating regulations and policies. Section 2(i) of the Executive Order provides that the federal government should be deferential to States when taking action that impacts policymaking discretion in States.

155.    Section 3(a) of the Executive Order requires that State and local officials "shall be consulted" to the extent practicable prior to any federal action that could have a substantial impact on the States. The Executive Order and the guidance issued by the Director of the Office of Management and Budget applies to federal agencies and must be addressed.

156.    SMCRA is a statute with obvious implications for the federal-state relationship. Congress created a statutorily defined system of cooperative federalism in SMCRA providing significant deference to the State regulatory bodies that are operating approved programs.

157.    Although the 2020 Rule afforded considerable respect to the federal structure mandated by SMCRA, the Final Rule subordinates State regulatory authorities to federal regulators in multiple ways. It allows the federal government to intrude into state permitting decisions subject to States' exclusive jurisdiction, circumvents required processes for addressing systematic issues with state programs, and gives States a second-tier role in responding to complaints.

158.    The Secretary's conclusory assertion that preparation of a federalism impact statement is unnecessary is arbitrary and capricious. Clearly, the Final Rule has significant impacts on the federal-state relationship to the detriment of States.

**Count 14 – The Entire Final Rule Is Procedurally Deficient, Arbitrary, and Inconsistent with SMCRA**

159.    Petitioners adopt by reference the previous paragraphs.

160.    In the Final Rule, the Department of the Interior seeks to impose by regulation a system that Congress rejected when it enacted SMCRA in 1977—one in which OSMRE would have concurrent regulatory jurisdiction with State regulatory authorities in primacy states.

161.    In the rulemaking process leading to the Final Rule, the Department of the Interior evidently conducted—at best—a pro forma march through procedural requirements that was deficient at each step of the way. In particular, the preliminary rule relies on purported and unspecified "experience" that could have been accumulated in no more than a year between the effective date of the 2020 rule and the launch of this rulemaking. It also drew on activity at the height of the COVID pandemic when government offices were operating with reduced capacity and disrupted communication pathways. It is facially absurd to abstract from delays in any administrative process in 2021 experience that might be generally applicable.

162.    The Final Rule is dismissive of consequences for federalism, regulatory flexibility, and other important measures for which analysis is required by Executive Order, but no meaningful assessment is provided.

163.    The Final Rule purports to reflect an intent for each proposed change to be severable from changes to other sections. *See* 89 Fed. Reg. at 24,733. But the Final Rule is best understood as an interrelated set of changes. To sever these provisions would upset the carefully crafted scheme of federalism that Congress enacted in SMCRA and upheld under a Tenth Amendment challenge by the Supreme Court in *Hodel v. Virginia Surface Mining and Reclamation Association*, 452 U.S. 264 (1981).

164.    The Final Rule is thus unlawful and should be in set aside its entirety.

## REQUEST FOR RELIEF

WHEREFORE, Petitioners request that the Court grant the following relief:

1.      Hold unlawful, set aside, and vacate the final rule as contrary to law and arbitrary and capricious, pursuant to 30 U.S.C. § 1276(a) and 5 U.S.C. § 706(2);

2.      Grant temporary relief staying the final rule, postponing the effective date of the final rule, and enjoining the final rule pending a final determination of this petition for review, pursuant to 30 U.S.C. § 1276(c) and 5 U.S.C. § 705;

3.      Grant any and all other such relief as the Court finds appropriate.

Respectfully submitted,

PATRICK MORRISEY
Attorney General of West Virginia

/s/ Michael R. Williams
Michael R. Williams (DC Bar No. 994953)
   Principal Deputy Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia and West Virginia Department of Environmental Protection*

THEODORE E. ROKITA
Attorney General of Indiana

/s/ James A. Barta
James A. Barta (DC Bar No. 1032613)
   Solicitor General
Betsy DeNardi*
   Special Counsel of Complex Litigation
Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6201
James.Barta@atg.in.gov
Betsy.DeNardi@atg.in.gov

*Counsel for State of Indiana and Indiana Department of Natural Resources*

STEVE MARSHALL
Attorney General of Alabama

/s/ Steven Shawn Sibley
Steven Shawn Sibley*
   Assistant Attorney General
Office of the Attorney General
State of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Shawn.Sibley@AlabamaAG.gov

*Counsel for State of Alabama and Alabama
Surface Mining Commission*


TIM GRIFFIN
Attorney General of Arkansas

/s/ Dylan L. Jacobs
Dylan L. Jacobs (DC Bar No. 1047239)
   Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*


ELIZABETH B. MURRILL
Attorney General of Louisiana

/s/ Kelsey L. Smith
Kelsey L. Smith**
   Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for State of Louisiana and Louisiana
Department of Energy and Natural Resources*

TREG TAYLOR
Attorney General of Alaska

/s/ Gilman Dana S. Burke
Gilman Dana S. Burke**
Natural Resource Section
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK  99501
(907) 269-5232
dana.burke@alaska.gov

*Counsel for State of Alaska and Alaska
Department of Natural Resources*


RUSSELL COLEMAN
Attorney General of Kentucky

/s/ Daniel J. Grabowski
Daniel J. Grabowski**
   Assistant Solicitor General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Daniel.Grabowski@ky.gov

*Counsel for Commonwealth of Kentucky*


AUSTIN KNUDSEN
Attorney General of Montana

/s/ Christian B. Corrigan
Christian B. Corrigan*
   Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
Christian.Corrigan@mt.gov

*Counsel for State of Montana*

DREW H. WRIGLEY
Attorney General of North Dakota

/s/ Philip Axt
Philip Axt**
  Solicitor General
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

/s/ Ian Lancaster
Ian Lancaster**
  Assistant Attorney General
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
(512) 463-2012
Ian.Lancaster@oag.texas.gov

*Counsel for State of Texas*

JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
Kevin M. Gallagher (DC Bar No. 1031415)
  Principal Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of Virginia and
Virginia Department of Energy*

DAVE YOST
Attorney General of Ohio

/s/ T. Elliot Gaiser
T. Elliot Gaiser (DC Bar No. 198293)
  Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

SEAN D. REYES
Attorney General of Utah

/s/ Gary T. Wight
Gary T. Wight*
  Assistant Attorney General
1594 West North Temple, Suite 300
Salt Lake City, UT 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah and Utah Department
of Natural Resources*

BRIDGET HILL
Attorney General of Wyoming

/s/ D. David DeWald
D. David DeWald**
  Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for the State of Wyoming*

* Registered per LCvR 83.2(g)
** Registration per LCvR 83.2(g) pending