# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

State of Indiana, Indiana Department of Natural Resources, State of West Virginia, West Virginia Department of Environmental Protection, et al.,

       Petitioners,

v.

Deb Haaland, in her official capacity as Secretary of the Interior, et al.,

       Respondents.

No. 1:24-cv-01665

## BRIEF IN SUPPORT OF MOTION FOR STAY/PRELIMINARY INJUNCTION

PATRICK MORRISEY
Attorney General of West Virginia

Michael R. Williams
  Solicitor General
Office of the West Virginia Attorney
General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550
Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia and West Virginia Department of Environmental Protection*

THEODORE E. ROKITA
Attorney General of Indiana

James A. Barta
  Solicitor General
Betsy DeNardi
  Special Counsel of Complex Litigation
Bradley S. Davis
  Deputy Attorney General
Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6201
James.Barta@atg.in.gov
Betsy.DeNardi@atg.in.gov

*Counsel for State of Indiana and Indiana Department of Natural Resources*

*(Additional counsel listed on signature block)*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.     The Surface Mining Control and Reclamation Act of 1977 ....................................... 3

     A.     The Act affords petitioner States exclusive jurisdiction over most aspects of surface mining and reclamation ........................................................................... 3

     B.     The Act provides for only limited federal exercise of oversight ........................... 4

          1.     Section 521(a) authorizes ten-day notices for violations by permittees ...... 4

          2.     Section 521(b) provides for federal enforcement should a State fail to enforce its federally approved program .................................................. 5

II.     Historically, the Secretary Construed the Act Deferentially to States ................................ 6

III.     The Secretary's Final Rule Reverses Prior Constructions of the Act ................................. 9

ARGUMENT .................................................................................................................... 11

I.     The Final Rule's Dramatic Expansion of Ten-Day Notices Is Unlawful ......................... 12

     A.     The Act forecloses the Secretary's newfound view regarding ten-day notices ..... 13

          1.     Section 521(a) addresses only site-specific violations by permittees ........ 13

          2.     Using ten-day notices to address "all" suspected violations would end run other statutory limits .................................................................. 16

     B.     The Secretary failed to provide a reasonable explanation in reversing longstanding policies regarding ten-day notices .................................................. 19

II.     The Final Rule's Changes to the Processes for Handling Complaints Are Unlawful ....... 22

     A.     The Final Rule's prohibition on considering readily available information from State regulatory authorities is contrary to law and arbitrary ........................ 23

     B.     The Final Rule's elimination of notice requirements is arbitrary ......................... 28

     C.     The Final Rule's elimination of other requirements for complaints is arbitrary ... 30

III.    The Final Rule's Rigid Deadlines and Prohibitions on Action Plans Are Unlawful........31

    A.    Imposing inflexible deadlines on States is contrary to law and arbitrary.............31

    B.    The changes regarding action plans are unlawful and arbitrary ..........................36

IV.    Cumulatively, the Final Rule's Provisions Upend the Federal-State Balance.................38

V.    The Remaining Requirements for Relief Are Satisfied ...................................................40

    A.    A stay will not adversely affect the public health, safety, or environment...........40

    B.    States, their citizens, and the public will suffer irreparable harm without relief...41

    C.    Granting relief is in the public interest .................................................................42

CONCLUSION.............................................................................................................................43

# TABLE OF AUTHORITIES

CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
594 U.S. 758 (2021) ....................................................................................................42

*Am. Wild Horse Pres. Campaign v. Perdue,*
873 F.3d 914 (D.C. Cir. 2017) ...................................................................30, 34, 37

*AMG Cap. Mgmt., LLC v. FTC,*
593 U.S. 67 (2021) ....................................................................................................18

*Biden v. Nebraska,*
143 S. Ct. 1255 (2023) ..............................................................................................19

*BP Energy Co. v. FERC,*
828 F.3d 959 (D.C. Cir. 2016) .................................................................................20

*Bragg v. W. Va. Coal Ass'n,*
248 F.3d 275 (4th Cir. 2001) .............................................................................. *passim*

*City of Brookings Mun. Tel. Co. v. FCC,*
822 F.2d 1153 (D.C. Cir. 1987) ...............................................................................27

*Clark v. Martinez,*
543 U.S. 371 (2005) ..................................................................................................19

*Conn. Nat'l Bank v. Germain,*
503 U.S. 249 (1992) ..................................................................................................13

*Davis v. Mich. Dept. of Treasury,*
489 U.S. 803 (1989) ..................................................................................................16

*Dep't of Com. v. New York,*
588 U.S. 752 (2019) ..................................................................................................40

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016) .......................................................................................20, 21, 24

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ..................................................................................................24

*Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior,*
728 F.3d 1229 (10th Cir. 2013) ...........................................................................4, 12

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) .............................................................................................20, 29

CASES [CONT'D]

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
  805 F.2d 1050, 1055 (D.C. Cir. 1986)................................................................24

*Harrington v. Purdue Pharma L.P.*,
  144 S. Ct. 2071 (2024).......................................................................................18

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
  452 U.S. 264 (1981).............................................................................................3

*Hughes Aircraft Co. v. Jacobson*,
  525 U.S. 432 (1999)...........................................................................................13

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  589 U.S. 178 (2020)...........................................................................................14

*Jaward Corp. v. Watt*,
  564 F. Supp. 797 (W.D. Va. 1983)..............................................................11, 40

*Keegel v. Key West & Caribbean Trading Co.*,
  627 F.2d 372 (D.C. Cir. 1980)...........................................................................32

*Kucana v. Holder*,
  558 U.S. 233 (2010)...........................................................................................14

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016)...............................................................................42

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024).......................................................................................13

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..................................................................20, 22, 32, 35

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018)...........................................................................................19

*Nken v. Holder*,
  556 U.S. 418 (2009)...........................................................................................14

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024)................................................................................11, 40

*PayPal, Inc. v. CFPB*,
  --- F. Supp. 3d ---, 2024 WL 1344791 (D.D.C. Mar. 29, 2024)......................35

*In re Permanent Surface Mining Regul. Litig.*,
  617 F.2d 807 (D.C. Cir. 1980)............................................................................3

CASES [CONT'D]

*In re Permanent Surface Mining Regul. Litig.,*
   653 F.2d 514, 523 (D.C. Cir. 1981) ........................................................4, 21, 38, 40

*Physicians for Soc. Resp. v. Wheeler,*
   965 F.3d 634 (D.C. Cir. 2020) ........................................................................32

*Se. Ala. Med. Ctr. v. Sebelius,*
   572 F.3d 912 (D.C. Cir. 2009) ........................................................................21

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ..........................................................................24

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ....................................................................41, 42

*United States v. Gonzalez,*
   520 U.S. 1 (1997) ...........................................................................................24

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...........................................................................................11

*Withrow v. Williams,*
   507 U.S. 680 (1993) .......................................................................................42

STATUTES

30 U.S.C. § 1201 ...............................................................................................32

30 U.S.C. § 1201(a) ...........................................................................................43

30 U.S.C § 1201(e) ............................................................................................43

30 U.S.C. § 1201(f) ..............................................................................................3

30 U.S.C. § 1202(d) ...........................................................................................43

30 U.S.C. § 1202(f) ............................................................................................43

30 U.S.C. § 1211 ..................................................................................................4

30 U.S.C. § 1211(c)(12) ...............................................................................24, 39

*30 U.S.C. § 1253(a) ........................................................................3, 4, 17, 40, 43

30 U.S.C. § 1254(b) .............................................................................................6

30 U.S.C. § 1253(b)(4) ...........................................................................4, 40, 43

STATUTES [CONT'D]

30 U.S.C. § 1256 ........................................................................................................4, 17

30 U.S.C. § 1259 ........................................................................................................4, 17

30 U.S.C. § 1260 ........................................................................................................4, 17

30 U.S.C. § 1267(a) ........................................................................................................4

30 U.S.C. § 1267(c) .....................................................................................................4, 17

30 U.S.C. § 1271 ...........................................................................................................6, 8

30 U.S.C. § 1271(a) ....................................................................................................8, 23

*30 U.S.C. § 1271(a)(1) ........................................................................................ *passim*

30 U.S.C. § 1271(a)(2) .....................................................................................................16

30 U.S.C. § 1271(a)(5) ................................................................................................14, 15

*30 U.S.C. § 1271(b) ..........................................................................................5, 8, 14, 18

*30 U.S.C. § 1272 .............................................................................................................3

30 U.S.C. § 1273(b)(2) .....................................................................................................4

*30 U.S.C. § 1276(c) ...................................................................................................11, 40

30 U.S.C. § 1291(19) ................................................................................................13, 14, 20

30 U.S.C. § 1291(26) ................................................................................................13, 14, 20

W. Va. Code § 29A-3-12 ...................................................................................................14

REGULATIONS AND RULES

30 C.F.R. § 732.15(b) .......................................................................................................3

OSMRE Permanent Regulatory Program,
    44 Fed. Reg. 14902 (Mar. 13, 1979) ..........................................................................6

Permanent Regulatory Program Modifications; Inspection and Enforcement; Civil
    Penalty Assessments,
    47 Fed. Reg. 35620 (Aug. 16, 1982) ...........................................................................7

REGULATIONS AND RULES [CONT'D]

Surface Coal Mining and Reclamation Operations; Evaluation of State Responses
 to Ten-Day Notices,
 53 Fed. Reg. 26728 (July 14, 1988)..................................................................36, 37

*Ownership and Control; Permit and Application Information; Transfer,
 Assignment, or Sale of Permit Rights,
 72 Fed. Reg. 68000 (Dec. 3, 2007).................................................................. *passim*

*Clarification of Provisions Related to the Issuance of Ten-Day Notices to State
 Regulatory Authorities and Enhancement of Corrective Action for State
 Regulatory Program Issues,
 85 Fed. Reg. 75150 (Nov. 24, 2020).................................................................. *passim*

Ten-Day Notices and Corrective Action for State Regulatory Program Issues,
 88 Fed. Reg. 24944 (Apr. 25, 2023) ....................................................................9, 26

*Ten-Day Notices and Corrective Action for State Regulatory Program Issues,
 89 Fed. Reg. 24714 (Apr. 9, 2024) .................................................................. *passim*

OTHER AUTHORITIES

*Greens, GOP Clash Over Mine Oversight, Cleanup Funding*, E&E News (Mar.
 12, 2024), https://www.eenews.net/articles/greens-gop-clash-over-mine-
 oversight-cleanup-funding/............................................................................................26

U.S. Dep't of Interior, Off. of Surface Mining Reclamation and Enf't, Application
 of the Ten-Day Notice Process & Federal Enforcement to Permitting Issued
 Under Approved Regulatory Programs (Nov. 15, 2010)..........................................7

U.S. Dep't of Interior, Off. of Surface Mining Reclamation & Enf't, Policy
 Directive 996 (May 3, 2019),
 https://www.osmre.gov/sites/default/files/pdfs/directive996.pdf .............................7

*Webster's New Collegiate Dictionary* 77 (1981)........................................................24

# INTRODUCTION

The Surface Mining Control and Reclamation Act of 1977 provides for a truly federalist approach to regulation. In States with federally approved programs, the Act gives those States exclusive regulatory authority over nearly all aspects of surface coal mining and reclamation, including permitting, inspections, and enforcement. On the other hand, the Act authorizes the Secretary of the Interior to act in those States in only a few limited circumstances.

Section 521 describes two of those circumstances. First, Section 521(a) authorizes the Secretary to issue a notice—called a ten-day notice—to State regulatory authorities when the Secretary has reason to believe that a "person" is violating the Act. Congress designed that notice process to address site-specific violations, such as a mining operator's violation of a permit requirement. A ten-day notice obligates States to cause the correction of the violation or show good cause for failure to do so within ten days. Even when the Secretary issues a ten-day notice, however, States remain primarily responsible for investigating and redressing potential violations. Second, Section 521(b) authorizes the Secretary to take over a State regulatory program where a State itself fails to enforce its program—but only if she follows a more involved process and makes specific findings.

Past Secretaries recognized that their authority under Section 521 was circumscribed. For example, in a 2020 rule, the Secretary conceded that the Department of the Interior could not use the ten-day notice process to correct problems with how a State administers its program. Instead, the Department may issue ten-day notices only for site-specific violations. The Secretary also reemphasized how important it was for the Department to closely coordinate with States, which have superior knowledge about local conditions and (until the ten-day notice process runs its course) exclusive jurisdiction to address issues. The 2020 Rule thus allowed agency staff to consider vital information from States in deciding whether to issue ten-day notices, and it reiterated

1

that citizens should contact State regulatory authorities before the federal government. And the 2020 Rule provided States with flexibility needed to undertake complex investigations.

The Final Rule challenged here reverses course. In provision after provision, the Final Rule enlarges the Secretary's authority at the States' expense, defying the Act. The Final Rule rejects the 2020 Rule's position—one grounded in statutory text—that the Secretary may issue ten-day notices only for site-specific violations. And the Final Rule provides, in a break with longstanding agency practice, that the Secretary can issue notices whenever States do not regulate consistently with the Secretary's view of things. Never mind that Section 521(a) authorizes ten-day notices only for violations by "person[s]"—a term statutorily defined to mean individuals and businesses. And forget that Section 521(b) provides a distinct process for addressing issues caused by any lax enforcement of the Act by the States. The statute notwithstanding, the Final Rule gives the Secretary a powerful new tool to corral States themselves.

The Final Rule seeks to curtail state authority in other ways, too. The Final Rule discards requirements that citizens contact States with concerns before the federal government, even though the federal government lacks jurisdiction to address most concerns. The Final Rule also imposes inflexible, arbitrary timelines for States to complete complex investigations, even where States have good cause for taking longer. This artificial time crunch positions federal regulators to replace state inspectors. And the Final Rule illogically requires the Secretary to blind herself to information that States possess when determining whether there is reason to believe that a violation exists, even if that information could establish beyond doubt that none does.

The Final Rule imposes changes that are contrary to the Act and arbitrary and capricious. The Court should stay or preliminary enjoin the Final Rule to prevent the irreparable harm to States that will otherwise occur. The Court need not leave the Final Rule in effect when States have

already proven they can effectively enforce the Act to the Secretary's satisfaction. And if a stay issues, the States will continue protecting the public. The Court should therefore grant the States' motion and restore Congress's States-first approach to surface mining regulation.

**BACKGROUND**

I.   **The Surface Mining Control and Reclamation Act of 1977**

 A.   **The Act affords petitioner States exclusive jurisdiction over most aspects of surface mining and reclamation**

The Surface Mining Control and Reclamation Act of 1977 (SMCRA or the Act) reflects "a truly federalist distribution of regulatory authority for the coal-mining industry." *In re Permanent Surface Mining Regul. Litig.*, 617 F.2d 807, 808 (D.C. Cir. 1980) (en banc). In recognition of the "diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," the Act provides for States to assume "primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation." 30 U.S.C. § 1201(f); *see Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981). "In contrast to other 'cooperative federalism' statutes," the Act does not simply give States *a* role in administering federal standards, policies, and regulations. *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 293–94 (4th Cir. 2001). Quite the opposite—the Act provides for States with federally approved programs to assume "*exclusive* jurisdiction" over nearly all aspects of surface coal mining and reclamation. 30 U.S.C. § 1253(a) (emphasis added).

To obtain exclusive jurisdiction, a State must demonstrate that it "has the capability of carrying out the provisions" of the Act and "meeting its purposes." 30 U.S.C. § 1253(a). This requires a State to demonstrate (among other things) that it can run an effective permitting system, that it can provide for sanctions for statutory and regulatory violations, and that it has "sufficient administrative and technical personnel." *Id.*; *see id.* § 1272; 30 C.F.R. § 732.15(b). A State must

3

obtain the written concurrence of the Administrator of the U.S. Environmental Protection Agency as well. 30 U.S.C. § 1273(b)(2). The Secretary of the Interior may not approve a state regulatory program without determining "that the State has the legal authority and qualified personnel necessary for the enforcement of the environmental protection standards." *Id.* § 1253(b)(4).

Once a state program wins federal approval, state jurisdiction becomes "exclusive" over virtually all aspects of surface coal mining and reclamation. 30 U.S.C. § 1253(a). The Act "provides for *either* State regulation of surface coal mining within its borders *or* federal regulations, but not both." *Bragg*, 248 F.3d at 289. Thus, in States with approved programs, State regulatory authorities, as opposed to the federal government, "exercise[] front-line supervision." *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d 514, 523 (D.C. Cir. 1981) (en banc). State regulatory authorities are responsible for administering the Act, including by issuing permits, 30 U.S.C. §§ 1256, 1260; ensuring bond requirements are met by permittees, *id.* § 1259; and inspecting mining sites, *id.* § 1267(c). Indiana, West Virginia, and the other petitioner States in this litigation all have primacy over surface coal mining and reclamation within their borders. *See* Dkt. 1 ¶¶ 37–48.

**B.     The Act provides for only limited federal exercise of oversight**

In States with primacy, the Secretary's role is circumscribed. The Act gives the Secretary a role in responding to reports of potential violations, as outlined in Section 521(a) and (b). It also provides for the Secretary to have a role in "evaluat[ing] the administration of approved State programs" and "administer[ing] grant-in-aid programs." 30 U.S.C. §§ 1211, 1267(a).

**1.     Section 521(a) authorizes ten-day notices for violations by permittees**

Section 521(a) "addresses individual violations by a specific permittee." *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1232 (10th Cir. 2013). It provides that, "[w]henever, on the basis of any information available to him, including receipt of information

from any person, the Secretary has reason to believe that any person is in violation of any require-ment of this chapter or any permit condition required by this chapter, the Secretary shall notify the State regulatory authority." 30 U.S.C. § 1271(a)(1).

The State regulatory authority then has ten days to either "take appropriate action to cause said violation to be corrected or to show good cause for such failure and transmit notification of its action to the Secretary." 30 U.S.C. § 1271(a)(1). That notice period can be waived only if "the person informing the Secretary provides adequate proof that an imminent danger of significant environmental harm exists and that the State has failed to take appropriate action." *Id.*

If the State regulatory authority either takes appropriate action in response to a ten-day notice or shows good cause for failing to do so, then the Secretary's role is at an end. Section 521(a) authorizes a federal inspection of surface coal mining operations for potential violations only if a State regulatory authority fails to comply with the Act. *See* 30 U.S.C. § 1271(a)(1).

### 2. Section 521(b) provides for federal enforcement should a State fail to enforce its federally approved program

Section 521(b) provides a different procedure for situations in which the Secretary "has reason to believe that the violations of all or any part of an approved State program result from a failure of the State to enforce such State program or any part thereof effectively." 30 U.S.C. § 1271(b). In that situation, the Secretary must provide public notice and notice to the State, and then hold a hearing "in the State within thirty days." *Id.* If the Secretary finds after the hearing "that there are violations and such violations result from a failure of the State to enforce all or any part of the State program effectively, and if he further finds that the State has not adequately demonstrated its capability and intent to enforce such State program," Section 521(b) directs the Secretary to take over responsibility for issuing permits and enforcing them. *Id.*

Absent compliance with the procedures set forth in Section 521, however, the Secretary

cannot "provide for the Federal enforcement" of the Act's requirements in States with exclusive jurisdiction. 30 U.S.C. § 1254(b). "Only if an approved State program is revoked, as provided in [30 U.S.C.] § 1271," can the Secretary provide for federal "regulation for surface coal mining in any State that has previously had its program approved." *Bragg*, 248 F.3d at 289.

## II.      Historically, the Secretary Construed the Act Deferentially to States

In years past, the Secretary repeatedly recognized the federal government's limited role. Most significantly for purposes of this litigation, past rulemakings have recognized that ten-day notices issued under Section 521(a) are a tool for addressing site-specific violations rather than a mechanism for second-guessing States' administration of programs or permitting decisions. Similarly, consistent with the Act's deference to States, past rulemakings have sought to encourage persons to report problems to State regulatory authorities before seeking federal involvement.

The Secretary originally promulgated regulations through the Act in 1979. 44 Fed. Reg. 14902 (Mar. 13, 1979). In those regulations, the Secretary provided for ten-day notices to be issued to State regulatory authorities in response to complaints about mining operations. *Id.* at 15459. The regulations did not provide for ten-day notices to be issued in response to complaints against State programs or permitting decisions. Instead, the regulations recognized that the Secretary will only directly intervene to enforce surface coal mining and reclamation regulations under Section 521(b) "where the State regulatory authority is not enforcing State programs." *Id.* at 14967.

The original distinction between ten-day notices of individual violations and complaints of program issues continued in subsequent rulemaking as well. As the Secretary explained in 2007, "Congress did not intend" for the Department of the Interior's Office of Surface Mining Reclamation and Enforcement ("OSM" or "OSMRE") "to second guess a State's permitting decisions." 72 Fed. Reg. 68000, 68025 (Dec. 3, 2007). "'Instead, the Secretary of the Interior's ultimate power

over a State's lax implementation of its permitting provisions is set out in section 521(b) of the Act. The Secretary's power under section 521(b) includes taking over an entire State permit-issuing process.'" *Id.* Absent a federal takeover, however, "'permit decisions and any appeals are solely matters of the state jurisdiction in which OSM plays no role.'" *Id.*

The only departure from the historical separation of ten-day notices and program violations can be found in a 2010 memorandum by the Director of OSMRE. That memorandum—which issued without notice and comment—asserted that OSMRE has the authority to issue ten-day notices for state permitting issues. U.S. Dep't of Interior, Off. of Surface Mining Reclamation and Enf't, Application of the Ten-Day Notice Process & Federal Enforcement to Permitting Issued Under Approved Regulatory Programs (Nov. 15, 2010). This position, however, was never formally adopted through rulemaking and was reversed in 2019 by an OSMRE policy directive. U.S. Dep't of Interior, Off. of Surface Mining Reclamation & Enf't, Policy Directive 996 (May 3, 2019), https://www.osmre.gov/sites/default/files/pdfs/directive996.pdf.

Likewise, earlier agency OSMRE actions also encouraged individuals to approach State regulatory authorities before filing reports with federal regulators. In 1982, the Secretary took the position that "it is consistent with the Act to require persons to contact State regulatory authority prior to, or simultaneously with, requesting a Federal inspection[s]." 47 Fed. Reg. 35620, 35628 (Aug. 16, 1982). The Secretary reasoned that, "if citizens contact the State initially, most problems will be resolved satisfactorily without the need for intrusion by the Federal government." *Id.* And, in 2005, OSMRE again issued a final decision declining to conduct a federal inspection of a state-permitted mining site at the request of a citizen's group, reasoning that ordering an inspection, in spite of the group's failure to make such an appeal before the State regulatory authority, was contrary to law. 72 Fed. Reg. at 68024. "OSM intervention at any stage in a state-issued permit process

would in effect terminate the state's exclusive jurisdiction over the matter and [would frustrate SMCRA's] careful and deliberate statutory design." *Id.*

OSMRE continued the decades-long separation of ten-day notices and state program issues through the immediately preceding round of rulemaking, which occurred in 2020. The 2020 Rule provided a "Clarification of Distinction Between OSMRE Enforcement Actions under 30 U.S.C. § 1271(a) and (b)." 85 Fed. Reg. 75150, 75151 (Nov. 24, 2020). The Secretary noted that Congress "differentiated" between ten-day notices and federal inspections for alleged violations of 30 U.S.C. § 1271(a) and actions OSMRE may take to address violations resulting from a State regulatory program's failure under § 1271(b). *Id.* While ten-day notices under § 1271(a) are intended to be used to address "site-specific violations," enforcement actions taken under § 1271(b) are intended to address systemic state regulatory problems and "ensure[] that a State regulatory authority is properly enforcing its State approved program." *Id.* at 75150–51. The differences in addressing violations by "any person," namely state permittees, under § 1271(a) and systemic problems with a state regulatory program, justify "using two separate mechanisms." *Id.*; 30 U.S.C. § 1271.

 The 2020 Rule also continued to respect the federalist structure established by the Act by deferring to State regulatory authorities due to their ability to correct potential violations quickly and without federal intervention. 85 Fed. Reg. at 75151, 75157. The Secretary "strongly encourage[d]" citizens to report a potential violation to the State regulatory authority before reporting said violation to OSMRE, as reporting to the State first reduces duplicative efforts to address potential violations. *Id.* at 75157. The Secretary noted that, "[i]n OSMRE's experience, when a citizen first contacts the State regulatory authority, violations are often promptly and effectively resolved without OSMRE's direct involvement" because "State regulatory authorities are more familiar with the operations in their States." *Id.* at 75157–58.

The 2020 Rule also directed OSMRE to consider "all readily available information" when investigating a possible violation. 85 Fed. Reg. at 75158. That includes information from State regulatory authorities, who "know[] [their] specific permits best." *Id.* at 75157. OSMRE acknowledged that considering information provided by State regulatory authorities could have prevented instances where OSMRE and State regulators engaged in duplicative and inefficient investigations of alleged violations. *Id.* at 75157–58. By using "all readily available information," including information from State regulatory authorities, both State regulators and OSMRE can "better understand the alleged violations, cooperate[] effectively, and spen[d] valuable time and resources addressing the alleged violations and not simply generating duplicative paperwork." *Id.* at 75158.

Additionally, the 2020 Rule clarified what would constitute "appropriate action" in responding to a ten-day notice and "good cause" for failing to redress a potential violation in that time. 30 U.S.C. § 1271(a)(1). Under the 2020 Rule, a State regulatory authority could demonstrate good cause by showing that it "has initiated an investigation into a possible violation and as a result has determined that it requires a reasonable, specified additional amount of time to determine whether a violation exists." 85 Fed. Reg. at 75190–91. The Secretary acknowledged that investigations are "often complicated and fact-specific," and declined to prejudge what would constitute a "reasonable time." *Id.* at 75178–79. Instead, the 2020 Rule gave OSMRE the discretion to "determine how long the State regulatory authority should reasonably be given to complete its investigation of the possible violation." *Id.* at 75191. The 2020 Rule took effect on December 24, 2020.

### III.   The Secretary's Final Rule Reverses Prior Constructions of the Act

In April 2023, citing the Act's legislative history and OSMRE's experience, the Secretary proposed an overhaul of regulations relating to ten-day notices. 88 Fed. Reg. 24944 (Apr. 25, 2023). A year later, that proposed rule became final. 89 Fed. Reg. 24714 (Apr. 9, 2024).

The Final Rule amends the ten-day notice regulations to allow OSMRE "to issue a [ten-day notice] for any possible violation," including violations by State regulatory authorities. 89 Fed. Reg. at 24715. "[T]he final rule treats all violations the same, regardless of their genesis." *Id.* That means that the Final Rule authorizes ten-day notices for a State regulatory authority's issuance of an allegedly defective permit, systemic problems with State regulatory programs, and anything else that OSMRE historically would have addressed under Section 521(b). *Id.* at 24715–16, 24734.

The Final Rule also restricts the information OSMRE may consider in deciding to issue a ten-day notice. Although the Act permits consideration of "any available information"—a term that the 2020 Rule understood to permit consideration of any "readily available information" in the hands of State regulatory authorities—the Final Rule limits OSMRE to considering three sources of information. 89 Fed. Reg. at 24715. The Final Rule restricts OSMRE to considering (1) "information received from a citizen complainant," (2) "information available in OSMRE files" at the time of the complaint, and (3) "publicly available electronic information." *Id.* The rule otherwise does not permit OSMRE to consider information from state authorities, including information that may disprove the existence of a violation. *Id.*

Additionally, under the Final Rule, citizens are no longer required to first notify State regulatory authorities prior to filing a complaint with OSMRE. 89 Fed. Reg. at 24717–18. The Final Rule allows citizens to bypass State regulatory authorities and proceed directly to federal authorities, despite contemporaneously recognizing that "[State regulatory authorities] should be more acquainted with conditions on the ground" and are "typically in the best position to quickly determine and, if necessary, act on the merits of a citizen complaint." *Id.* at 24718.

The Final Rule also restricts States' flexibility in responding to ten-day notices. The Final Rule allows that a State can show "good cause" for failing to redress a suspected violation within

10

ten days by saying that it needs more time to investigate the issue. 89 Fed. Reg. at 24717. But the Final Rule now requires non-complex investigations to be completed in 30 days and complex investigations in 90 days, without the possibility of further extension. *Id.* at 24731. Similarly, the Final Rule concedes that States may show "good cause" for failing to redress a programmatic violation within ten days, providing that States can do so by developing an "action plan." *Id.* But it demands that all steps of an action plan be completed within 365 days. *Id.*

## ARGUMENT

The Court should stay or preliminarily enjoin the Final Rule. Ordinarily, a court considering an application for a stay or preliminary injunction must "ask (1) whether the applicant is likely to succeed on the merits, (2) whether it will suffer irreparable injury without a stay, (3) whether the stay will substantially injure the other parties interested in the proceedings, and (4) where the public interest lies." *Ohio v. EPA*, 144 S. Ct. 2040, 2052 (2024); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (similar). But Congress lowered the bar for challenges under the Act. To obtain relief against "any order or decision," the applicant need show only that (1) all parties have been notified and given an opportunity to be heard, (2) "a substantial likelihood that [the applicant] will prevail on the merits," and (3) a stay "will not adversely affect the public health or safety or cause significant imminent environmental harm to land, air, or water resources." 30 U.S.C. § 1276(c); *see Jaward Corp. v. Watt*, 564 F. Supp. 797, 799–800 (W.D. Va. 1983).

Petitioners satisfy the requirements for interim relief. Petitioners have a substantial likelihood of success. By dramatically expanding the use of ten-day notices, changing the processes for handling complaints, and imposing rigid requirements on States across the board, the Final Rule contravenes the Act and principles of reasoned decisionmaking. Nearly every aspect of the Final Rule conflicts with the deference to States the Act requires, substituting federal regulatory oversight for state oversight. Meanwhile, temporarily barring enforcement of the Final Rule would not

harm the public health, safety, or environment. As the Secretary necessarily found in approving Petitioners' programs, those programs effectively protect the public health, safety, and the environment. They were working effectively before the Final Rule took effect and will continue working effectively without it. Finally, although this Court need not consider any other factors, a stay is necessary to prevent irreparable harm to Petitioners and is consistent with the public interest.

## I.    The Final Rule's Dramatic Expansion of Ten-Day Notices Is Unlawful

In the Act, Congress generally gave States with approved programs exclusive regulatory authority over surface coal mining and reclamation. It entrusted States—not the federal government—with issuing permits, determining bonding, and regularly inspecting sites. The Act withholds from the Secretary a general power to review or revise decisions made by State regulatory authorities, instead requiring the Secretary to provide oversight in accordance with Section 521.

Section 521 in turn provides two distinct oversight mechanisms. Section 521(a) authorizes the Secretary to issue ten-day notices to "address individual violations by a specific permittee," *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1232 (10th Cir. 2013), while Section 521(b) authorizes the Secretary to assume enforcement responsibilities if a State regulatory authority is unwilling to enforce its program. As past Secretaries have recognized, Congress designed ten-day notices as a tool for addressing "site-specific" violations rather than issues concerning a State's running of its regulatory program. 85 Fed. Reg. 75150 (Nov. 24, 2020). It would frustrate the Act's "careful and deliberate statutory design" to issue ten-day notices for an allegedly defective permit issued by a State. 72 Fed. Reg. 68000, 68024 (Dec. 3, 2007).

In the Final Rule, the Secretary ignored the careful distinction Congress made. The Final Rule authorizes federal regulators to issue ten-day notices for "*all* violations . . . regardless of their

genesis." 89 Fed. Reg. 24714, 24715 (Apr. 9, 2024) (emphasis added). No longer must the Secretary refrain from interfering with state permitting decisions or adhere to the procedures described in Section 521(b) for addressing alleged lapses by State regulatory authorities. Instead, federal regulators may now issue ten-day notices whenever they deem States to have "issu[ed] a defective permit" or otherwise acted inconsistently with the Act. 89 Fed. Reg. at 24716. That sea change in the Secretary's implementation of the Act defies both the statute and reasoned decisionmaking.

## A.      The Act forecloses the Secretary's newfound view regarding ten-day notices

In reviewing an agency action, courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and enforce the "best reading of a statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263, 2273 (2024). The starting point for determining a statute's best reading is the text itself. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). "When the words of a statute are unambiguous," the "'judicial inquiry is complete.'" *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

### 1.      Section 521(a) addresses only site-specific violations by permittees

Section 521(a)'s plain language makes clear that ten-day notices can be issued only for site-specific violations by permittees—not alleged missteps by State regulatory authorities. Section 521(a) directs the Secretary to "notify the State regulatory authority" if, "on the basis of any information available to him," the Secretary has "reason to believe that any *person* is in violation of any requirement" of the Act or "any permit condition" required by the Act. 30 U.S.C. § 1271(a)(1) (emphasis added). As defined in the Act, "person" refers to "an individual, partnership, association, society, joint stock company, firm, company, corporation, or other business organization." *Id.* § 1291(19). The term does not encompass State regulatory authorities. State reg-

ulatory authorities are the "department[s] or agenc[ies]" of a State, *id.* § 1291(26), not "individ-ual[s]," "compan[ies]," or "other business organization[s]," *id.* § 1291(19). So ten-day notices can-not be issued for suspected violations of the Act by State regulatory authorities themselves.

Had Congress wished to empower the Secretary to issue ten-day notices in response to purported violations by State regulatory authorities, "Congress could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010). Section 521(b) illustrates Congress knew precisely how to give the Secretary authority to address suspected problems with State regulatory programs. There, Congress authorized a public-hearing process whenever "the Secretary has reason to believe that violations of all or any part of an approved State program *result from a failure of the State to enforce such State program or any part thereof effectively*." 30 U.S.C. § 1271(b) (emphasis added). By contrast, Congress authorized ten-day notices only for situations in which a "person" (not a State) is in violation of the Act or a permit condition. That difference is conspicuous. Where "Con-gress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally." *Nken v. Holder*, 556 U.S. 418, 430 (2009); *see Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 186 (2020).

Other language in Section 521(a) reinforces that ten-day notices are for site-specific viola-tions. Whenever the Secretary finds that a "State regulatory authority fails to take appropriate ac-tion or show good cause for such failure," Section 521(a) states that the "Secretary shall immedi-ately order Federal *inspection* of the surface coal mining operation *at which* the alleged violation is occurring." 30 U.S.C. § 1271(a)(1) (emphasis added). It further states that the notice must be provided to the permittee and include "a reasonable description of the portion of the surface coal mining and reclamation operation to which the notice . . . applies." *Id.* § 1271(a)(5). The text con-

templates that the suspected violation is occurring "at" a particular mining site operated by a permittee and that the violation can be detected by a physical inspection. Thus, ten-day notices cannot be used to address systemic issues with State regulatory programs, alleged defects in permitting and bonding decisions made by State regulatory authorities, and similar state-level issues. Paperwork deficiencies committed by State permitting authorities and systemic problems with a State regulatory program do not occur "at" a specific mining site. Nor can those types of issues be redressed with a physical inspection. Indeed, if the violation relates to a permit or bond issued *before* mining has begun, there will be no mining operation to inspect or to describe in a notice.

Section 521(a) further provides that a complainant may "accompany" a federal inspector "during the [required] inspection." 30 U.S.C. § 1271(a)(1). That provision, too, contemplates that the inspection is a physical inspection of a particular mining site for violations that can be seen or otherwise detected while there. There would be no reason for a citizen to "accompany" a federal inspector to a mining operation for violations relating to the contents of a permit or bond. In fact, for such violations, there would be no need for a federal inspector to travel bodily to a mining operation at all. The inspector could look at the documents from the comfort of his or her office. Similarly, the reason that Section 521(a) requires the Secretary to describe "with reasonable specificity" the "portion of the surface coal mining and reclamation operation" to which a notice or order applies is that ten-day notices are for site-specific violations. 30 U.S.C. § 1271(a)(5). Such a requirement would make no sense if Congress had intended for ten-day notices to be used for systematic issues with State regulatory programs or problems with state-issued paperwork.

Consider yet another provision of Section 521(a) incompatible with using ten-day notices for systemic problems with State regulatory programs. When the Secretary conducts an inspection and finds a violation that "creates an imminent danger to the health or safety of the public, or is

causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources," Section 521(a) requires the Secretary to order "a cessation of surface coal mining and reclamation operations or the portion thereof relevant to the condition, practice, or violation or the part impacted by the violation," and if cessation is not enough, to "impose affirmative obligations on the operator." 30 U.S.C. § 1271(a)(2). That remedial provision—which requires an "operator" to stop mining or take affirmative actions—makes sense only in the context of using ten-day notices for site-specific violations. It makes no sense in the context of using ten-day notices for systematic problems with a State regulatory program. Surely, Congress did not intend for the Secretary to take the drastic step of ordering all mining in a State to cease.

Lastly, the Final Rule ignores that Section 521(a) must be used for a "violation of any requirement of this chapter or any permit condition required by this chapter." 30 U.S.C. § 1271(a)(1). It purports to authorize ten-day notices for any "issue" arising from the Secretary's belief that a State regulatory authority is not administering a program "consistent with the basis for OSMRE's approval of the State program." 89 Fed. Reg. at 24734. Simply put, the Final Rule exceeds the Secretary's statutory authority by authorizing ten-day notices for any perceived issue with State regulatory authorities' understanding, implementation, and enforcement of the Act.

### 2.    Using ten-day notices to address "all" suspected violations would end run other statutory limits

Structural considerations reinforce that ten-day notices cannot be used to address suspected permit defects or other suspected nonconformance with the Act by State regulatory authorities. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989). Here, the Final Rule's expansive construction of Section 521(a) conflicts with two important structural features of the Act.

16

First, under the Final Rule's construction, the Secretary would gain powers to review and revise State permitting and bonding decisions that Congress withheld. Recall that the Act gives States with approved programs "exclusive jurisdiction" over surface coal mining and reclamation operations within their borders, "except as" specifically provided in the Act. 30 U.S.C. § 1253(a). This structure reflects Congress's desire to establish "'minimum national standards' for regulating surface coal mining and [to] encourage[] the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they might choose." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001). As a result, in States with primacy, State regulatory authorities have exclusive responsibility for permitting, 30 U.S.C. §§ 1256, 1260, bonding, *id.* § 1259, and regular inspections of mining sites, *id.* § 1267(c). The federal government has no power to conduct those activities. As the Fourth Circuit aptly summarized, the Act "provides for *either* State regulation of surface coal mining within its borders *or* federal regulation, but not both." *Bragg*, 248 F.3d at 289.

To construe Section 521(a) as authorizing ten-day notices for state permitting and bonding decisions would give the Secretary a review power that the Act withholds. Under the Final Rule, the Secretary claims the power to issue ten-day notices whenever a State issues an allegedly "defective permit" or takes any other action the Secretary deems inconsistent with the Act. 89 Fed. Reg. at 24716. That notice would then trigger an obligation on the State to "cause said violation to be corrected" (or show good cause for failure to do so). 30 U.S.C. § 1271(a)(1). According to the Secretary's view, correcting a permit defect would require the State to issue a new permit that comports with how the federal government thinks the permit should be written. But no provision of the Act gives the Secretary a general review power over state permitting and bonding decisions. Only in the event of a federal takeover under Section 521(b) does the Act say the Secretary has

power to "issue new or revised permits." *Id.* § 1271(b). The Final Rule end runs the Act's express vesting of exclusive jurisdiction over permitting and bonding decisions in States.

Second, the Final Rule rewrites the structure of Section 521. Section 521 sets forth two distinct oversight mechanisms. Under Section 521(a), the Secretary may order a federal inspection of a surface coal mining operation if the Secretary provides notice of a suspected violation of the Act and if the State regulatory authority "fails within ten days after notification to take appropriate action to cause said violation to be corrected or show good cause for such failure." 30 U.S.C. § 1271(a)(1). This streamlined process reflects that ten-day notices are designed for correcting site-specific violations in States where the State program is, as a general matter, being enforced.

By contrast, Section 521(b) requires the Secretary to follow a longer, more involved process precisely because it is designed for remedying violations that "result from a failure of the State to enforce such State program or any part thereof effectively." 30 U.S.C. § 1271(b). Before the Secretary can intervene under Section 521(b), the Secretary must (i) provide "public notice and notice to the State," (ii) "hold a hearing thereon in the State within thirty days of such notice," (iii) find "that there are violations and such violations result from a failure of the State to enforce all or any part of the State program effectively," (iv) find "that the State has not adequately demonstrated its capability and intent to enforce such State program," and (v) issue another "public notice." *Id.* "It is highly unlikely that Congress would have enacted" these detailed procedures for addressing violations resulting from deficient state enforcement "if the Act, via [Section 521(a)], . . . already implicitly allowed" the Secretary to address the violations resulting from deficient state enforcement "without satisfying" those procedures. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77 (2021); *see Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 2085 (2024).

Lastly, embracing the Final Rule's capacious view of Section 521(a) would raise substantial constitutional doubts. Although the Constitution authorizes Congress to regulate directly, it withholds the federal government "the power to issue orders directly to the States." *N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018). Some of the reasons that the Constitution withholds that power is to "promote[] political accountability," ensuring that citizens know "who to credit or blame" for a regulation, and to "prevent[] Congress from shifting the costs of regulation to the States." *Id.* at 473–74. By giving the Secretary the power to issue ten-day notices to States in an attempt to force them to revise their own permitting and bonding decisions, the Final Rule veers into forbidden territory. It obscures the actor responsible for making permitting and bonding decisions. Even if the constitutional problem is only debatable, that cuts against the Final Rule. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005). The Final Rule's dramatic expansion of ten-day notices is contrary to law.

### B.    The Secretary failed to provide a reasonable explanation in reversing longstanding policies regarding ten-day notices

The Final Rule is arbitrary and capricious as well. In federal regulations, "[t]he Secretary has never previously claimed" the "power[]" to issue ten-day notices to State regulatory authorities for permit deficiencies and other issues related to State programs. *Biden v. Nebraska*, 143 S. Ct. 1255, 1372 (2023). In fact, past Secretaries disclaimed that power. For example, in 2007, the Secretary declared that "Congress did not intend for OSM to second guess a State's permitting decisions." 72 Fed. Reg. at 68025. "[P]ermit decisions and any appeals are solely matters of the state jurisdiction in which OSM plays no role." *Id.* Similarly, in 2020, the Secretary again explained that Congress designed ten-day notices for "site-specific violations," requiring use of Section 521(b) for systemic problems with a State regulatory program. 85 Fed. Reg. at 75150–51. The Final Rule is devoid of any reasoned explanation for its sudden reversal of longstanding policies.

In any rulemaking, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation . . . that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The bar is even higher when the agency changes its position. The agency must "display awareness that it *is* changing position," and "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). When a new agency policy contradicts facts upon which previous policy relied or the prior policy "has engendered serious reliance interests" then "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–16.

In the Final Rule, the Secretary did not articulate a reasonable explanation for her sudden change of position. Despite asserting that its view of ten-day notices "best comport[s]" with the Act, 89 Fed. Reg. at 24721, the Final Rule "d[oes] not analyze or explain why the statute should be interpreted" as it says, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016). As discussed, Section 521(a) requires ten-day notices to relate to violations by "person[s]," 30 U.S.C. § 1271(a)(1)—a term the Act defines to mean "an individual, partnership, association, society, joint stock company, firm, company, corporation, or other business organization," *id.* § 1291(19). But the Final Rule nowhere "refers back" to how the Act defines a "person." *BP Energy Co. v. FERC*, 828 F.3d 959, 965 (D.C. Cir. 2016). Instead, the Final Rule asserts that a "person" can include a State regulatory authority because agency regulations say so. 89 Fed. Reg. at 24716,

20

24722. That blatant rewriting of the statutory definition of "person" is the epitome of unreasoned decisionmaking. *See Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 920 (D.C. Cir. 2009).

The Final Rule likewise ignores other critical pieces of statutory text. For example, the Final Rule asserts that defective permits can be the subject of ten-day notices even before mining has begun. 89 Fed. Reg. at 24715. But the Final Rule never explains how a State regulatory authority's issuance of defective paperwork occurs "at" a mining site or can be detected with an inspection of the site "at which the alleged violation is occurring." 30 U.S.C. § 1271(a)(1). Nor does the Final Rule explain why it is consistent with the Act's structure to use Section 521(a) for violations attributable to State regulatory authorities where Section 521(b) already addresses them—a conspicuous omission considering the 2020 Rule's explanation of how Section 521's structure reveals that ten-day notices are for "site-specific violations." 85 Fed. Reg. at 75151. At bottom, the Secretary relies on atextual notions of what makes "sense." 89 Fed. Reg. at 24715.

Similarly, the Final Rule lacks a reasoned explanation of how it is consistent with the Act's vesting of exclusive jurisdiction over permitting and bonding in State regulatory authorities. The Final Rule asserts that Section 521 is "an exception to a State's otherwise-exclusive jurisdiction." 89 Fed. Reg. at 24722. But that "conclusory" assertion is not an explanation of why Section 521 can be construed to grant the Secretary a power to second-guess state permitting and bonding decisions that the remainder of the Act withholds. *Encino Motorcars*, 579 U.S. at 224. Moreover, as commenters observed, the Final Rule's assertion of authority over permitting and bonding decisions is contrary to precedent. *See* Ex. 1, Interstate Mining Compact Commission (IMCC) Comment 11. As the D.C. Circuit and Fourth Circuit have observed, the Act gives the Secretary "no role" to play in reviewing permitting and bonding decisions by States. *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d 514, 519 (D.C. Cir. 1981) (en banc); *see, e.g.*, *Bragg*, 248 F.3d at

288. The mere fact that those decisions may not have addressed the specific issue in the Final Rule, *see* 89 Fed. Reg. at 24721–22, does not alter the legal principle they establish. The Act gives federal authorities no power to "second guess a State's permitting decisions." 72 Fed. Reg. at 68025.

Apart from a conclusory—and incorrect—assertion about adherence with the statutory text, the Final Rule offers no rationale to support its dramatic expansion of ten-day notices. The Final Rule does not address the 2020 Rule's observation that, through "four decades of oversight enforcement," the Secretary has learned that citizens' failures to understand that Section 521(a) and 521(b) provide distinct oversight mechanisms has resulted in "frustration, duplication, and unnecessary complication of the [ten-day notice] process, which was designed to quickly address on-the-ground impacts." 85 Fed. Reg. at 75170. Nor does the Final Rule identify any problems in the way the Act was previously administered sufficient to justify a complete reconfiguration of federal-state roles so soon after the 2020 Rule—even if the Act allowed for that reconfiguration. And lastly, the Final Rule does not even discuss States' or regulated parties' reliance on the Act's plain language, which gives States exclusive permitting and bonding authority. *See* Ex. 1, Alaska Department of Natural Resources Comment 1 ("the proposed rules would . . . create additional burdens on both the State and OSMRE without any benefits to the environment or to the participation by individual citizens in coal communities"); Ex. 1, Montana Department of Environmental Quality Comment 2 ("Allowing permit decisions to be 're-tried' as a Citizen Complaint is an abuse of Citizen Complaint provisions and adds unnecessary confusion to a well-established permitting process that includes opportunity for review, comment, and appeal."). At a minimum, the agency failed to consider "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

## II.     The Final Rule's Changes to the Processes for Handling Complaints Are Unlawful

The Final Rule's problems do not end with its arbitrary expansion of ten-day notices to

include actions taken by State regulatory authorities. While authorizing ten-day notices for those actions, the Final Rule simultaneously requires the Secretary to disregard important information from State regulatory authorities. And the Final Rule excuses citizens from needing to contact State regulatory authorities with their concerns, even though the Secretary concedes that State regulatory authorities are best positioned to address citizens' concerns. Those changes make no sense—and the Final Rule fails to offer a reasoned justification grounded in the Act's text.

### A.   The Final Rule's prohibition on considering readily available information from State regulatory authorities is contrary to law and arbitrary

Section 521(a) provides that the Secretary may issue a ten-day notice if, "on the basis of any information available" she has "reason to believe" that a person has committed a potential violation of the Act or a state permit condition required by the Act. 30 U.S.C. § 1271(a)(1). When the Secretary received a citizen complaint in years past, the Secretary would consider not just the complaint's allegations in determining whether there is reason to believe a violation exists, but also all "readily available information, including any information that a State regulatory authority" can provide without unreasonable delay. 85 Fed. Reg. at 75157, 75179. That practice reflected that State regulatory authorities may have information "vital" for efficiently and effectively addressing complaints. *Id.* at 75164. The Final Rule, however, "limits" what the Secretary will consider in determining whether she has "reason to believe" a potential violation has occurred to (1) allegations in the citizen complaint (which may or may not be true); (2) information in OSMRE's files at the time of the complaint; and (3) publicly available electronic information. 89 Fed. Reg. at 24715, 24724. That newly imposed limitation is both contrary to the statute and arbitrary.

Start with the statute. Section 521(a) directs the Secretary to determine whether there is "reason to believe" a violation exists on "the basis of *any* information *available* to him." 30 U.S.C. § 1271(a) (emphasis added). Around the time the Act was enacted, the term "available" meant

"present or ready for immediate use" or "accessible, obtainable." *Webster's New Collegiate Dictionary* 77 (1981). "[A]ny" meant "one or some indiscriminately of whatever kind." *Id.* at 55. The Act's plain language thus permits the Secretary to consider information available from any source, including State regulatory authorities—the entities most likely to have up-to-date information. "There is no basis in the text for limiting" the information the Secretary can consider to information found in OSMRE's files or on the internet, *United States v. Gonzalez*, 520 U.S. 1, 5 (1997), especially given the Secretary's statutory duty to "cooperate" with "State regulatory authorities to minimize duplication of inspections, enforcement, and administration," 30 U.S.C. § 1211(c)(12).

Tellingly, the Final Rule does not explain how considering some information from third parties while ignoring other information that can be obtained just as easily from State regulatory authorities is consistent with the Act's direction to consider "any" available information or the Secretary's duty of cooperation. Instead, the Final Rule asserts that "legislative history" indicates that a reasonable belief can be established without proof of an "actual violation." 89 Fed. Reg. at 24715. "But legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). And saying that Section 521(a) does not require definitive proof of a violation does not explain why the Secretary may intentionally blind herself to available information from some of the most knowledgeable sources. Nor can the Secretary cure her failure to grapple with the statutory text by generically asserting the Final Rule is consistent with the Act. "[C]onclusory statements" are not reasoned explanations. *Encino Motorcars*, 579 U.S. at 224. "'Stating that a factor was considered . . . is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)).

Textual failures aside, the Final Rule fails to offer a reasoned explanation for the Secretary's change of position from the 2020 Rule. In the 2020 Rule, the Secretary explained that he

24

should consider any information that is readily available, including information from the State regulatory authorities, before issuing a ten-day notice. 85 Fed. Reg. at 75151. More than "40 years" of experience had shown that considering information from State regulatory authorities would lead to a more efficient and effective enforcement process, preventing wasteful and duplicative efforts. *Id*. at 75157–58. That makes sense: "State inspectors" visit mine sites "at least once a month," inspecting problem ones more frequently, and have the "best, most current information" about mine sites. Ex. 1, IMCC Comment 20; *see, e.g.*, Ex. 1, Montana Department of Environmental Quality Comment 2 (Montana "is aptly positioned to answer OSMRE questions"). Considering information that can be quickly obtained from States thus improves decisionmaking and efficiency.

The Final Rule does not dispute that States usually have the best, most current information. Indeed, the Final Rule concedes that States are "more acquainted with conditions on the ground" and could have vital information that "definitively disprove[s] the existence of a violation." 89 Fed. Reg. at 24715, 24718. Nevertheless, the Final Rule directs OSMRE to disregard any information available from States and consider only allegations in a citizen complaint and potentially lower quality information or less up-to-date information found in OSMRE's files or the internet. To explain that change, the Final Rule asserts that considering information from State regulatory authorities could cause "delay" because there were "some instances" where it took "up to 30 days" for a State to provide information. *Id.* at 24715. But that there were *some*, unspecified instances in which a State did not provide requested information immediately does not explain why it is rational to prohibit consideration of information that can be obtained from States with a single phone call or email. *See* Ex. 1, IMCC Comment 20. As the 2020 Rule observed, nothing in it requires federal regulators to wait indefinitely for information from States. 85 Fed. Reg. at 75167.

A total prohibition on considering information that can be quickly obtained from States is

especially illogical given the Final Rule's putative goal of reducing processing times. The Final Rule does not deny that "increased communication" between federal and state regulators has "improved response times." Ex. 1, Kentucky Department of Natural Resources Comment 5; *see, e.g.*, Ex. 1, West Virginia Department of Environmental Protection Comment 4 ("The 2020 Rule has resulted in significant improvements in the ability to expeditiously address violations."). Yet the Final Rule bars OSMRE staff from communicating with their state counterparts even where a simple phone call or quick email could save a "chronically underfunded and understaffed" agency both time and trouble. Hannah Northey, *Greens, GOP Clash Over Mine Oversight, Cleanup Funding*, E&E News (Mar. 12, 2024), https://www.eenews.net/articles/greens-gop-clash-over-mine-oversight-cleanup-funding/ (quoting Appalachian Voices senior manager Erin Savage).

If the Secretary were truly concerned about processing citizen complaints more quickly, there were other options she should have considered. One of the most obvious would be to set internal deadlines for processing complaints. Ex. 1, Indiana Department of Natural Resources Comment 1–2. According to the Secretary, it can take OSMRE "months" to decide whether there is a reason to believe a violation is occurring. 88 Fed. Reg. at 24949. That months-long delay far exceeds the hours or days it might take to obtain readily available information from a State. Yet rather than address one of the biggest sources of delay, the Secretary chose to forbid OSMRE staff from considering information that could help them resolve complaints more quickly. That makes no sense: "If OSMRE staff are taking months to gather and analyze information," "this is a problem for OSMRE to address in management of its workforce" or through internal policies that set a deadline for working up complaints (much as States have under Section 521(a)). Ex. 1, IMCC Comment 19; *see* Ex. 1, Indiana Department of Natural Resources Comment 1–2. The Final Rule, however, never provides a "'reasoned explanation for its rejection of such alternatives.'" *City of*

*Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987).

Not only does the Final Rule fail to achieve the Secretary's purported objective, but it introduces error and inefficiencies. By automatically excluding from consideration any information in the hands of State regulatory authorities—the entities with the most local knowledge— the Final Rule ensures decisions will be more "poorly informed." Ex. 1, IMCC Comment 20. Stating that the Secretary will consider "publicly available electronic information" (*e.g.*, information gleaned from internet searches) to "fill[] in any gaps in a citizen complaint," 89 Fed. Reg. at 24715, is no answer. State inspectors, who visit sites on at least a monthly basis, generally will have more intimate and recent information than unknown internet denizens. *See* Ex. 1, IMCC Comment 20. And it is hard to see why calling or emailing an expert state inspector would take any more time than sifting through masses of unfiltered information on the internet. *See id.* Yet the Final Rule condemns federal regulators to lower quality sources of information even if they think they could obtain information more quickly from State regulatory authorities.

Another problem sure to result from the Final Rule is inefficient regulation. As the 2020 Rule documented, past failures to consider readily available information from States have resulted in "time," "taxpayer money," and federal and state resources being "wasted." 85 Fed. Reg. at 75158, 75165. States have had to devote resources to "preparing and exchanging paperwork" in response to notices issued on erroneous assumptions that could have been "better" put to "resolving real issues." *Id.* at 75158. The Final Rule offers no cogent response. It asserts that ignoring information in States' possession will allow "OSMRE to proceed more quickly and efficiently." 89 Fed. Reg. at 24724. But it never explains why generating and receiving paperwork is more efficient where "a simple phone call or email with state regulators might result in the submittal of state records that show the citizen's complaint is not factual or lacks legal basis." Ex. 1, Kentucky

Department of Natural Resources Comment 5. At bottom, the Secretary's one-size-fits-all approach deprives her own staff of the flexibility needed to determine what is most efficient. The Final Rule's imposition of a blanket prohibition on considering pertinent information that is readily available from State regulatory authorities is arbitrary and capricious.

### B.     The Final Rule's elimination of notice requirements is arbitrary

A related change to the process for handling complaints makes the failure to consider information held by State regulatory authorities all the more inexplicable. From at least 1982 until issuance of the Final Rule, the Secretary required citizens to contact State regulatory authorities before or simultaneously with submitting a complaint to OSMRE. 85 Fed. Reg. at 75157. That requirement reflected the Secretary's experience—based on "data acquired" over "43 years"—that, "if citizens contact the State initially, most problems will be resolved satisfactorily without the need for intrusion by the federal government." *Id.* at 75167. Additionally, as the Secretary explained in 2020, "including a State regulatory authority early in the process is advantageous . . . because it reduces the duplicative efforts to address potential violations." *Id.* at 75157.

The Final Rule arbitrarily eliminates the longstanding requirement that citizens contact State regulatory authorities. In the Final Rule, the Secretary asserts there have been instances in which citizens "were hesitant to contact the State regulatory authority." 89 Fed. Reg. at 24714, 24717. But "[n]o evidence" shows that citizens in fact were deterred from filing complaints with State regulatory authorities. Ex. 1, Wyoming Department of Environmental Quality Comment 7. Nor does the Final Rule explain why a theoretical concern that *some* citizens might be hesitant to contact State regulatory authorities justifies allowing *all* citizens to bypass State regulatory authorities, or why the concern could not be addressed by allowing citizens to articulate good cause for

failing to contact States. The Secretary's abstract concern that some, unquantified number of citizens may be hesitant to contact a State is not a "good reason[]" to "disregard[]" the more than 40 years of experience that "underlay the prior policy." *Fox Television*, 556 U.S. at 515–16.

The Secretary, moreover, failed to consider other important factors. As commenters pointed out, State regulatory authorities can more quickly and efficiently resolve citizen complaints than federal regulators. Not only do State regulatory authorities "know and understand better than OSMRE the circumstances surrounding a citizen complaint which allows the state to timely and proactively address the reported matter." Ex. 1, Alabama Surface Mining Commission Comment 3. But the Secretary "has no jurisdiction to take direct action to cause a violation to be corrected." Ex. 1, IMCC Comment 23. In the absence of "imminent harm," the Secretary cannot order a federal inspection without first "sending a ten day notice to the State, waiting for the State to respond, making a determination," and then considering any "informal review." *Id.* This means that it will take much longer for violations to be redressed if citizens bypass States, which have the authority to address violations "immediately." *Id.*; *see* Ex. 1, West Virginia Department of Environmental Protection Comment 8–9 ("Requiring information about potential violations to be communicated to the State regulatory authority is better for the public and the environment.").

Additionally, as the 2020 Rule and commenters documented, allowing citizens to bypass State regulatory authorities can lead to inefficacies that detract from redressing actual problems. *See, e.g.*, Ex. 1, IMCC Comment 23; Ex. 1, Wyoming Department of Environmental Quality Comment 7 ("Elimination of this requirement makes the TDN process less effective, increases cost of resolution, and does not quickly resolve any potential violation."); Ex. 1, Alabama Surface Mining Commission Comment 3 ("Removal of this requirement will result in unnecessary delays, duplication of resource use, and more importantly the risk of incorrect decisions"). "For example, in

one instance, OSMRE issued six [ten-day notices] on the same permit in less than six months." 85 Fed. Reg. at 75158. "Instead of focusing directly on correcting the alleged violations at the site, both OSMRE and the State regulatory authority were subsumed by the paperwork exercise of issuing [ten-day notices], responding to [ten-day notices], and evaluating the State's responses to the [ten-day notices]; correcting the alleged violations became secondary" to paperwork. *Id.*

The Final Rule has no answer to the problems with bypassing State regulators. It concedes that State regulatory authorities are "typically in the best position to quickly determine and, if necessary, act on the merits of a citizen complaint." 89 Fed. Reg. at 24718. But the Final Rule nowhere even acknowledges evidence that eliminating a requirement to contact State regulatory authorities will undermine efforts to resolve possible violations quickly and efficiently. That failure to "examine all relevant factors and record evidence" is the antithesis of reasoned decisionmaking. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

**C.     The Final Rule's elimination of other requirements for complaints is arbitrary**

The Final Rule also eliminates a requirement for citizens to state the reason for their belief that State regulatory authorities have failed to act on a complaint. In explanation, the Final Rule states that "[c]itizens are not necessarily well-versed on the text of SMCRA or its implementing regulations; therefore, they should not need to state their allegation in statutory or regulatory language." 89 Fed. Reg. at 24718. But that statement fails to address the basis for the 2020 Rule. As the 2020 Rule stated, citizens need not "provide the level of information that would be required for a legal filing." 85 Fed. Reg. at 75160. They may simply provide the information in their possession, "such as information explaining why the citizen believes there is a violation, that the State regulatory authority was notified, and, possibly, the State regulatory authority's response." *Id.* Moreover, even if there were some merit to the Final Rule's concern, the Final Rule does not

address potential alternative solutions, such as "clarifying" that failure to provide the information is "not a basis for rejecting a citizens' complaint." Ex. 1, IMCC Comment 24.

## III.    The Final Rule's Rigid Deadlines and Prohibitions on Action Plans Are Unlawful

Even while making changes designed to increase the volume of ten-day notices, the Final Rule curtails States' ability to address them. The Final Rule imposes inflexible deadlines on States for responding to ten-day notices and disallows action plans as a permissible response. Those changes are unlawful and arbitrary.

### A.    Imposing inflexible deadlines on States is contrary to law and arbitrary

When the Secretary issues a notice to a State regulatory authority under Section 521(a), the authority can respond in one of two ways: it can "take appropriate action to cause said violation to be corrected or show good cause for such failure." 30 U.S.C. § 1271(a)(1). In the 2020 Rule, the Secretary clarified that the "good cause" standard is met where a State regulatory authority "has initiated an investigation into a possible violation" and "determined that it requires a reasonable, specified additional amount of time to determine whether a violation exists." 85 Fed. Reg. at 75190–91. The Secretary declined to put a hard limit on extension of time to complete "often complicated and fact-specific investigations," instead choosing to give OSMRE staff "discretion" to determine how much time is reasonably needed to complete an investigation. *Id.* at 75178–79. The Final Rule reverses course. It "specifi[es] the time in which a [State regulatory authority] must complete its investigation." 89 Fed. Reg. at 24717. The Final Rule demands that State regulatory authorities complete most investigations within 30 days. *Id.* And while the Final Rule allows a State regulatory authority to request additional 60 days to complete an investigation in "complex situations," the Final Rule "caps the maximum amount" of time for an investigation at 90 days. *Id.*

The Final Rule's arbitrary imposition of 30- and 90-day limits for responding to ten-day

31

notices defies the Act. As mentioned, Section 521(a) provides that a State may forestall a federal inspection by showing "good cause" for failing to remedy a violation within ten days. 30 U.S.C. § 1271(a)(1). The Act does not impose a "rigid" deadline on States for completing investigations; it sets an open-ended standard that "call[s] for an exercise of . . . discretion." *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 375 n.5 (D.C. Cir. 1980). So long as a State can show good cause, the Act provides it with the flexibility needed to complete complex or labor-intensive investigations. That choice reflects both Congress's "policy of encouraging 'exclusive' State regulation" and its recognition that many local factors—including "terrain," "climate," and "physical conditions," 30 U.S.C. § 1201—affect mining regulation. *Bragg*, 248 F.3d at 294. By contrast, the Final Rule demands that State regulatory authorities complete their work within 30 or, at most, 90 days even when investigating the matter or remedying the violation would be impossible within that timeframe. The Final Rule withholds the discretion the statute confers.

Perhaps the Secretary could justify a presumptive time limit for completing investigations if she had evidence that investigations usually could be completed within a particular time. But the Final Rule does not identify *any* evidence supporting the agency's choice of an initial 30-day limit or a 90-day cap for complex investigations. The Final Rule simply asserts that imposing a time limit will "facilitate expedited resolution of identified issues." 89 Fed. Reg. at 24717. Reasoned decisionmaking requires more. A "foundational precept of administrative law" is that the "'agency must examine the relevant data and articulate a satisfactory explanation for its action,'" "especially . . . where, as here, an agency changes course." *Physicians for Soc. Resp. v. Wheeler*, 965 F.3d 634, 644 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43). A reasoned analysis of the data supporting a hard cap on investigations is missing entirely. *See id.* at 646–47.

If the Secretary had examined the evidence, it would have been apparent that a State regulatory authority may have "good cause" for failing to complete an investigation or redress a violation within 30 or 90 days. As States with firsthand experience explained in comments, "complex matters such as subsidence damage, blasting damage or diminution of the quantity or quality of well water can often take much longer than 90 days" to investigate. Ex. 1, IMCC Comment 21; *see* Ex. 1, Indiana Department of Natural Resources Comment 2; Ex. 1, West Virginia Department of Environmental Protection Comment 8. Other investigations can take longer than 90 days due to seasonal and environmental realities beyond any regulator's control. For example, "snow cover" can prolong investigations in "more northern States," preventing effective completion of some investigations until "snows have melted." Ex. 1, IMCC Comment 23. And if a State needs to assess a mining operation's "impact on hydrologic balance, inside or outside the permit area," the State's investigation will need to "take into account seasonal variation" in water levels. *Id.* at 22. "This simply cannot be done in 90 days." *Id.*

Even for issues that theoretically can be investigated in 30 or 90 days, investigations on the ground may take longer. "Gathering enough evidence to justify a decision to take enforcement is only a part of what an investigation entails." Ex. 1, IMCC Comment 21; *see* Ex. 1, West Virginia Department of Environmental Protection Comment 8; Ex. 1, Wyoming Department of Environmental Quality Comment 8. Mining companies armed with "competent lawyers" and "well-paid expert witnesses" "often appeal enforcement action[s]." Ex. 1, IMCC Comment 21. This means that, during investigations, States need to be "thorough" and gather enough evidence that any enforcement action taken can withstand a legal challenge. *Id.* at 21–22. Forcing a State to conclude an investigation before it has gathered enough evidence to meet a 30- or 90-day deadline would "be harmful to the citizens whose interests the State is attempting to protect." *Id.*

33

The Final Rule's imposition of 30- and 90-day caps is even harder to justify given its decision to authorize ten-day notices for systemic issues with State programs and permit defects. As comments observed, addressing a programmatic issue could "require the issuance of emergency state regulations, followed by promulgation of permanent state regulations, and ultimately a federal amendment." Ex. 1, Kentucky Department of Natural Resources Comment 6. If a programmatic issue requires an amendment to a state statute, the process could be even more drawn out. *See id.* Making changes to a State program and winning federal approval can take years. *See id.*; Ex. 1, IMCC Comment 13 ("OSMRE has not been capable of processing even the simplest of State program amendments in less than a *period of years*"). States' requirements regarding promulgating regulations and the frequency of legislatives sessions will differ. For example, in West Virginia these types of rules must be approved through a Legislative Rule-Making Review Committee and then submitted to the Legislature with the possibility that rules will be withheld if not submitted to the Committee prior to the last Friday in August. *See* W. Va. Code § 29A-3-12.

The Final Rule's time limits for addressing permit issues make no sense either. As the Secretary should know from past experience, resolving notices issued for permitting issues frequently "take[s] months" and "require[s] the exchange of hundreds of pages of information between OSMRE and the states." Ex. 1, IMCC Comment 13. To cite just one example, a State once had to prepare a "472 page response" upon receiving a notice for a permit-related complaint. *Id.* And if resolving a permit-related issue requires a permit amendment, the permitting process alone could last "months" due "to the multitude of issues involved." *Id.* at 12–13. In setting inflexible 30- and 90-day deadlines, however, the Secretary addressed none of these important considerations. The Secretary simply "averted [her] eyes." *Am. Wild Horse*, 873 F.3d at 931.

Indeed, the Secretary did not even provide a good reason for abandoning the 2020 Rule. In

the Final Rule, the Secretary expressed concern that the 2020 Rule had the "potential" for "violations to remain unabated for an open-ended amount of time." 89 Fed. Reg. at 24717. But the Secretary cited no examples of any investigation under the 2020 Rule continuing for months and months without resolution. The Final Rule seems to be a "solution in search of a problem." *PayPal, Inc. v. CFPB*, --- F. Supp. 3d ---, 2024 WL 1344791, at *6 (D.D.C. Mar. 29, 2024). Further, in criticizing the 2020 Rule, the Secretary overlooked that the 2020 Rule did not authorize investigations for an "open-ended amount of time." The 2020 Rule required investigations to be complete in a "reasonable, specified additional amount of time." 85 Fed. Reg. at 75190–91. An investigation could remain open-ended under the 2020 Rule only if OSMRE failed to follow the rule—an internal-agency problem that could be solved without imposing arbitrary deadlines on States.

In changing course from the 2020 Rule, moreover, the Secretary failed to consider other ways to "facilitate expedited resolutions" of the ten-day notice process. 89 Fed. Reg. at 24717. One alternative would be to impress upon OSMRE staff the importance of giving States a "reasonable, specified" amount of time to complete investigations, or to instruct OSMRE staff to probe States' assertions of good cause. Another alternative would be to give OSMRE staff a deadline for processing ten-day notices and responses to notices received from States. As commenters observed, OSMRE has no deadline for resolving a complaint or a response to a ten-day notice. *See* Ex. 1, IMCC Comment 13, 19; Ex. 1, Indiana Department of Natural Resources Comment 1–2. Kentucky, for example, had 21 of its responses awaiting review from OSMRE as of June 2023— two of which dated from 2014. Ex. 1, Kentucky Department of Natural Resources Comment 6. But the Final Rule never explains why giving States inflexible deadlines is the best way to speed the investigatory process when unresolved cases are languishing on the Secretary's own desk. It simply failed to "even consider" possible "alternative[s]." *State Farm*, 463 U.S. at 48.

**B.      The changes regarding action plans are unlawful and arbitrary**

The Final Rule's provisions regarding "action plans" are unlawful and arbitrary as well. When the Secretary issues a ten-day notice to a State regulatory authority, Section 521(a) directs the State regulatory authority to take "appropriate action to cause said violation to be corrected." 30 U.S.C. § 1271(a)(1). In recognition of the fact that notices issued for site-specific violations could sometimes reveal a larger programmatic issue, the 2020 Rule provided for state and federal regulators to develop cooperatively an "action plan." 85 Fed. Reg. at 75182. An action plan would include steps for "timely" and "effectively" addressing a programmatic issue. *Id.* at 75190 (listing required elements). The Final Rule makes two major changes to the provisions governing action plans. First, it provides that developing an action plan no longer constitutes an "appropriate action." 89 Fed. Reg. at 24718. Second, the Final Rule provides that an action plan must be completed within 365 days. *Id*. at 24731. Both changes are unlawful and arbitrary.

Consider first the Final Rule's statement that an action plan is not "appropriate action." According to the Final Rule, action plans cannot be "appropriate actions" because "action plans do not themselves remedy violations." 89 Fed. Reg. at 24718. As the Secretary recognized historically, however, Section 521(a) does not state that an "appropriate action" must abate a violation; it indicates that an "appropriate action" will "cause" a violation to be corrected. 30 U.S.C. § 1271(a)(1); *see* 53 Fed. Reg. 26728, 26734 (July 14, 1998). Actions that initiate a process of correction thus can constitute an appropriate action for purposes of Section 521(a). That is particularly true if the Final Rule is correct that ten-day notices can be issued for "all" suspected departures from the Act. 89 Fed. Reg. at 24715–16. If a State's lax enforcement program-wide can trigger a ten-day notice, then an action plan to improve enforcement certainly corrects the violation. The Final Rule identifies no textual reason for categorically eliminating action plans.

Nor does the Final Rule grapple with past explanations of why action plans are important and consistent with the text. For example, in the 2020 Rule, the Secretary observed, "[t]he addition of the action plan process will allow OSMRE to more easily address, with the cooperation of the State regulatory authority, situations where an alleged violation can be traced to a systemic problem within an existing State regulatory program." 85 Fed. Reg. at 75172. And in 1998, the Secretary observed that an action that "initiates" a process of correcting a permit can be an appropriate action. 53 Fed. Reg. at 26734. The Final Rule, however, does not even mention those explanations. Its failure to "explain its reversal" is "arbitrary and capricious." *Am. Wild Horse*, 873 F.3d at 927.

Next consider the Final Rule's requirement that an action plan be completed in 365 days. Although the Final Rule does not consider action plans an "appropriate action," the Final Rule states that action plans can constitute "good cause" for failing to take an appropriate action in ten days. 89 Fed. Reg. at 24727. Even on that theory, however, the Final Rule cannot be sustained. Section 521(a) does not impose an upper time limit on States for taking an action. It simply says State regulatory authorities must show "good cause" for failing to act. 30 U.S.C. § 1271(a)(1). Insisting that States complete an entire plan in 365 days, even if there is good cause for taking longer, is contrary to the Act's plain language. *See* pp. 31–32, *supra*.

The record highlights the 365-day limit's arbitrary nature. As commenters observed, making changes to a State program and winning federal approval for those changes can take far more than 365 days. Completing action plans may require a State to conduct a rulemaking, wait for a part-time legislature to be back in session to amend a statute, or engage in litigation over court-imposed conditions. Ex. 1, IMCC Comment 16; Ex. 1, Wyoming Department of Environmental Quality Comment 6. Or an action plan may call for a permit revision, a process that can take more than a year to complete, especially if a mine operator is slow to respond. Ex. 1, IMCC Comment

17. Indeed, OSMRE itself can prevent an action plan from being completed in 365 days. During the last 14 years, "OSMRE has not been capable of processing even the simplest of State program amendments in less than a *period of years*." Ex. 1, IMCC Comment 13, 16. A year simply does not provide sufficient time to complete all tasks that must be completed in every action plan.

Curiously, in the Final Rule, the Secretary admits that 365 days will be insufficient. She concedes that "final resolution of an issue could exceed one year," "particularly" where an issue involves "multiple parties and/or agencies, State legislative actions, or any requirements imposed by court decisions." 89 Fed. Reg. at 24717. Rather than provide States the flexibility they need to address issues, however, the Secretary's answer is to direct States to include in an action plan only those items that "can be accomplished within one calendar year." *Id.* That makes no sense. According to the Secretary's own regulations, action plans are supposed to provide an "effective mechanism" for correcting an issue with a State regulatory program. *Id.* at 24734–35. They will not be effective if States are required to ignore out-of-hand any solutions that would take more than a year to implement, even if the solution is the best or only one available. The Final Rule's arbitrary time limit is destined to make action plans unavailable or ineffective for many issues.

## IV.    Cumulatively, the Final Rule's Provisions Upend the Federal-State Balance

Individually, the Final Rule's changes to ten-day notices are bad enough. Together, the changes combine to transform the federal-state relationship in a way that is contrary to the Act. Recall that the Act is unique among "cooperative federalism" statutes. The Act "does not provide for shared regulation of coal mining"; it provides for States to have exclusive jurisdiction over coal mining, with the Secretary performing a limited oversight function. *Bragg*, 248 F.3d at 293; *see In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 523 (States exercise "front-line supervision"). Even Section 521(a) does not permit federal intervention at the first sign of an issue. Rather,

the statute requires the Secretary to give States opportunity to take appropriate action in response to a complaint or show good cause for failing to do so. *See* 30 U.S.C. § 1271(a)(1). And in everything, the Act requires the Secretary to "cooperate" with "State regulatory authorities to minimize duplication of inspections, enforcement, and administration." *Id.* § 1211(c)(12). The "deference" that the Act extends to States is "extraordinary" and "'unparalleled.'" *Bragg*, 248 F.3d at 293.

The impact of the Final Rule is to overthrow the Act's deference to States. The Final Rule authorizes the Secretary to issue ten-day notices for any action by State regulatory authorities deemed inconsistent with the Act, circumventing Congress's decision to give the Secretary "no role" in permitting, 72 Fed. Reg. at 68025, and depriving States of Section 521(b)'s procedural protections. The Final Rule then ensures the volume of ten-day notices will swell still further by discarding requirements that citizens first contact States with concerns and by requiring OSMRE to blind itself to vital information from States in considering complaints. Those changes alone would suggest an intention to make the federal government the regulator of first resort. But the Final Rule then proceeds to impose arbitrary, inflexible deadlines on States that will be impossible to meet in many situations, partly due to the federal government's own track record of delay. Together, all of these changes leave a distinct impression—the Final Rule is calculated to displace States from their front-line role and to allow federal authorities to swoop in.

Even more troublingly, the Secretary is bent on ignoring the impact on States. The Secretary declined even to order preparation of a federalism impact statement or a Regulatory Flexibility Act statement on the theory that the Final Rule will not have "significant" impact on States and that the hours that States must devote to processing ten-day notices will remain "the same." 89 Fed. Reg. at 24733–34. The Final Rule, however, does not even try to explain how that theory comports with the record evidence. It simply ignores that multiple States submitted comments

explaining how the Final Rule would increase the volume of ten-day notices, Ex. 1, IMCC Comment 12–13, correspondingly increase administrative burdens on States, *id.*, and intrude into exclusive areas of state jurisdiction, such as permitting, *id.* at 8–9. Turning a blind eye is not reasoned decisionmaking. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024). Indeed, an explanation so "incongruent with what the record reveals" raises significant questions about whether the Final Rule's proffered rationale is its real one. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). There is ample reason to conclude the Final Rule is likely invalid.

## V. The Remaining Requirements for Relief Are Satisfied

### A. A stay will not adversely affect the public health, safety, or environment

Petitioners satisfy all the equitable requirements for a stay or preliminary injunction as well. To grant a stay, the Court need only find that a stay "will not adversely affect the public health or safety or cause significant imminent environmental harm to land, air, or water resources." 30 U.S.C. § 1276(c); *see Jaward*, 564 F. Supp. at 799–800. A stay will not. Petitioner States have already demonstrated to the Secretary's satisfaction that their regulatory programs are "capab[le] of carrying out" the Act and "meeting its purposes." 30 U.S.C. § 1253(a); *see id.* § 1253(b)(4). The Secretary would not have approved the programs otherwise. *See In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 520 ("The Secretary's primary means of guaranteeing effective state programs lies in his approval function"). Petitioners' programs (many of which are award winning) will continue protecting the public health, safety, and environment during a stay, just as they did before the Final Rule. *See, e.g.*, Ex. 2, Christmann Decl. ¶ 19; Ex. 2, Moore Decl. ¶ 28.

Petitioners' track records bear this out. As OSMRE's Annual Report observed, Indiana "administers its program in a way that effectively protects citizens and the environment from the adverse impacts resulting from surface coal mining." Ex. 3, Annual Evaluation Report for the

Regulatory and Abandoned Mine Land Program Administered by the State Regulatory Authority of Indiana for 2023, at 13. In fact, Indiana has not received a ten-day notice since 2016. Ex. 2, Weinzapfel Decl. ¶¶ 11, 13, 19. Other States boast similar records. *See* Dkt. 1, ¶¶ 33–48, 83, 86. And while West Virginia, a State with significant mining, received a higher volume of complaints than other States, it has a demonstrated track record of addressing them swiftly. *See* Ex. 3, 2022 West Virginia Department of Environmental Protection Annual Evaluation Report, at 5.

     **B.**     **States, their citizens, and the public will suffer irreparable harm without relief**

Although Petitioners need not demonstrate anything more to obtain relief under the Act, they satisfy the traditional requirements for a preliminary injunction too. Without an injunction, the Final Rule will inflict irreparable harm. First, it will inflict an irreparable sovereign injury by fundamentally altering the balance between federal and state regulation and by allowing federal regulators to intrude into areas within the exclusive jurisdiction of State regulatory authorities. *See Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

Second, the Final Rule will increase administrative burdens on States. Under the Final Rule, the volume of ten-day notices will increase. *See, e.g.*, Ex. 2, Rorrer Decl. ¶ 19. The Final Rule authorizes the Secretary to send notices for issues that previously could not have been addressed under Section 521(a), eliminates requirements that fostered efficient resolution of concerns, and forces States to meet arbitrary timelines. *See* pp. 12–38, *supra*. In West Virginia, the volume of ten-day notices has already "increased by a factor of 47." Ex. 2, Rorrer Decl. ¶ 21.

Responding to the increased volume of ten-day notices will require States to devote resources to reviewing "relevant information and formulate a response," pulling employees away from other duties. Ex. 2, Weinzapfel Decl. ¶¶ 16–18; *see, e.g.*, Ex. 2, Rorrer Decl. ¶ 23, Ex. 2,

Moore Decl. ¶ 25. And if addressing a programmatic issue requires a statutory change or rulemaking, the burdens on States will be especially acute. Those nonrecoverable costs constitute irreparable harm. *See Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021).

Third, the Final Rule threatens to delay the issue of permits, both by miring permits in challenges and pulling staff away from permit reviews. *See, e.g.*, Ex. 2, Rorrer Decl. ¶ 23; Ex. 2, Weinzapfel Decl. ¶ 28; Ex. 2, Moore Decl. ¶ 26. Those delays could interfere with mining operators' contractual obligations—an especially serious concern for power plants that depend on a steady supply of coal from adjacent operations. *See, e.g.*, Ex. 2, Christmann Decl. ¶ 17; Ex. 2, Weinzapfel Decl. ¶¶ 28, 29; Ex. 2, Moore Decl. ¶ 27. Any permitting delay for mines feeding coal-fired power plants could jeopardize electrical reliability, harming consumers. *See* Ex. 2, Christmann Decl. ¶ 18; *see also Texas*, 829 F.3d at 435.

## C.     Granting relief is in the public interest

Meanwhile, the federal government has no interest in perpetuating an unlawful regulation. As this Court has observed, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Granting relief would also further the public's interest in maintaining federalism's "constitutional balance"—a balance that Congress sought to respect and to preserve though the Act. *Withrow v. Williams*, 507 U.S. 680, 687 (1993). In an affront to Congress, the Final Rule reverses the special deference that the Act extends to States, allowing the federal government to encroach on States' exclusive jurisdiction.

The Final Rule, moreover, disserves the public's interest in "effective and reasonable" regulation of coal mining that protects the environment while allowing an industry "essential to the

national interest" to flourish. 30 U.S.C. § 1201(a), (e); *see id.* § 1202(d), (f). The Final Rule ensures that the Secretary cannot consider vital information that would disprove the existence of a suspected violation, ensuring that busy state regulators will have to devote time to unnecessary paperwork on a tight schedule that could be better put to pursuing actual offenders. Additionally, by imposing arbitrary deadlines, the Final Rule handcuffs state regulators' ability to conduct thorough investigations, to marshal the evidence for an order to survive judicial review, and to design action plans that will redress a problem's root cause. And by allowing citizens to bypass state regulators, the Final Rule ensures that the State regulatory authorities with jurisdiction to do something about a problem will only hear about it after a complaint has sat with a chronically understaffed federal agency prone to delay. None of that serves the public.

If the Final Rule were calculated to solve some real-world threat to the public health or environment, perhaps there would be more to say for it. But the Final Rule identifies no such problem. As the Secretary necessarily recognized in approving the States' regulatory programs, the States have competent and effective programs to protect the public health and environment. *See* 30 U.S.C. § 1253(a), (b)(4). The Court should enable the State regulators that Congress deemed best equipped to oversee surface coal mining and reclamation to do their jobs.

## CONCLUSION

The Final Rule should be stayed or its enforcement preliminarily enjoined.

Respectfully submitted,

PATRICK MORRISEY
  Attorney General of West Virginia
/s/ Michael R. Williams
Michael R. Williams (DC Bar No. 994953)
  Solicitor General
Office of the West Virginia Attorney General
State Capitol, Bldg 1, Room E-26
Charleston, WV 25305
(681) 313-4550

THEODORE E. ROKITA
  Attorney General of Indiana
/s/ James A. Barta
James A. Barta (DC Bar No. 1032613)
  Solicitor General
Betsy DeNardi*
  Special Counsel of Complex Litigation
Bradley S. Davis**
  Deputy Attorney General

43

Michael.R.Williams@wvago.gov

*Counsel for State of West Virginia and West Virginia Department of Environmental Protection*

STEVE MARSHALL
  Attorney General of Alabama
/s/ Steven Shawn Sibley
Steven Shawn Sibley*
  Assistant Attorney General
Office of the Attorney General
State of Alabama
501 Washington Avenue
Montgomery, AL 36130
(334) 242-7300
Shawn.Sibley@AlabamaAG.gov

*Counsel for State of Alabama and Alabama Surface Mining Commission*

TIM GRIFFIN
  Attorney General of Arkansas
/s/ Dylan L. Jacobs
Dylan L. Jacobs (DC Bar No. 1047239)
  Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-2007
Dylan.jacobs@arkansasag.gov

*Counsel for State of Arkansas*

ELIZABETH B. MURRILL
  Attorney General of Louisiana
/s/ Kelsey L. Smith
Kelsey L. Smith*
  Deputy Solicitor General
Louisiana Department of Justice
1885 N. Third Street
Baton Rouge, LA 70804
(225) 428-7432
smithkel@ag.louisiana.gov

*Counsel for State of Louisiana and Louisiana*

Indiana Attorney General's Office
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN 46204
(317) 232-6201
James.Barta@atg.in.gov

*Counsel for State of Indiana and Indiana Department of Natural Resources*

TREG TAYLOR
  Attorney General of Alaska
/s/ Gilman Dana S. Burke
Gilman Dana S. Burke*
Natural Resource Section
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
dana.burke@alaska.gov

*Counsel for State of Alaska and Alaska Department of Natural Resources*

RUSSELL COLEMAN
  Attorney General of Kentucky
/s/ Daniel J. Grabowski
Daniel J. Grabowski*
  Assistant Solicitor General
Kentucky Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, KY 40601
(502) 696-5300
Daniel.Grabowski@ky.gov

*Counsel for Commonwealth of Kentucky*

AUSTIN KNUDSEN
  Attorney General of Montana
/s/ Christian B. Corrigan
Christian B. Corrigan*
  Solicitor General
Montana Department of Justice
215 N. Sanders Helena, MT 59601
Christian.Corrigan@mt.gov

*Department of Energy and Natural Resources*

DREW H. WRIGLEY
   Attorney General of North Dakota
 /s/ Philip Axt
Philip Axt*
   Solicitor General
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
(701) 328-2210
pjaxt@nd.gov

*Counsel for State of North Dakota*

KEN PAXTON
   Attorney General of Texas
BRENT WEBSTER
   First Assistant Attorney General
/s/ Ian Lancaster
Ian Lancaster*
   Assistant Attorney General
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548 (MC 059)
Austin, TX 78711-2548
(512) 463-2012
Ian.Lancaster@oag.texas.gov

*Counsel for State of Texas*

JASON S. MIYARES
   Attorney General of Virginia
/s/ Kevin M. Gallagher
Kevin M. Gallagher (DC Bar No. 1031415)
   Principal Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of Virginia and
Virginia Department of Energy*

*Counsel for State of Montana*

DAVE YOST
   Attorney General of Ohio
/s/ T. Elliot Gaiser
T. Elliot Gaiser (DC Bar No. 198293)
   Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, OH 43215
(614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for State of Ohio*

SEAN D. REYES
   Attorney General of Utah
/s/ Gary T. Wight
Gary T. Wight*
   Assistant Attorney General
1594 West North Temple, Suite 300
Salt Lake City, UT 84116
(801) 538-7227
gwight@agutah.gov

*Counsel for State of Utah and Utah Department of Natural Resources*

BRIDGET HILL
   Attorney General of Wyoming
/s/ D. David DeWald
D. David DeWald*
   Deputy Attorney General
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
david.dewald@wyo.gov

*Counsel for the State of Wyoming*

* Registered per LCvR 83.2(g)
** Registration per LCvR 83.2(g) pending