# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF INDIANA, *et al.*, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-01665-RBW |
| | ) | |
| DEBRA HAALAND, | ) | |
| Secretary of the Interior, *et al.*, | ) | THE HON. REGGIE B. WALTON |
| | ) | |
| Respondents. | ) | |
| | ) | |

**Respondents' Brief in Opposition to Petitioners' Motion for a Stay / Preliminary Injunction**

# TABLE OF CONTENTS

Introduction ................................................................................................................ 1

Background ................................................................................................................. 2

    1.    OSMRE exercises a critical oversight function under SMCRA ............................ 2

    2.    Section 521(a)(1) of SMCRA requires OSMRE to issue TDNs ............................ 4

    3.    OSMRE has promulgated regulations to carry out its mandate ............................ 5

    4.    The 2024 TDN Rule is consistent with SMCRA's regulatory history ................. 7

        a.    OSMRE's regulations have provided wide latitude to issue TDNs
            for most of the agency's history .................................................................. 8

        b.    OSMRE's 2020 Rule changed the TDN process ...................................... 10

        c.    The 2024 TDN Rule partially restored the pre-2020 status quo .............. 12

Procedural History .................................................................................................... 14

Argument .................................................................................................................. 14

    I.    Petitioners' motion does not comply with the Local Rules ................................. 14

    II.    The Court lacks jurisdiction over this action ...................................................... 15

    III.    The Court should analyze Petitioners' motion under the traditional four-part
        test for preliminary injunctions ......................................................................... 16

    IV.    Petitioners fail to demonstrate that they are likely to succeed on the merits ........ 20

        1.    Petitioners bear a heavy burden to challenge the 2024 TDN Rule ........... 20

        2.    Petitioners are unlikely to demonstrate that the 2024 TDN Rule is
            inconsistent with SMCRA ...................................................................... 22

            a.    OSMRE must exercise its oversight role with regard to State
                permitting decisions .................................................................... 22

            b.    OSMRE has historically had the ability to issue TDNs for
                permit defects ............................................................................ 24

            c.    Petitioners fail to show that the 2024 TDN Rule violates
                SMCRA ..................................................................................... 26

|  |  | d. | Petitioners' statutory interpretation arguments lack merit............ 26 |
|---|---|---|---|
|  | 3. |  | Petitioners are unlikely to demonstrate that the 2024 TDN Rule's revisions to the mechanics of the TDN process are unlawful.................. 32 |
|  |  | a. | The 2024 TDN Rule reasonably specifies the sources of information OSMRE may consider before issuing a TDN ........... 33 |
|  |  | b. | The 2024 TDN Rule increases the ease with which citizens can file complaints to OSMRE ..................................................... 35 |
|  |  | c. | The 2024 TDN Rule sets reasonably boundaries on the use of action plans ................................................................................ 36 |
|  |  | d. | The 2024 TDN Rule sets reasonable deadlines for the TDN Process ...................................................................................... 37 |
| V. |  |  | Petitioners fail to demonstrate irreparable injury.................................... 39 |
|  | 1. |  | Petitioners do not suffer any injury to their sovereign authority ............. 39 |
|  | 2. |  | The 2024 TDN Rule will not increase Petitioners' administrative burdens.................................................................................................. 41 |
|  | 3. |  | Possible impacts on mining are purely speculative ................................. 43 |
| VI. |  |  | The balance of the equities and the public interest weigh against enjoining the 2024 TDN Rule.................................................................................... 43 |
| VII. |  |  | Any relief should be appropriately limited ........................................... 44 |
| Conclusion | | | ........................................................................................................ 455 |

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abdullah v. Obama*,
  753 F.3d 193 (D.C. Cir. 2014) ............................................................................ 16

*Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*,
  613 F.3d 206 (D.C. Cir. 2010) ............................................................................ 21

*Am. Hosp. Ass'n v. NLRB*,
  499 U.S. 606 (1991) ............................................................................................ 21

*Am. Radio Relay League, Inc. v. FCC*,
  617 F.2d 875 (D.C. Cir. 1980) ............................................................................ 21

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
  681 F.3d 427 (D.C. Cir. 2012) ............................................................................ 21

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................................ 43

*California v. Texas*,
  593 U.S. 659 (2021) ............................................................................................ 43

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012) ............................................................... 32, 38

*Chamber of Com. of U.S. v. NLRB*,
  118 F. Supp. 3d 171 (D.D.C. 2015) ..................................................................... 21

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ....................................................................... 38, 42

*Com. of Va. ex rel. Va. Dep't of Conservation & Econ. Dev. v. Watt*,
  741 F.2d 37 (4th Cir. 1984) ................................................................................. 18

*Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*,
  728 F.3d 1229 (10th Cir. 2013) ...................................................................... 24, 32

*FCC v. Fox Television Stations*, Inc.,
  556 U.S. 502 (2009) ............................................................................................ 37

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 15

*Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................ 38

*Green Oceans v. U.S. Dep't of the Interior*,
  No. 24-CV-00141, 2024 WL 1885543 (D.D.C. Apr. 30, 2024) ........................... 14

*Hill Dermaceuticals, Inc. v. FDA,*
    709 F.3d 44 (D.C. Cir. 2013) ........................................................... 32, 38

*Hodel v. Va. Surface Min. & Reclamation Ass'n,*
    452 U.S. 264 (1981) ............................................................................ 2, 18

*In re Permanent Surface Mining Regul. Litig.,*
    653 F.2d 514 (D.C. Cir. 1981) ..................................... 2, 4, 20, 22, 31

*INS v. Nat'l Ctr. for Immigrants' Rts., Inc.,*
    502 U.S. 183 (1991) ................................................................................. 21

*Jaward Corp. v. Watt,*
    564 F. Supp. 797 (W.D. Va. 1983) ..................................................... 18

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ................................................ 20, 26, 27, 35, 36

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ................................................................................. 15

*Metro. Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia,*
    62 F.4th 567 (D.C. Cir. 2023) ........................................................ 21, 37

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ....................................................... 39, 40

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... 38

*Nat'l Treasury Emps. Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) ............................................................ 15

*Orton Motor, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    884 F.3d 1205 (D.C. Cir. 2018) ..................................................... 26, 28

*Penn. Fed'n of Sportsmen's Clubs, Inc. v. Hess,*
    297 F.3d 310 (3d Cir. 2002) .................................................................... 4

*Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.,*
    316 F. Supp. 3d 22 (D.D.C. 2018) ....................................................... 15

*Postsecondary Sch. v. DeVos,*
    344 F. Supp. 3d 158 (D.D.C. 2018) ..................................................... 39

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
    831 F.3d 500 (D.C. Cir. 2016) .............................................................. 16

*Reno v. Flores,*
    507 U.S. 292 (1993) .......................................................................... 21, 26

*Roberts v. Sea-Land Servs., Inc.,*
    566 U.S. 93 (2012) ................................................................................... 18

iv

*Scherer v. U.S. Forest Serv.*,
   653 F.3d 1241 (10th Cir. 2011) ........................................................................ 21

*Shawnee Coal Co. v. Andrus*,
   661 F.2d 1083 (6th Cir. 1981) ......................................................................... 19

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) .......................................................................................... 26

*Starbucks Corp. v. McKinney*,
   144 S. Ct. 1570 (2024) ................................................................................ 17, 20

*Texas v. U.S. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................................................... 39

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .......................................................................................... 15

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................................ 16, 44

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ........................................................ 21, 22, 32, 38

**Statutes**

30 U.S.C. § 1201(d) ............................................................................................. 2

30 U.S.C. § 1201(k) ................................................................................... 2, 3, 42

30 U.S.C. § 1202(m) .......................................................................................... 28

30 U.S.C. § 1211(c)(2) ......................................................................................... 5

30 U.S.C. § 1253(a) ...................................................................................... 22, 39

30 U.S.C. § 1267(a) ............................................................................................. 4

30 U.S.C. § 1271 ...................................................................................... 3, 29, 37

30 U.S.C. § 1271(a)(1) ................................................................. 4, 5, 16, 23, 33

30 U.S.C. § 1271(a)(2) .......................................................... 17, 19, 29, 42

30 U.S.C. § 1271(b) ........................................................................................... 31

30 U.S.C. § 1275(c) ..................................................................................... 17, 19

30 U.S.C. § 1276(a) ........................................................................................... 18

30 U.S.C. § 1276(a)(1) ................................................. 17, 19, 20, 27, 28, 37

30 U.S.C. § 1276(a)(2) ....................................................................................... 18

30 U.S.C. § 1276(c) ................................................................................................ 17, 18

30 U.S.C. § 1276(d) ...................................................................................................... 20

30 U.S.C. § 1295(a) ....................................................................................................... 41

30 U.S.C. §§ 1271(a) ................................................................................ 17, 19, 29, 30, 39

5 U.S.C. § 551(6) ........................................................................................................... 18

5 U.S.C. § 553 ............................................................................................................... 18

5 U.S.C. § 554 ............................................................................................................... 18

5 U.S.C. § 706(2) ........................................................................................................... 20

**Regulations**

30 C.F.R. § 1271(a)(1) .................................................................................................. 30

30 C.F.R. § 700.5 (1979) ..................................................................................... 23, 26, 28

30 C.F.R. § 732 .............................................................................................................. 11

30 C.F.R. § 733.12(b) ............................................................................................. 35, 36

30 C.F.R. § 733.12(b)(1) ......................................................................................... 13, 36

30 C.F.R. § 842.11(a) ....................................................................................................... 4

30 C.F.R. § 842.11(a)(1) (1979) ...................................................................................... 8

30 C.F.R. § 842.11(b)(1)(i) ................................................................. 4, 8, 11, 13, 33

30 C.F.R. § 842.11(b)(2) (1979) ...................................................................................... 8

30 C.F.R. § 842.5 ................................................................................................. 5, 6, 7, 15

30 C.F.R. §§ 733.12 ....................................................................................................... 14

43 C.F.R. § 733 .............................................................................................................. 42

**Other Authorities**

1977 U.S.C.C.A.N. 593 .................................................................................. 2, 22, 29, 43

44 Fed. Reg. 14902 (Mar. 13, 1979) ................................................................................ 8

44 Fed. Reg. 15299 (August 27, 1979) .......................................................................... 35

44 Fed. Reg. 15314 (Mar. 13, 1979) ....................................................................... 23, 34

47 Fed. Reg. 35620 (Aug. 16, 1982) ......................................................................... 8, 34

53 Fed. Reg. 25737 (July 8, 1988) ................................................................................. 31

53 Fed. Reg. 26728 (July 14, 1988) .......................................................................... 9, 23

72 Fed. Reg. 6872 (Feb. 13, 2007) ................................................................................ 25

85 Fed. Reg. 75150 (Nov. 24, 2020)..................................................... 11, 27, 29, 33, 34, 36, 41, 42

88 Fed. Reg. 24944 (Apr. 25, 2023) ........................................................................... 12

89 Fed. Reg. 24714 (Apr. 9, 2024) ............................................................................... 1

**Introduction**

Petitioners challenge revisions to regulations promulgated by the United States Department of the Interior to optimize structured communication between the Office of Surface Mining Reclamation and Enforcement ("OSMRE") and State authorities, which regulate surface coal mining and reclamation operations on non-Federal, non-Indian lands. The Department of the Interior promulgated the challenged rule entitled, Ten-Day Notices and Corrective Action for State Regulatory Program Issues, 89 Fed. Reg. 24714 (Apr. 9, 2024) (codified at 30 C.F.R. pts. 733 and 842) ("2024 TDN Rule"), to enhance OSMRE's ability to alert State authorities to potential problems, including those that could lead to dangerous or environmentally harmful coal mining conditions. The 2024 TDN Rule also provides OSMRE with the tools needed to help State regulatory authorities respond to those problems.

Specifically, the 2024 TDN Rule governs how OSMRE issues a Ten-Day Notice ("TDN"), as required by the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). Contrary to Petitioners' mistaken suggestion that the new rule reflects a dramatic shift intruding upon their regulatory authority, the 2024 TDN Rule represents a measured change primarily designed to reinstate a prior policy and make it easier for citizens to notify OSMRE about possible violations. Since the enactment of SMCRA, OSMRE has used the TDN as a communication tool to advise State regulatory authorities about potential violations of the law. A TDN is frequently an outgrowth of a complaint filed by a citizen or adjacent landowner that raises a purported mining or reclamation violation, thus putting OSMRE in an intermediary position of advising the State regulatory authority of the purported violation so that it can respond appropriately. The 2024 TDN Rule improves this process by setting clear guidelines for OSMRE on when to issue a TDN, how to evaluate a State regulatory authority's response, and

how to support the State regulatory programs. The 2024 TDN Rule advances OSMRE's statutory mission to provide assistance and oversight to the States' enforcement of their coal mining regulations, and it is fully consistent with OSMRE's statutory authority.

**Background**

*1. OSMRE exercises a critical oversight function under SMCRA.*

SMCRA "is a comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.'" *Hodel v. Va. Surface Min. & Reclamation Ass'n,*, 452 U.S. 264, 268–69 (1981) (citing § 102(a) of SMCRA, 30 U.S.C. § 1202(a)). Congress enacted SMCRA in 1977 in response to the steep environmental and human cost of unregulated coal mining, including the Buffalo Creek flood, in which the failure of an impoundment dam killed 125 people. *See* H.R. Rep. No. 95-218, at 58, 84–85, (1977), *reprinted in* 1977 U.S.C.C.A.N. 593, 596, 621 (discussing the destructive effects of unregulated surface mining on streams, forests, farmland, and "the very communities which labored most to produce the energy which once impelled the Nation's industrial plant.").

In enacting SMCRA, Congress found that "the expansion of coal mining to meet the Nation's energy needs makes even more urgent the establishment of appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." 30 U.S.C. § 1201(d). In furtherance of this goal, SMCRA "contemplates a continuing partnership between the States and the federal government, with the Secretary [of the Interior ("Secretary")] providing oversight, advice, and back-up authority, and the States bearing the major responsibility for implementation of the Act." *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d 514, 516 (D.C. Cir. 1981) (*en banc*). Congress also found that "the cooperative

effort established by this chapter is necessary to prevent or mitigate adverse environmental effects of present and future surface coal mining operations." 30 U.S.C. § 1201(k).

SMCRA envisioned an important role for the States in this cooperative effort. "[B]ecause of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States[.]" *Id*. § 1201(f). At the same time, however, SMCRA recognized that Federal standards were necessary to address the problem posed by competition in the national coal markets. *Id*. § 1201(g). SMCRA thus directed the Secretary to assist the States in carrying out its statutory purposes, and "wherever necessary, exercise the full reach of Federal constitutional powers to insure the protection of the public interest through effective control of surface coal mining operations." *Id*. § 1202(m).

SMCRA gives States the option to seek primary responsibility for achieving the Act's purposes by submitting their own surface coal mining and reclamation programs for federal approval. *Id*. § 1253*; see also id.* § 1291(26) (definition of "State regulatory authority," which means "the department or agency in each State which has primary responsibility at the State level for administering" SMCRA). Under section 1253(a), any state that "wishes to assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-Federal and non-Indian lands, subject to the exception at 30 U.S.C. § 1271, may submit a proposed state program demonstrating that the State "has the capability of carrying out the provisions of [SMCRA] and meeting" the purposes of the Act. After OSMRE approves a State program, the State becomes the primary regulatory authority, and its program, codified in State law, governs the regulation of surface coal mining and reclamation operations on non-Federal

3

and non-Indian lands within that State. *Id.* § 1253. At this point, the State's authority over the regulation of surface coal mining and reclamation operations within its jurisdiction is "exclusive," except for OSMRE's oversight and enforcement authority specified in sections 521 and 523. *Id.* §§ 1253(a), 1271, 1273. "Once the State has assumed all these functions, the Secretary's role is primarily one of oversight." *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 519. For example, SMCRA requires occasional federal inspections "to evaluate the administration of approved State programs." *Id.* (citing 30 U.S.C. § 1267(a)); *see also* 30 C.F.R. § 842.11(a)). Part of this oversight role also entails the issuance of TDNs under Section 521(a). 30 U.S.C. § 1271(a)(1). These oversight functions "ensure that the minimum requirements of SMCRA are being satisfied and 'to assure that the old patterns of minimal enforcement are not repeated.'" *Penn. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 317 (3d Cir. 2002) (citing H.R. Rep. No. 95-218, at 129 (1977), *reprinted* in 1977 U.S.C.C.A.N. 593, 661).

    2.  *Section 521(a)(1) of SMCRA requires OSMRE to issue TDNs.*

      Section 521(a)(1) of SMCRA provides that the Secretary "shall" notify the State regulatory authority whenever, on the basis of any information available to her, she has reason to believe that any person is in violation of any requirement of SMCRA or any permit condition required by the Act.[1] 30 U.S.C. § 1271(a)(1). The notification required under this section is commonly referred to as a TDN. OSMRE may decide to issue a TDN after a citizen complaint or based on information it has learned through its oversight activities. *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 519 (describing the TDN process in the context of the

---

[1] OSMRE must bypass the issuance of a TDN and immediately conduct a Federal inspection if, at any point, it has adequate proof of an imminent harm to the environment. 30 U.S.C. § 1271(a)(1) ("The ten-day notification period shall be waived when the person informing the Secretary provides adequate proof that an imminent danger of significant environmental harm exists and that the State has failed to take appropriate action."); *see also* 30 C.F.R. § 842.11(b)(1)(i) and (ii)(C).

Secretary's role in overseeing a State program). After being notified of a possible violation, the

State regulatory authority has ten days to either "take appropriate action to cause said violation to

be corrected" or "show good cause for such failure." 30 U.S.C. § 1271(a)(1). If the State

regulatory authority fails to either take appropriate action or show good cause for not doing so,

the Secretary "shall immediately order Federal inspection of the surface coal mining operation at

which the alleged violation is occurring unless the information available to the Secretary is a

result of a previous Federal inspection of such surface coal mining operation." *Id.*

   3.  *OSMRE has promulgated regulations to carry out its mandate.*

      Pursuant to her statutory authority to "publish and promulgate such rules and regulations

as may be necessary to carry out the purposes and provisions of [SMCRA]" (30 U.S.C.

§ 1211(c)(2)), the Secretary, through OSMRE, has issued regulations governing the operation of

Section 521(a)(1). These regulations, some of which were modified by the 2024 TDN Rule,

effective as of May 9, 2024, are codified in Parts 733 and 842 of Title 30 of the Code of Federal

Regulations ("C.F.R."). In a definition newly added by the 2024 TDN Rule, the regulations

define a TDN as:

> a communication mechanism that OSMRE uses, in non-imminent harm situations,
> to notify a State regulatory authority . . . when an OSMRE authorized representative
> has reason to believe that any permittee and/or operator is in violation of the Act,
> this chapter, the applicable State regulatory program, or any condition of a permit
> or an exploration approval or when, on the basis of a Federal inspection, OSMRE
> determines that a person is in violation of the Act, this chapter, the applicable State
> regulatory program, or any condition of a permit or an exploration approval and
> OSMRE has not issued a previous ten-day notice for the same violation.

30 C.F.R. § 842.5.

      After it issues a TDN, unless there is an imminent harm situation, OSMRE cannot

conduct a Federal inspection until after the State responds to the TDN, and OSMRE makes a

determination about the adequacy of the State's response. After it receives a TDN, the State

regulatory authority can either "take[] appropriate action to cause the violation to be corrected or to show good cause for not doing so." *Id*. § 842.11(b)(1)(ii)(B)(*1*). If the State does either, OSMRE will not conduct a federal inspection. *Id*. An "[a]ppropriate action" is defined simply as "enforcement or other action authorized under the approved State regulatory program to cause the violation to be corrected." *Id*.  § 842.11(b)(1)(ii)(B)(*3*).

"Good cause" for not taking appropriate action, on the other hand, can take one of six enumerated forms. *See id*. § 842.11(b)(1)(ii)(B)(*4*). For example, the State regulatory authority may show "good cause" to not take appropriate action where there is no violation under the State regulatory program or where the State regulatory authority lacks jurisdiction over the possible violation. *Id*. § 842.11(b)(1)(ii)(B)(*4*)(*i*), (*iv*). The State regulatory authority may also show good cause where it initiates an investigation but determines that it needs more time to determine whether a violation exists. *Id*.§ 842.11(b)(1)(ii)(B)(*4*)(*ii*).

The State regulatory authority can also show good cause when OSMRE "has identified substantively similar possible violations on separate permits and considers the possible violations as a single State regulatory program issue addressed through § 733.12 of this chapter," with the corresponding creation and implementation of an action plan to resolve the "State regulatory program issue." *Id*. § 842.11(b)(1)(ii)(B)(*4*)(*iii*). Section 733.12 provides a mechanism for OSMRE and the State regulatory authorities to cooperate "to identify the State regulatory program issue and identify an effective mechanism for timely correction." *Id*. § 733.12(b)(1). The TDN will remain open until the action plan for addressing the State regulatory program issue is completed, and if the State regulatory authority fails to complete the action plan, it will no longer have good cause to not resolve the possible violation under Section 521(a)(1)'s TDN process. 89 Fed. Reg. at 24727. On the other hand, "[u]pon successful completion of the action

plan, the [State regulatory authority] will be deemed to have taken appropriate action . . ., and the TDN will be resolved." *Id.*

Once the State regulatory authority responds to the TDN, either by taking appropriate action or showing good cause, but before a Federal inspection, OSMRE evaluates the sufficiency of that response.[2] OSMRE determines "whether the standards for appropriate action or good cause have been satisfied." 30 C.F.R. § 842.11(b)(1)(ii)(B)(*1*). These standards are deferential towards the State regulatory authority, and OSMRE will consider any action "that is not arbitrary, capricious, or an abuse of discretion under the state program" to be an "appropriate action" to cause a violation to be corrected or "good cause" for not doing so. *Id.* § 842.11(b)(1)(ii)(B)(*2*). When a State regulatory authority fails either to take appropriate action or show good cause for not doing so, however, OSMRE must "immediately" notify the State regulatory authority in writing. *Id.* § 842.11(b)(1)(iii)(A).

Under section 842.11(b)(1)(iii)(A), if the State regulatory authority disagrees with this determination, it has recourse to an internal appellate review. The State regulatory authority can seek informal review of the decision with the OSMRE Deputy Director. *Id.* The Deputy Director can then affirm, reverse, or modify OSMRE's initial determination. *Id.* § 842.11(b)(1)(iii)(C). With some exceptions, only if the Deputy Director finds that the State regulatory authority has not taken "appropriate action" or shown "good cause" will OSMRE conduct an inspection of the possible violation. *Id.*

4.  *The 2024 TDN Rule is consistent with SMCRA's regulatory history.*

---

[2] A State regulatory authority's failure to respond within ten days does not prevent OSMRE from making a determination. 30 C.F.R. § 842.11(b)(1)(ii)(B)(*1*).

*a.   OSMRE's regulations have provided wide latitude to issue TDNs for most of the agency's history.*

The 2024 TDN Rule is the Department of the Interior's fifth rule governing the TDN process. The Department promulgated the first regulations for the TDN process in 1979. Surface Coal Mining and Reclamation Operations, 44 Fed. Reg. 14,902 (Mar. 13, 1979) the "1979 Rule"). As now, those regulations required OSMRE[3] to undertake inspections "as necessary . . . [t]o evaluate the administration of approved State programs[.]" 30 C.F.R. § 842.11(a)(1) (1979); 44 Fed. Reg. at 15456. When it had reason to believe that "there exists a violation of the Act, this Chapter, the applicable program, or any condition of a permit or an exploration approval," OSMRE was to notify the State regulatory authority and conduct a Federal inspection if that authority failed to take appropriate action or provide "a valid reason for its inaction" within ten days. 30 C.F.R. § 842.11(b)(1)(i) and (ii)(B) (1979); 44 Fed. Reg. at 15456–57. In determining whether to issue a TDN, OSMRE was required to accept as true any information provided by a citizen complaint. 30 C.F.R. § 842.11(b)(2) (1979); 44 Fed. Reg. at 15457.

OSMRE's 1982 rulemaking changed little of the TDN process outlined in 1979. *See* Permanent Regulatory Program Modifications; Inspection and Enforcement; Civil Penalty Assessments, 47 Fed. Reg. 35620 (Aug. 16, 1982) ("the 1982 Rule"). The preamble to the 1982 Rule explained that the rule added the requirement that a person who requests a Federal inspection must also notify the State regulatory authority. *Id*. at 35628. The 1982 preamble specified, however, that the person was not required to wait for an answer from the State before proceeding with their request to OSMRE. *Id*.

---

[3] OSMRE has sometimes referred to itself as the "Office of Surface Mining" or "OSM," but Respondents will refer to the agency by its preference—OSMRE—throughout to avoid confusion.

In its 1988 rulemaking, OSMRE added the modern definitions of "appropriate action" and "good cause" for inaction. *See* Surface Coal Mining and Reclamation Operations; Evaluation of State Responses to TDNs, 53 Fed. Reg. 26728, 26729 (July 14, 1988) (the "1988 Rule"). Significantly, the preamble to the 1988 Rule specified that "in a case where the [S]tate regulatory authority erred in issuing the permit and the permittee is performing in accordance with the permit, the appropriate State response to a ten-day notice could be" to notify the permittee that a permit revision is required, to receive an application for the required revision, and establish a time period for a decision on the application. *Id*. at 26734.

The preamble to the 1988 Rule also clarified what could constitute "good cause" for not taking appropriate action under section 521(a)(1). OSMRE recognized that a State's need for a period longer than ten days to conduct an investigation could amount to "good cause." *Id*. at 26736. But OSMRE cautioned that this cannot become "an abused provision[,]" and that it should only grant extensions where the State regulatory authority needed a "reasonable and specified amount of additional time." *Id*. The 1988 Rule preamble emphasized that TDNs should provide a mechanism for State and Federal authorities to resolve any disputes *before* involving the permittee. *Id*. at 26738 (discussing how the TDN process provides a "'buffer' before making an operator responsible for the consequences of a mistake by the State regulatory authority").

Between at least 1987 and 2020, the relevant statutory and regulatory provisions related to permit defects were also subject to several agency interpretations and guidance documents. For example, in a now-rescinded 1987 OSMRE internal directive, OSMRE could issue a TDN, based on the results of a field inspection, when a State regulatory authority possibly "issued a permit containing omissions or other permit defects." Ex. F, Directive INE-27: Use of Ten-Day Notices to Address Permit Revisions ("1987 Directive"), 1. In 1989, the INE-27 policy was

incorporated into OSMRE Directive INE-35 ("1989 Directive"). Ex. E, 1989 Directive. Like

INE-27, the 1989 Directive allowed OSMRE, on the basis of a field inspection, to issue a TDN

when a permittee was "operating in compliance with a defective permit." Ex. E, 3. A 1990

version of INE-35 specifically defined "Permit Defect" and provided that OSMRE could issue a

"Ten-day Letter" for a possible permit defect. Ex. D, Directive INE-35 ("1990 Directive") 1–2.

       In 2005, the Department's Assistant Secretary for Land and Minerals Management issued

a letter decision (the "Watson Letter"), which called into question OSMRE's oversight and

enforcement roles regarding State permitting decisions. October 21, 2005, letter from Rebecca

W. Watson, Assistant Secretary. As a result of this letter, OSMRE rescinded the 1990 version of

INE-35 in 2006. Within four years, however, the Director of OSMRE issued a memorandum to

clarify that OSMRE was in fact authorized to issue TDNs with respect to alleged violations of

permitting authorities. Ex. C, "Application of the Ten-Day Notice Process" ("the 2010

Memorandum"). TDNs were thus to be issued, where appropriate, for "*all* types of violations,

including violations of performance standards or permit conditions and violations of permitting

requirements." *Id*. at 1–2. In 2011, OSMRE issued a new version of Directive INE-35 which

expressly allowed OSMRE to issue TDNs for permit defects. Thus, at least since 1987,

OSMRE's internal policies and directives have allowed it to issue TDNs for permitting issues,

except as described below.

       *b.  OSMRE's 2020 Rule changed the TDN process.*

       OSMRE changed its TDN policy again in 2019. On May 3, 2019, the Deputy Director of

OSMRE issued a revised Directive on TDNs (revised OSMRE Directive INE-35—"the 2019

Directive"). Ex. B. The 2019 version of INE-35 does not mention permit defects, and it did not

expressly alter the conclusion of the 2010 Memorandum, though the 2019 Directive did indicate

that OSMRE will not issue a TDN based upon a citizen complaint where the citizen "has not alleged any site-specific violations and OSMRE determines that the issue raised by the citizen is programmatic in nature." 2019 Directive at 7.

OSMRE then codified this policy by promulgating a revised regulation in 2020. *See* Clarification of Provisions Related to the Issuance of TDN to State Regulatory Authorities and Enhancement of Corrective Action for State Regulatory Program Issues, 85 Fed. Reg. 75150 (Nov. 24, 2020 ("the 2020 Rule"). The preamble to the 2020 Rule generally took the view that TDNs were meant to address "on-the-ground impacts" and not "systemic, programmatic issues with State programs." *Id*. at 75170. Despite this view, however, OSMRE declined a commenter's invitation to "[s]tate that State regulatory program issues are not the basis for a TDN[,]" recognizing that State regulatory program issues can result in an "on-the-ground impact[]." *Id*. at 75175. In addition, in the 2020 preamble, OSMRE "preserv[ed]" its "ability to take enforcement action in the event that a previously identified State regulatory program issue results in or may imminently result in a violation of the approved State program[,]" and not necessarily only on-the-ground violations.  *Id*. at 75176. And the 2020 regulatory language only referred to issuing TDNs when OSMRE had "reason to believe . . . that there exists a violation of the Act, this chapter, the applicable program, or any condition of a permit or an exploration approval, " 30 C.F.R. § 842.11(b)(1)(i) (2020), and it did not point only to on-the-ground violations. Thus, the 2020 Rule did not categorically limit TDNs to site-specific violations. 85 Fed. Reg. at 75189–91.

The 2020 Rule, however, changed the mechanics of the TDN process. It permitted OSMRE to consider information submitted by State regulatory authorities *prior* to issuing a TDN. *Id*. at 75151. It also required that a citizen complaint to OSMRE include a statement that

the citizen had asked the State regulatory authority to correct the alleged violation and the grounds for the citizen's belief that the State authority had not taken action. *Id*. at 75160.

   *c. The 2024 TDN Rule partially restored the pre-2020 status quo.*

  The 2020 Rule quickly created confusion in some areas and presented barriers for citizen access to OSMRE, which set about to revise it. TDNs and Corrective Action for State Regulatory Program Issues, 88 Fed. Reg. 24944 (Apr. 25, 2023) ("2023 Proposed TDN Rule").[4] To remove any uncertainty about the term TDN and when OSMRE should issue TDNs, OSMRE proposed to define the term TDN, and adopted that proposal in the final rule, and also proposed to clarify that "State regulatory program issues will be considered as possible violations and will initially proceed, and may be resolved, under part 842 of this chapter." 88 Fed. Reg. at 24953, 24957. The 2024 TDN Final Rule made clear that OSMRE would issue TDNs for all violations, regardless of their genesis. It clarified that OSMRE would not exclude violations from the TDN process based on whether they might be considered programmatic. 89 Fed. Reg. at 24715–16.

  Ultimately though, OSMRE decided to retain some, but not all, of the 2020 Rule's changes. The 2024 TDN Rule kept revised versions of the early identification and corrective action provisions of the 2020 Rule, but it changed how a State regulatory authority could show "good cause" for not taking appropriate action under section 521(a)(1). 30 C.F.R. § 842.11(b)(1)(ii)(B)(*4*); 89 Fed. Reg. at 24717. First, the TDN Rule provides that the establishment of an action plan can under 30 C.F.R. part 733 can now constitute "good cause" for not resolving the possible violation within the meaning of section 521(a)(1), but it can no longer constitute an "appropriate action." 89 Fed. Reg. at 24718. Instead, the TDN remains open

---

[4] In the preamble to the 2024 TDN Final Rule, because the Department adopted the regulatory provisions as proposed, with one exception, OSMRE also directed the reader to the preamble for the proposed rule. 89 Fed. Reg. at 24714.

and unresolved until activities under the action plan are completed. 89 Fed. Reg. at 24,727.

Under the 2024 TDN Rule, an action plan must also allow the State regulatory authority to

accomplish its goals within 365 days. 30 C.F.R. § 733.12(b)(1).

Second, the 2024 TDN Rule limited how long a State regulatory authority can show

"good cause" by conducting an investigation of a possible violation. It provides that OSMRE

may permit the State regulatory authority up to 30 days after the response to a TDN to conduct

an investigation, and up to 60 days thereafter if the matter is complex. 30 C.F.R.

§ 842.11(b)(1)(ii)(B)(*4*)(*ii*); 89 Fed. Reg. at 24717. Under the 2024 TDN Rule, OSMRE will not

approve any request for an investigation-related extension unless it is supported by an

explanation justifying its need. 30 C.F.R. § 842.11(b)(1)(ii)(B)(*4*)(*ii*); 89 Fed. Reg. at 24717.

Even in complex cases, such an extension must not exceed 90 days. 30 C.F.R. §

842.11(b)(1)(ii)(B)(*4*)(*ii*); 89 Fed. Reg. at 24717.

OSMRE also implemented other measures in the 2024 TDN Rule to simplify and

expedite the TDN process. As explained in the preamble to the 2024 TDN Rule, in the interest of

the timely resolution of possible violations, OSMRE did away with its approach under the 2020

Rule to request and review information submitted by the State regulatory authority *prior* to

issuing a TDN. 89 Fed. Reg. at 24715. Under the 2024 TDN Rule, OSMRE now considers only

information from citizen complaints, information in its files, and publicly available electronic

information in determining whether it has reason to believe a possible violation exists. 30 C.F.R.

§§ 842.11(b)(1)(i), 842.12(a). And in the interest of easing administrative burdens on those who

wish to lodge complaints with OSMRE, citizen complainants no longer need to convey proof of

communications with the State regulatory authority. 89 Fed. Reg. at 24717–18.

In sum, the 2024 TDN Rule kept some elements of the 2020 Rule and changed others. While the 2024 TDN Rule retains the 2020 Rule's adoption of early identification and action plans to address State regulatory program issues, it streamlined the action plan process and declined to exempt certain State regulatory program issues from the TDN process. 30 C.F.R. §§ 733.12; 733.5. It also introduced new procedures and timelines to simplify and expedite the TDN process—from citizen complaint to TDN to resolution. *Id*. at § 842.11(b).

### Procedural History

Three of the four proposed Intervenors in this case—Citizens Coal Council, Appalachian Voices, and Sierra Club—challenged the 2020 Rule in this Court. *See Citizens Coal Council v. Haaland*, No. 1:21-cv-195-RBW (D.D.C. Apr. 18, 2024). The Court stayed the case pending the promulgation of the 2024 TDN Rule, which rendered the case moot, and the Court dismissed the case on April 18, 2024. Order, *Citizens Coal Council*, No. 21-cv-195-RBW, ECF No. 25.

Petitioners filed their Petition for Review of the 2024 TDN Rule on June 7, 2024. ECF No. 1. They then filed their Motion for Stay/Preliminary Injunction on August 16, 2024. ECF No. 24. Upon Respondents' Motion, the Court set a briefing schedule on August 27. ECF No. 27.

### Argument

### I.       Petitioners' motion does not comply with the Local Rules.

The Local Rules for this District impose a duty on movants to confer on nondispositive motions and to certify that conferral occurred. LCvR 7(m). Although Petitioners met with undersigned counsel to discuss case logistics the day before they filed their motion for a preliminary injunction, they failed to confer on (or even mention) that motion. The Court can deny their Motion on these grounds alone. *See* ECF No. 28, <u>General Order for Civil Cases before the Honorable Reggie B. Walton</u> 5(b); *Green Oceans v. U.S. Dep't of the Interior*, No. 24-CV-

00141, 2024 WL 1885543, at *3 (D.D.C. Apr. 30, 2024) (denying motion on Rule 7(m) grounds where movant sought to stay to stay an agency action); *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 316 F. Supp. 3d 22, 24 (D.D.C. 2018). Had Petitioners conferred regarding their motion, Respondents could have corrected their misapprehensions about the alleged irreparable injury traceable to the 2024 TDN Rule, see *infra*, at 39–43, and possibly avoided this unnecessary motion practice.

## II.       The Court lacks jurisdiction over this action.

To establish Article III standing, Petitioners must show that they have suffered an (1) "'injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'—(2) which is 'fairly traceable' to the challenged act, and (3) 'likely' to be 'redressed by a favorable decision.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "Standing requires more than just a keen interest in the issue." *Trump v. Hawaii*, 585 U.S. 667, 697–98 (2018) (citation omitted). "It requires allegations—and, eventually, proof—that the plaintiff 'personal[ly]' suffered a concrete and particularized injury in connection with the conduct about which he complains.'" *Id.* (citation omitted). Petitioners have not even tried to make such a showing, and "an inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction[.]" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

A TDN is a communication tool. 30 C.F.R. §§ 842.5, 842.11(b)(1)(ii)(B)(*1*). It is meant to give the State regulatory authority notice of a possible SMCRA violation. *Id*. It does not carry any coercive effect or threat of sanction. 88 Fed. Reg. at 24947 (proposed rule); 89 Fed. Reg. at 24723–24 (final rule). A TDN is not "a direct enforcement action, a finding that any form of

violation exists, or a determination that the State has acted improperly." 88 Fed. Reg. at 24947.

In fact, it is a way that SMCRA provides to give the State regulatory authority the first chance to

ensure that any violation discovered is corrected or explain why such a correction was not

necessary. Only if OSMRE ultimately determines that the State regulatory authority has failed to

take "appropriate action" or show "good cause," will OSMRE conduct a Federal inspection, 30

U.S.C. § 1271(a)(1); 30 C.F.R. §§ 842.11(b)(1)(ii)(B)(*I*), 842.11(b)(1)(iii)(C). Even then, an

inspection in and of itself does not give rise to any cognizable injury in fact. It follows that any

coercion Petitioners fear would take place after a Federal inspection and after the TDN process

has ended, which would be outside the bounds of this case. Absent any indication that Federal

regulators will take particular, concrete actions on an imminent basis, Petitioners cannot show

that their fears constitute a cognizable injury.

Petitioners have not carried their burden to demonstrate Article III standing, and the

Court can deny their motion for a preliminary injunction on that basis alone.

### III. The Court should analyze Petitioners' motion under the traditional four-part test for preliminary injunctions.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*.,

555 U.S. 7, 22 (2008). "A plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Id.* at 20. The movant bears the burden for each factor. *Abdullah v. Obama*, 753

F.3d 193, 197 (D.C. Cir. 2014). Where a federal agency is the party, the third and fourth factors

can be considered as "one and the same, because the government's interest *is* the public interest."

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016).

SMCRA does not justify any departure from the traditional four-factor test. The Supreme

Court has recently reemphasized that when interpreting a statute that authorizes federal courts to

grant preliminary injunctions, courts should apply a "presumption that traditional equitable

principles apply." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1577 (2024). Only where a

statute embodies a "clear command from Congress" to apply a different test may a court depart

from the four-factor test. *Id.* at 1576. SMCRA provides no such command, and traditional

equitable principles should therefore govern this motion. This case arises under section 526(a)(1)

of SMCRA, which provides for judicial review of "[a]ny action by the Secretary promulgating

national rules or regulations[.]" 30 U.S.C. § 1276(a)(1). Section 526(a)(1) contains detailed

guidance on such judicial review; it specifies the venue, legal standard, and statute of limitations

for such an action. *Id.* It does not specify a standard of review for motions for preliminary

injunctions, however, and Petitioners have no basis to graft the temporary relief framework from

section 526(c) onto a challenge to a national rule under section 526(a)(1). *See* Brief in Supp. of

Pet'rs' Mot. ("Pet'rs' Br.") 11, ECF No. 25.

Indeed, by its own terms, section 526(c) does not apply to petitions for review of

SMCRA regulations. Its more lenient three-part test is available only

> [i]n the case of a proceeding to review any *order or decision* issued by the Secretary
> under this chapter, including an order or decision issued pursuant to subsection (c)
> or (d) of section 1275 of this title pertaining to any order issued under paragraph
> (2), (3), or (4) of subsection (a) of section 1271 of this title for cessation of coal
> mining and reclamation operations[.]

30 U.S.C. § 1276(c) (emphasis added). Far from issuing a clear command to apply the three-part

test to *rulemaking* challenges, Congress gave a clear command to apply the test only to "an order

or decision" issued pursuant to the section of the chapter governing enforcement actions (30

U.S.C. § 1271(a)(2)–4)) and Secretarial review of such enforcement actions (30 U.S.C. §

17

1275(c)–(d)). For example, a permittee who is aggrieved by a federal enforcement order issued under section 521(a), can request immediate temporary relief from the Secretary under section 525(c), and then, if unsuccessful, from a federal district court under section 526(c). *See*, 30 U.S.C. §§ 1271(a); 1275(c), 1276(c); *see also Hodel*, 452 U.S. at 298–99. This is consistent with the only case cited by Petitioners for their proposed use of the three-part test, which involved a company's petition for review of a cessation order issued under section 521(a)(2). *See Jaward Corp. v. Watt*, 564 F. Supp. 797, 800 (W.D. Va. 1983), *reversed and remanded by Com. of Va. ex rel. Va. Dep't of Conservation & Econ. Dev. v. Watt*, 741 F.2d 37, 40–41 (4th Cir. 1984) (holding that the district court erred by reasoning that it had jurisdiction under § 1276(a)(1) and then "[i]n spite of this conclusion" analyzing the merits under the criteria of § 1276(c)).

Petitioners are not seeking judicial review of an "order or decision" within the meaning of section 526(c). 30 U.S.C. § 1276(c). Without any analysis, Petitioners assume that an "*action by the Secretary promulgating national rules or regulations*," under section 526(a)(1) is such an "order or decision." 30 U.S.C. § 1276(a), (c) (emphasis added). Pet'rs' Br. 11. But no definition of the word "Order" or "Decision" includes a rulemaking or a regulatory action. *See* ORDER, Black's Law Dictionary (12th ed. 2024); DECISION, Black's Law Dictionary (12th ed. 2024); *see also* 5 U.S.C. § 551(6) (explicitly excluding rulemaking from the Administrative Procedure Act's definition of "Order"). Instead, section 526(a)(2), as opposed to section 526(a)(1), of SMCRA provides for review of an "order or decision" "in a civil penalty proceeding or any other proceeding required to be conducted pursuant to section 554 of title 5." 30 U.S.C. § 1276(a)(2). Like section 526(a)(2), section 526(c) applies only to orders or decisions, which are subject to adjudication under 5 U.S.C. § 554; it does not apply to rulemakings conducted under 5 U.S.C. § 553, which are governed by section 526(a)(1). 30 U.S.C. § 1276(a), (c).

Petitioners' arguments to the contrary are inconsistent with SMCRA's structure and text. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted). Looking to the broader statutory context, the term "order or decision" is typically used in the context of an administrative adjudication. Starting with the two sections explicitly mentioned by section 526(c), section 525(c) provides an applicant the right, "[p]ending completion of the investigation and hearing required by this section," to seek "temporary relief from any notice or order issued under section 1271 of this title, a Federal program or the Federal lands program" and requires the Secretary to issue an "order or decision" either expeditiously or within five days. 30 U.S.C. § 1275(c). And section 521(c) provides the Secretary the right to seek judicial enforcement where a permittee violates or refuses to comply with any order or decision issued by the Secretary. *Id.* § 1271(c).

Indeed, SMCRA is clear that temporary relief from an "order or decision" is intended for administrative appellants, not challengers to rulemaking actions. Section 526(c) authorizes judicial review when the Secretary has issued an order or decision denying temporary relief from an enforcement order issued under 30 U.S.C. §§ 1271(a)(2), (3), or (4) and 1276(c). And it authorizes judicial review only after the movant under section 526(c) has exhausted its administrative remedies under section 525(c), which provides, with an identical three-part test, a mechanism for aggrieved permittees to appeal adverse orders to the Secretary. 30 U.S.C. §§ 1275(c); 1276(c); *Shawnee Coal Co. v. Andrus*, 661 F.2d 1083, 1091 (6th Cir. 1981). Section 526(c) "is inextricably intertwined with the administrative review procedures of s[ection] 525(c)." *Shawnee Coal,* 661 F.2d at 1091. Section 525(c) calls for the Secretary to issue an "order or decision," and section 526(c) provides for judicial review of such an "order or

decision." 30 U.S.C §§ 1275(c), 1276(c). But Petitioners did not, and could not, seek temporary

relief under section 525(c). *Id.* § 1275(c).

Petitioners, in sum, are wrong to assert that a rulemaking action under section 526(a)(1)

is an order or decision under section 526(c). Where Congress meant to refer to "[a]ny action by

the Secretary promulgating national rules or regulations," 30 U.S.C. § 1276(a)(1), it did so

clearly, as it did in the next provision—section 526(d): "[t]he commencement of a proceeding

under this section shall not, unless specifically ordered by the court, operate as a stay of the

*action*, order, or decision of the Secretary." 30 U.S.C. § 1276(d) (emphasis added). Congress

therefore did not intend to "lower[] the bar" for challengers to SMCRA regulatory actions. *See*

Pet'rs' Br. 11. Had it wanted to do so, it would have issued a "clear command" to depart from

the traditional four-factor test, *Starbucks Corp.*, 144 S. Ct. at 1576–1577, just like it did in

specifying the venue, legal standard, and statute of limitations for challenges to OSMRE

rulemaking. 30 U.S.C. § 1276(a)(1). Because it did not, Petitioners must demonstrate that they

are entitled to preliminary relief under the traditional test, including the irreparable injury

requirement. They have made only a cursory effort to meet this burden. Pet'rs' Br. 41–42.

## IV.     Petitioners fail to demonstrate that they are likely to succeed on the merits.

### 1. *Petitioners bear a heavy burden to challenge the 2024 TDN Rule.*

Any agency rulemaking challenged under SMCRA "shall be affirmed unless the court

concludes that such action is arbitrary, capricious, or otherwise inconsistent with law." 30 U.S.C.

§ 1276(a)(1). This standard is almost identical to that of the Administrative Procedure Act

("APA"), 5 U.S.C. § 706(2), under which Petitioners also seek relief. When reviewing agency

action under the APA, "[c]ourts must exercise their independent judgment in deciding whether

an agency has acted within its statutory authority[.]" *Loper Bright Enters. v. Raimondo*, 144

S. Ct. 2244, 2273 (2024). To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 2266. "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 2273. Such attention is particularly warranted for regulations promulgated under SMCRA, in light of the statute's complexity and legislative history. *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 522–23.

Petitioners challenge the 2024 TDN Rule on its face, not in its application. In mounting a facial challenge to a regulatory action, Petitioners "must establish that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (alteration in original) (quoting *United States v. Salerno,* 481 U.S. 739, 745 (1987)); *accord Ass'n of Private Sector Colls. & Univs. v. Duncan,* 681 F.3d 427, 433–34, 442 (D.C. Cir. 2012) (applying no circumstances test to challenge to Department of Education regulations); *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243–44 (10th Cir. 2011) (rejecting a facial challenge to a regulation imposing a fee on activities in a national forest where the fee is sometimes imposed within the agency's statutory authority); *Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.,* 613 F.3d 206, 208, 213 (D.C. Cir. 2010) (applying no circumstances test to facial challenge).

Under this standard, it does not suffice for a plaintiff to show that a rule's application in *some* cases might violate a relevant statute. *INS v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 188 (1991); *see also Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 619 (1991); *Chamber of Com. of U.S. v. NLRB*, 118 F. Supp. 3d 171, 184 (D.D.C. 2015). Petitioners must instead establish that it is not possible for OSMRE to implement the 2024 TDN Rule consistent with SMCRA. Especially now, on a "fact-poor record," the Court "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Metro.*

21

*Wash. Chapter, Associated Builders & Contractors, Inc. v. District of Columbia*, 62 F.4th 567, 577 (D.C. Cir. 2023) (citations omitted).

Petitioners also must meet a high bar to prove that the 2024 TDN Rule is arbitrary or capricious. The APA's arbitrary and capricious standard is a "highly deferential standard," *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (citation omitted), and "the agency's decision is presumed to be valid." *Chamber of Com.*, 118 F. Supp. 3d at 182 (citing *Am. Radio Relay League, Inc. v. FCC*, 617 F.2d 875, 879 (D.C. Cir. 1980)). The Court may not substitute its judgment for the agency's but will require only that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Zevallos*, 793 F.3d at 112 (citation omitted).

   2. *Petitioners are unlikely to demonstrate that the 2024 TDN Rule is inconsistent with SMCRA.*

      a. *OSMRE must exercise its oversight role with regard to State permitting decisions.*

Petitioners' primacy under SMCRA does not diminish the Secretary's oversight and enforcement responsibilities. SMCRA gives primacy States "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, *except as provided in sections* 1271 *and* 1273 *and title IV of this Act[.]*" 30 U.S.C. § 1253(a) (emphasis added). These exceptions, which codify OSMRE's oversight role, are critical to the statute's operation. In enacting the statute, Congress was "of the belief that a limited Federal oversight role as well as increased opportunity for citizens to participate in the enforcement program are necessary to assure that the old patterns of minimal enforcement are not repeated*." In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 520 (quoting H.R. Rep. No. 95-218, at 129 (1977), *reprinted in* 1977 U.S.C.C.A.N. 593, 661). Federal authority was necessary to make sure that environmental concerns were not brushed aside by the "economic interest in expanding a State's mining

22

industry." *Id*. (quoting H.R. Rep. No. 95-218, at 91 (1977), *reprinted in* 1977 U.S.C.C.A.N. 593, 627). Given these Congressional aims, the D.C. Circuit, sitting *en banc*, found no reason to restrict requirements for coal mining permits to those specifically enumerated in SMCRA, reasoning that despite the primary role for the States in SMCRA, the Secretary retained the authority to set minimum standards for permitting. *Id*. at 523.

Petitioners are unlikely to succeed in this most recent attempt to leverage their primacy to restrict the Secretary's section 521 oversight and enforcement authority. Congress intended that OSMRE issue TDNs to flag all possible violations of SMCRA or the approved State program. "Whenever, on the basis of any information available to him, including receipt of information from any person, the Secretary has reason to believe that any person is in violation of any requirement of this chapter or any permit condition required by this chapter, the Secretary shall notify the State regulatory authority, if one exists, in the State in which such violation exists." 30 U.S.C. § 1271(a)(1). The 2024 TDN Rule recognizes that there is no statutory basis to carve out an exception for permit defects. 89 Fed. Reg. at 24715. The trigger for the TDN notification requirement, which the Secretary "shall" carry out, is reason to believe that any person is in violation of SMCRA, or a permit condition required thereof. 30 U.S.C. § 1271(a)(1). And the relevant regulations have long defined "person" to include a State regulatory authority. 30 C.F.R. § 700.5 (1979);[5] 44 Fed. Reg. 15314. The statute does not treat violations differently depending on who or what caused the violation. For this reason, the 2024 TDN Rule "treats all violations the same, regardless of their genesis." 89 Fed. Reg. at 24715. OSMRE gives the State regulatory

---

[5] Section 700.5's definition of "person" in 1979 included "any agency, unit, or instrumentality of Federal, State or local government." 44 Fed. Reg. 15314.

authority ten days to assess the possible violation and either take "appropriate action" or show "good cause" for not doing so. 30 U.S.C. § 1271(a)(1).

    *b. OSMRE has historically had the ability to issue TDNs for permit defects.*

The TDN Rule's recognition that OSMRE can issue TDNs for permit defects is consistent with the agency's historical practice. Per its 1987 Directive, OSMRE could issue a TDN when a State regulatory authority possibly "issued a permit containing omissions or other permit defects." Ex. F, 1. OSMRE stated in the preamble to its 1988 Rule that, "in a case where the State regulatory authority erred in issuing the permit and the permittee is performing in accordance with the permit, the appropriate State response to a ten-day notice could be" to revise the permit. 53 Fed. Reg. 26734. OSMRE reiterated this view in its 1989 Directive and provided for Ten Day Letters in its 1990 Directive. Ex. E., 3; Ex. D, 1–2. And OSMRE called for TDNs to be issued for permit defects in its 2010 Memorandum. Ex. C, 1–2. As recognized in the preamble to the 2020 Rule, OMSRE has, "at various times, it has addressed State permitting issues through the TDN process." 85 Fed. Reg. at 75175. In its 2023 Proposed TDN Rule, OSMRE found that it had issued TDNs for permit defects for "most of its existence." 88 Fed. Reg. at 24948.

This historical practice has been upheld in administrative appeals. The Interior Board of Land Appeals ("IBLA") has consistently declined to restrict OSMRE's mandate to issue TDNs for permit defects. When OSMRE issued a TDN to the Alabama Surface Mining Commission in 1987 based on a citizen complaints' allegations of "permitting irregularities", the IBLA held that "OSM[RE] acted properly in referring the complaint to the State" as part of its TDN process. *Samuel M. Mullinax*, 96 IBLA 52, 59 (Feb. 27, 1987). Similarly, in 1990, the IBLA ordered OSMRE to undertake a Federal inspection following a TDN because the Kentucky Natural Resources and Environmental Protection Cabinet had issued a permit in violation of Kentucky

24

law. *W.E. Carter et al.*, 116 IBLA 262, 262–268 (Oct. 18, 1990). A year later, looking to the

precedent of *Mullinax* and *Carter*, an Administrative Judge of the IBLA reached the same

conclusion with respect to a TDN that provided the Ohio Department of Natural Resources,

Division of Reclamation with "reason to believe" that it had issued a permit "in error." *Paul F.

Kuhn*, 120 IBLA 1, 4–5 (July 3, 1991). Similarly, federal courts held that where a mine operator

violates SMCRA or the approved State regulatory program, its compliance with its permit

conditions is not a defense to a TDN. *Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*,

728 F.3d 1229, 1236–37 (10th Cir. 2013); *M.L. Johnson Family Props., LLC v. Jewell*, 27 F.

Supp. 3d 767, 774 (E.D. Ky. 2014).

　　　　OSMRE broke with its historical practice of issuing TDNs for permit defects only several

times in its 47-year history. The Watson Letter, issued in 2005, called into question OSMRE's

longstanding authority to issue TDNs to alert the State to issues in its permitting practices. 2010

Memorandum 1.[6] But its effect was short-lived. As the Director clarified in 2010, SMCRA

mandates that OSMRE issue TDNs for all violations of SMCRA or an approved State program,

including violations of permitting requirements. 2010 Memorandum 1–2. Next, in its 2019

Directive and 2020 Rule, OSMRE distinguished between "site-specific" violations for which

TDNs could issue, and "programmatic" issues, for which they could not. 85 Fed. Reg. at 75715.

But it always recognized that the former was often the product of the latter. *Id*. In the preamble to

---

[6] Relying partially on this guidance, and partially on the nonuse of the regulation, OSMRE decided to remove section 843.21 two years later. *Ownership and Control; Permit and Application Information; Transfer, Assignment, or Sale of Permit Rights*, 72 Fed. Reg. 68,000, 68024 (Dec. 3, 2007) ("2007 Rule"). Section 843.21 had provided for "direct Federal inspection and enforcement . . . if, after an initial notice, a State failed to take appropriate action or show good cause for not taking action with respect to an improvidently issued State permit." *Id*. Petitioners pepper their brief with quotations from the 2007 Rule's preamble in an attempt to make the 2020 Rule's interpretation of SMCRA appear more deeply rooted, *see, e.g.,* Pet'rs' Br. 12, but they fail to mention that the 2007 Rule had nothing to do with TDNs or the statutory or regulatory provisions at issue in this case.

the 2020 Rule, OSMRE observed that "the reality of OSMRE enforcement is that, in practice, the nature of these violations may sometimes blur." 85 Fed. Reg. at 75174.

    *c.  Petitioners fail to show that the 2024 TDN Rule violates SMCRA.*

    In the 2023 Proposed TDN Rule, OSMRE clarified that there is no distinction between site-specific and programmatic violations on the grounds that it is not rooted in the statute and makes no practical sense. 88 Fed. Reg. at 24949. And though Petitioners attempt to cast this as a dramatic break with the status quo, even the 2020 Rule had recognized that "OSMRE retains the right to issue a TDN to a State regulatory authority if a previously identified State regulatory program issue has not been adequately addressed and results in an actual or imminent violation of the approved State program." 85 Fed. Reg. at 75174. The 2020 Rule declined to carve out the blanket exception for permit defects that the Petitioners seek from the Court; it reasoned that the "wholesale exclusion of State regulatory program issues from the TDN process[] would create a regulatory loophole and be inconsistent with congressional intent." *Id*. at 75175.

    Now as then, OSMRE has no grounds to exclude certain violations of SMCRA or the approved State regulatory program just because they can be traced to a State permitting decision. Even if this were not the case, Petitioners' statutory arguments fail to meet their burden in mounting a facial challenge to a regulation. It is not enough for Petitioners to imagine a theoretical situation where OSMRE issues a TDN that is inconsistent with SMCRA. *Reno,* 507 U.S. at 301. Petitioners must show that OSMRE can only exercise its authority under the 2024 TDN Rule in a manner inconsistent with SMCRA. *Id*. Because they challenge only a small subsection of the possible TDNs OSMRE can issue under the 2024 TDN Rule, Petitioners cannot make such a showing. Their facial challenge to the Rule is therefore unlikely to succeed.

    *d.  Petitioners' statutory interpretation arguments lack merit.*

**First**, a State regulatory authority is a person within the meaning of SMCRA. OSMRE has long defined "person" to include "[a] State regulatory authority." 30 C.F.R. § 700.5; 89 Fed. Reg. at 24722. This definition is persuasive by virtue of OSMRE's consistency and the thoroughness of its reasoning. "Under *Skidmore*, the weight a court affords to an agency interpretation 'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Orton Motor, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018) (citing *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)); *accord Loper Bright*, 144 S. Ct. at 2259, 2262.

Starting with consistency, OSMRE has defined "person" to include a State regulatory authority since 1979. None of the Petitioners have ever challenged that definition until now. In the 1979 implementing regulations for SMCRA, OSMRE reasoned that State regulatory authorities are included in the definition of person "because under section 524 of the Act, they are subject to regulation when engaged in surface coal mining and reclamation operations and because such agencies have definite interests in actions taken under the Act." 44 Fed. Reg. at 14912. The 2020 Rule did not change this definition. Only in its preamble did OSMRE state that the State regulatory authority was typically not a person for the purpose of violating SMCRA or an approved state program. 85 Fed. Reg. at 75176. Even then though, the 2020 Rule recognized that a State regulatory authority would be a person if it were a permit holder. *Id*. It also recognized that a State regulatory authority would continue to be "a person" for the purposes of being "any person" that provides information to the Secretary regarding a possible violation.[7] *Id*.

---

[7] Despite their interpretation of the word "person," Petitioners seek to preserve OSMRE's ability under the 2020 Rule to consider information from State regulatory agencies as "'any person' that provides information to the Secretary about possible violations" 85 Fed. Reg. 75176; *see* Pet'rs' Br. 25.

OSMRE has thoroughly considered the statutory grounds for including a State regulatory authority within SMCRA's broad definition of "person." If Congress meant for "any person" to be read narrowly, it would not have used the term in such critical places in the statute, including the judicial review provision that Petitioners are seeking to invoke in this lawsuit. *See* 30 U.S.C. § 1276(a)(1) ("Any such petition may be made by *any person* who participated in the administrative proceedings and who is aggrieved by the action of the Secretary.") (emphasis added); § 1276 (c)(2) ("*[T]he person* requesting such relief shows that there is a substantial likelihood that he will prevail on the merits of the final determination of the proceeding[.]" (emphasis added)). Nor would Congress have used the term so liberally in other provisions of the statute that are both critical to the functioning of SMCRA and clearly intended to apply to State regulatory authorities. *See* 30 U.S.C. § 1297 ("If any provision of this chapter or the applicability thereof to *any person* or circumstances is held invalid, the remainder of this chapter and the application of such provision to other persons or circumstances shall not be affected thereby.") (emphasis added); 1211 ("After the Secretary has adopted the regulations required by section 1251 of this title, *any person* may petition the Director to initiate a proceeding for the issuance, amendment, or repeal of a rule under this chapter.") (emphasis added).

Excluding State regulatory authorities from SMCRA's definition of person would also interfere with the emphasis SMCRA puts on federal oversight, *see, e.g.,* 30 U.S.C. § 1202(m), by forcing OSMRE to needlessly delay alerting State regulatory authorities to possible violations. There is no question that under both the 2024 TDN Rule and the 2020 Rule a permittee can be in violation of the statute or an approved State program by operating under an improperly issued State permit. *See* 89 Fed. Reg. at 24715; 85 Fed. Reg. at 75175. Petitioners would have OSMRE delay notifying the State regulatory authority until the permittee actually starts mining under the

defective permit. But "[i]t makes little sense to wait for mining to occur under a defective permit or a violation to occur on-the-ground before issuing a TDN for an inconsistency with the approved permit, approved State program, or SMCRA." 89 Fed. Reg. at 24715. The TDN process is not meant to assess the relative culpability of the permittee and the State regulatory authority; it is meant to abate a hazard before an accident occurs. *Id*. at 24717.

Given the longevity and thoroughness of OSMRE's interpretation of "person," 30 C.F.R. § 700.5, and the 2024 TDN Rule's incorporation of that definition, OSMRE's interpretation should persuade the Court under *Skidmore*. *See Orton Motor*, 884 F.3d at 1211. Petitioners have never challenged § 700.5 or the thoroughness of its reasoning, and they cannot directly challenge it now. *See* 30 U.S.C. § 1276(a)(1) (sixty-day statute of limitation for filing a petition for review of a SMCRA regulatory action). Their hairsplitting definition of "person," which is unmoored from its statutory context, is therefore unlikely to succeed on the merits.

**Second**, Petitioners' interpretation of SMCRA relies on guesswork about the intention of Congress. Petitioners surmise that Congress put all its directions regarding permittee violations in section 521(a) and all of its directions regarding State regulatory issues in section 521(b). Pet'rs' Br. 17–18. The problem with this argument is that Congress addressed violations by "any person," in section 521(a), not "any permittee." 30 U.S.C. § 1271(a). Petitioners expound at length that Congress's use of one term in one provision but not another should be presumed intentional. Pet'rs' Br. 14. But they fail to explain why section 521(a)(1) does not then explicitly require that OSMRE issue TDNs only for violations of permittees. After all, Congress knew how to specify that certain provisions were only applicable to violations by permittees. *See, e.g.,* 30 U.S.C. §§ 1271(a)(2)–(4), (c); 1268. Indeed, as the legislative history confirms, Congress was concerned about resolving possible violations, not determining their genesis. *See* H.R. Rep. No.

95-218, at 176 (1977), *reprinted in* 1977 U.S.C.C.A.N. 593, 707 ("Under subsection (a), the Secretary is required to order a Federal inspection if he has reason to believe the act is being violated—after giving the State regulatory authority 10 days to respond.").

**Third**, Petitioners have no basis to read the term "site-specific" into the statute. *See* Pet'rs' Br. 15. The term does not appear in section 521, and the possibility of an on-the-ground Federal inspection does not exclude permit defect TDNs. 30 U.S.C. § 1271. As the preamble to the 2020 Rule recognized, defective permits often manifest themselves in on-the-ground violations. 85 Fed. Reg. 75175. And because most TDNs describe violations committed by specific permittees, subsequent subsections of section 521(a) provide the Secretary with enforcement authority against such permittees, including the authority to issue notices of violations, cessation orders, or permit revocation orders. 30 U.S.C. § 1271(a)(2)–(4). Petitioners fail to explain why these subsequent subsections support their reading of section 521(a)(1). Pet'rs' Br. 16. The fact that SMCRA permits inspectors and complainants to visit mines sites does not mean that such an inspection is necessary to issue a TDN. Nor does the fact that the Secretary can take a site-specific action to address an imminent danger suggest that the Secretary can only take site-specific actions to address non-imminent danger.

Similarly, section 521(a)(5) does not apply to TDNs issued under section 521(a)(1). 30 C.F.R. § 1271(a)(1), (5). Section 521(a)(5) states that "Notices and orders issued pursuant to this section shall set forth with reasonable specificity the nature of the violation and the remedial action required, the period of time established for abatement, and a reasonable description of the portion of the surface coal mining and reclamation operation to which the notice or order applies." *Id*. § 1271(a)(5). There is no doubt what notices and orders this subsection refers to, as the preceding three subsections all provide for notices of violations or cessation or permit

revocation orders to be issued against permittees. *Id*. § 1271(a)(2) (cessation orders); (a)(3) (notices of violation); (a)(4) (show cause order for permit revocation). And because section 521(a)(5) also specifies that each such notice shall be given promptly to the permittee, there is little chance that its requirements would pertain to section 521(b), which provides for the process of OSMRE to Federally enforce a State program if a State has failed to adequately do so. *Id*. § 1271(a)(5), (b). Nor would it make sense for section 521(a)(5) to apply to notifications issued under section 521(a)(1), which are also issued to State regulatory authorities, not permittees. *Id*. § 1271(a)(1). Petitioners' argument to the contrary would, illogically, require OSMRE to forward a copy of the TDNs to the State regulatory authority to which the original TDN was directed. *Id*. § 1271(a)(5) ("A copy of any such order or notice shall be sent to the State regulatory authority in the State in which the violation occurs[.]"). Even if Petitioners' reading were correct, the requirement that TDNs be reasonably specific about the mining operations described hardly excludes permit defect TDNs, which are tied to a specific permittee.

**Fourth**, Petitioners' structural arguments about SMCRA are unlikely to succeed. *See* Pet'rs' Br. 16–19. By enhancing the early notification requirements of the 2020 Rule, the 2024 TDN Rule gives States the opportunity to address not only site-specific mining violations but also State regulatory program issues. 89 Fed. Reg. at 24727. This is consistent with OSMRE's view of the TDN since at least the 1988 Rule, where OSMRE specified that the TDN process provided a "buffer before making an operator responsible for the consequence of a mistake by the State regulatory authority." 53 Fed. Reg. 25737–78. The 2024 TDN Rule is also consistent with SMCRA's cooperative federalism, which empowers States to address problems in the first instance while also providing for robust federal oversight. *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 521. "Congress did not withhold powers that the Secretary might

31

require in his efforts to safeguard federal interests." *Id*. By requiring the Secretary to issue TDNs regardless of the genesis of the violation, Congress ensured that the Federal authorities would notify the States of these violations before taking stronger measures, if warranted, against the State regulatory authority under section 521(b). 30 U.S.C. § 1271(b).

The TDN is a communication tool meant to foster cooperation between OSMRE and the States. A TDN does not "issue orders directly to the States." Pet'rs' Br. 19. At its most coercive, a TDN provides incentives for State regulatory authorities to work with OSMRE to avoid a Federal inspection under section 521(a). Petitioners arguments gives short shrift to the text of SMCRA, the agency's historical practice, and precedent affirming the Secretary's authority to provide oversight to State permitting decisions. *Farrell-Cooper*, 728 F.3d at 1236–37; *In re Permanent Surface Mining Regul. Litig.*, 653 F.2d at 527; *Mullinax*, 96 IBLA at 59; *W.E. Carter*, 116 IBLA at 262–268; *Paul F. Kuhn*, 120 IBLA at 4–5. Petitioners are unlikely to succeed on the merits because they misconstrue SMCRA and misunderstand the 2024 TDN Rule.

3. *Petitioners are unlikely to demonstrate that the 2024 TDN Rule's revisions to the mechanics of the TDN process are unlawful.*

The 2024 TDN Rule is a well-calibrated effort to optimize OSMRE's statutory oversight of State regulatory authorities. OSMRE intended the 2024 TDN Rule to strike the "better balance between minimizing duplication of efforts with the State regulatory authorities and affording citizens an appropriate level of involvement in enforcement of SMCRA programs." 88 Fed. Reg. at 24947. That Petitioners may have preferred the balance struck by the 2020 Rule does not make this Rule arbitrary, capricious, or otherwise inconsistent with the law. Petitioners have not demonstrated that the 2024 TDN Rule's revisions are inconsistent with SMCRA.

Nor have Petitioners demonstrated that there is no rational connection between the facts found by OSMRE and the decisions it made. *See Zevallos*, 793 F.3d at 112. Given the early stage

of this litigation, Petitioners have little basis to make this showing, because "it is black-letter administrative law that in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013) (quotation omitted). Petitioners' declarations, all dated after the Rule's promulgation, will not be part of the administrative record and therefore have no bearing on the likelihood of Petitioners' success on the merits. *See Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 216 (D.D.C. 2012) (Walton, J) (declining to consider affidavits submitted by the parties at the preliminary injunction phase). Though the full scope of the agency's reasoning will not be apparent until it files the administrative record, the reasoning in the preamble to the 2024 TDN Rule is sufficient to refute Petitioners' arguments at this stage.[8]

    a.   *The 2024 TDN Rule reasonably specifies the sources of information OSMRE may consider before issuing a TDN.*

SMCRA gives the Secretary wide latitude in determining what information to consider before issuing a TDN. The 2024 TDN Rule specifies three sources of information for OSMRE to consider in determining whether there is reason to believe that there is a violation: 1) a citizen complaint, 2) information in its files, and 3) publicly available electronic information. 30 C.F.R. §§ 842.11(b)(1)(i), § 842.12(a); 88 Fed. Reg. at 24948–49. This represents a change from the 2020 Rule, which permitted OSMRE to request information from the State regulatory authorities *prior* to issuing a TDN. *See* 85 Fed. Reg. 75,151. OSMRE found that it could take months to gather all the necessary information from the State regulatory authority, and that such a delay was inconsistent with its statutory mandate. 88 Fed. Reg. at 24949.

---

[8] Petitioners repeatedly reference "the record." Pet'rs' Br. 30, 37, 39, 40. There is no record yet in this case. Respondents anticipate lodging the administrative record on November 8, 2024.

This provision is fully consistent with SMCRA. The Secretary can have reason to believe that there is a possible violation of SMCRA or an approved State program "on the basis of any information available to him, including receipt of information from any person[.]" 30 U.S.C. § 1271(a)(1). Petitioners seek to require OSMRE to consider all information that may become available to them, Pet'rs' Br. 23–25, but this would replace the word "any" with the word "all." Tellingly, they argue that SMCRA "permits the Secretary to consider information available from any source, including State regulatory authorities[.]" Pet'rs' Br. 24. But permission is different from requirement, and Petitioners do not show how OSMRE's decision to use its discretion to focus OSMRE's internal process for pre-TDN information gathering on the most readily available information is arbitrary or capricious. Instead, they cite to a news article for the proposition that the 2024 TDN Rule "bars OSMRE staff from communicating with their State counterparts." Pet'rs' Br. 26. But Petitioners forget that the TDN notice *is* itself a communication device. And Congress contemplated that such communication be in writing and follow formal rules. 30 U.S.C. § 1271(a)(1). Notice in advance of a TDN by "phone call or email[,]" as Petitioners may prefer, is not required by 30 U.S.C. § 1271(a)(1). *See* Pet'rs' Br. 25.

Petitioners' interpretation of SMCRA is also inconsistent with the regulatory history. Until 2020, OSMRE did not consider information provided by the State regulatory authority before issuing a TDN. 88 Fed. Reg. at 24946. The 1979 Rule provided that OSMRE "shall have reason to believe that a violation, condition or practice exists if the facts alleged by the informant would, if true, constitute a . . . violation. 44 Fed. Reg. 15457. OSMRE declined to change this standard in 1982. 47 Fed. Reg. 35627 ("[S]ection 521(a)(1) of the Act . . . does not require [OSMRE] to conduct an inquiry into the veracity of the complainant."). When, in 2020, OSMRE decided to consider information submitted by the State regulatory authority before a TDN issued,

it changed its historic practice and anticipated "at most, only a modest increase in the amount of time it takes the authorized representative to decide whether he or she has 'reason to believe.'" 85 Fed. Reg. 75165. Experience proved otherwise, however, and, in issuing the 2024 TDN Rule, the Secretary determined that relying on the State regulatory authority to provide data regarding a complaint unnecessarily slowed down the TDN process. 88 Fed. Reg. at 24949. If Congress had intended for a lengthy exchange *before* the issuance of a TDN, there would be no need for the States to respond to a TDN within a tight ten-day timeframe. Petitioners have no grounds to argue that the 2024 TDN Rule's changes to the sources of information that OSMRE will consider before issuing a TDN are arbitrary, capricious, or otherwise inconsistent with SMCRA.

      *b. The 2024 TDN Rule increases the ease with which citizens can file complaints to OSMRE.*

      The 2024 TDN Rule removes some of the formal requirements imposed by the 2020 Rule to streamline the submission of citizen complaints. The 2020 Rule required citizens to certify that they had contacted the State before filing their complaint and to provide the basis for their assertion that the State regulatory authority had not taken action. 85 Fed. Reg. at 75172. These requirements are not required by SMCRA and were inconsistent with the federal regulatory history. Indeed, a commenter first suggested that OSMRE include such a requirement in 1979, but OSMRE rejected that comment, reasoning that if the State was responsive to citizen complaints, there would be no need to request a Federal inspection rather than a State inspection. 44 Fed. Reg. 15299. OSMRE went on to note that it "has no authority under [SMCRA] to require a citizen to ask for a State inspection before asking for a Federal inspection." *Id*. at 15299. Consistent with this history, OSMRE found that requirements of the 2020 Rule were too burdensome on the public and could dissuade citizens from submitting otherwise helpful complaints. 88 Fed. Reg. at 24956. While it continued to "strongly encourage" citizens to contact

35

State regulatory authorities to alert them to possible violations before reaching out to OSMRE, OSMRE recognized that citizens were not often in a position to determine a State officials' reasoning for declining to take action on a possible violation. 88 Fed. Reg. at 24946.

      *c.   The 2024 TDN Rule sets reasonably boundaries on the use of action plans.*

The 2024 Rule continues the 2020 Rule's use of "action plans." Under the 2024 TDN Rule, OSMRE, in consultation with the State regulatory authority, can draw up an action plan to address a "State regulatory program issue." 30 C.F.R. § 733.12(b). Unlike the 2020 Rule, however, the 2024 Rule does not deem the mere establishment of an action plan as "appropriate action" sufficient to satisfy a TDN. The establishment of an action plan instead counts as "good cause" for a State regulatory authority not to act in response to a possible violation. 89 Fed. Reg. at 24718. In legislating with qualitative terms like "appropriate action," and "good cause," Congress gave OSMRE flexibility in interpreting SMCRA. *See Loper Bright*, 144 S. Ct. at 2263 (giving "appropriate" and "reasonable" as examples of words which delegate discretion). "When the best reading of a statute is that it delegates discretionary authority to an agency," the reviewing court's role is limited to "recognizing" the delegation, "fix[ing] the boundaries of [the] delegated authority," and "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (citation omitted). OSMRE's reclassification of the action plan from "appropriate action" to "good cause" reflects reasoned decisionmaking within the bounds of SMCRA. Petitioners would prefer that actions plans continue to be classified as "appropriate action" because they "cause" violations to be resolved. Pet'rs' Br. 36–37. As OSMRE observed, however, actions, not plans for actions, remedy violations. 89 Fed. Reg. at 24718.

Nor do Petitioners show that the time limits built into section 733.12(b) are arbitrary or capricious. Consistent with its focus on timely action, the action plan must "identify an effective

mechanism for timely correction" of the State regulatory issue and identify technical assistance for OSMRE to provide. 30 C.F.R. § 733.12(b)(1). Likewise, an action plan must be completed within 365 days. *Id*. Recognizing that States may need over a year to abate certain violations, OSMRE requires only that all the completion criteria for the plan be achievable within a year. 88 Fed. Reg. at 24950. Contrary to their assertion, Petitioners will not need "to ignore out-of-hand any solutions that would take more than a year to implement[.]" Pet'rs' Br. at 38. Rather, action plans would just need milestones that can be completed within a year. 30 C.F.R. § 733.12(b)(3)(iii)–(v); 88 Fed. Reg. at 24950. "The goal is to keep violations from going unabated, minimize on-the-ground impacts, and prevent off-site impacts." 88 Fed. Reg. at 24950.

The 2024 TDN Rule does not change the broad function of action plans. As first codified with the 2020 Rule, action plans were meant to allow OSMRE and State regulatory authorities to cooperate in order to "correct systemic State regulatory program issues." 85 Fed. Reg. 75172. This has not changed. OSMRE has only provided reasonable parameters to ensure that action plans timely fix the problems they are designed to fix. 89 Fed. Reg. at 24717.

> *d. The 2024 TDN Rule sets reasonable deadlines for the TDN Process.*

A State can also show "good cause" for not taking appropriate action within the meaning of 30 U.S.C. § 1271 when it determines it needs more than ten days to complete its investigation into the possible violation. OSMRE exercises its discretion in the 2024 TDN Rule to require that investigations be completed within 30 days in order to constitute good cause, and that complex investigations take no more than 60 days thereafter. 89 Fed. Reg. at 24727. OSMRE imposed these limits "so that a State regulatory authority will not postpone abatement measures while it is engaging in an open-ended investigation of whether a violation exists." 88 Fed. Reg. at 24951. Petitioners worry that exigencies such a seasonal snow cover could make completing an

investigation in under 90 days impossible. Pet'rs' Br. 33. This is exactly the type of hypothetical that is unavailable on a facial challenge to a rule. *Metro. Washington Chapter, Associated Builders & Contractors*, 62 F.4th at 577. Even in such an event, however, OSMRE will not "forc[e] a State to conclude an investigation before it has gathered enough evidence[.]" Pet'rs' Br. 33. OSMRE found, in its experience that "determining if a violation exists is not an exhaustive or indeterminate process[,]" 88 Fed. Reg. at 24951, and Petitioners' array of hypotheticals is not likely to defeat the agency's reliance on its expertise and experience to craft reasoned parameters for its own discretion.

***

Petitioners might do things differently in OSMRE's shoes, but such differences in opinion do not meet the "arbitrary and capricious or otherwise inconsistent with law" standard, as required by 30 U.S.C. § 1276(a)(1). "The question in each case is whether the agency's reasons for the change, when viewed in light of the data available to it, and when informed by the experience and expertise of the agency, suffice to demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority." *FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 536 (2009). The arbitrary and capricious standard is "highly deferential" and requires only that the agency examine the relevant data and draw a rational connection between its factual findings and its decision. *Zevallos*, 793 F.3d at 112. That Petitioners think the 2024 TDN Rule could be better carries no weight, because the Court may not substitute its judgment for the agency's. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor will Petitioners' argument that OSMRE failed to respond to their alternatives succeed, as courts do not demand that an agency consider "all policy alternatives in reaching decision." *Id*. at 51.

38

Petitioners also seek to substitute their own submissions and affidavits for the administrative record. While Petitioners cite their comments as uncontroverted fact, OSMRE considered and analyzed these comments during its rulemaking process. The administrative record will include all documents considered during that process, and that record—not Petitioners' declarations, news articles, or other exhibits—will be the basis for this Court's analysis. *See Hill Dermaceuticals*, 709 F.3d at 47; *Cardinal Health*, 846 F. Supp. 2d at 216.

## V.     Petitioners fail to demonstrate irreparable injury.

Petitioners' failure to clear the high bar of demonstrating irreparable injury provides an independent basis for denying their motion. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Their injury "must be both certain and great; it must be actual and not theoretical." *Id.* (quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). Petitioners must also show that "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* Finally, Petitioners must show that injury is "beyond remediation." *Id.* Indeed, "a mere possibility of irreparable harm will not suffice," and showing a likelihood of irreparable injury is sometimes considered "the *sine qua non* for obtaining a preliminary injunction—it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).

Petitioners make three arguments in their page-and-a-half analysis. Pet'rs' Br. 41–42. None of them are meritorious.

*1. Petitioners do not suffer any injury to their sovereign authority.*

39

The 2024 TDN Rule respects the States' statutory authority under SMCRA. SMCRA gives primacy States "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations, except as provided in sections 1271 and 1273 and title and subchapter IV of this chapter[.]" 30 U.S.C. §1253(a). Petitioners frequently refer to their "exclusive jurisdiction" but rarely to the exception for the Secretary's oversight and enforcement role under section 521. 30 U.S.C. § 1271(a); *see e.g.* Pet'rs' Br. 41–42. The Secretary promulgated the 2024 TDN Rule under section 521 to improve her oversight and enforcement of SMCRA, and Petitioners have no sovereign interest in avoiding the Secretary's exercise of such authority.

Nor do Petitioners even explain how an injury to their sovereign authority will be irreparable. The one case they cite found that State challengers to a regulation had demonstrated irreparable injury, not because of harm to state sovereignty, but because they had demonstrated financial harm. *See Texas v. U.S. EPA*, 829 F.3d 405, 434 (5th Cir. 2016). But, unlike the plaintiffs in *Texas*, Petitioners have not demonstrated "any specific, identifiable cost they will incur" because of the 2024 TDN Rule, nor how such a cost would be irreparable. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015).

The 2024 TDN Rule does not invade or encroach on any State authority. A TDN is a communication mechanism, not a demerit or factual finding against a State regulatory authority. 88 Fed. Reg. at 24947; 89 Fed. Reg. at 24724. In and of itself, it carries no coercive force. When evaluating a State's response to a TDN, OSMRE must defer to the State regulatory authorities' response under an arbitrary and capricious standard, 30 C.F.R. § 842.11(b)(1)(ii)(B)(*2*), and if the State regulatory authority disagrees with OSMRE's conclusion, it can seek administrative appellate review, during which OSMRE typically cannot conduct an inspection. 30 C.F.R. §842.11(b)(1)(iii)(C). Only upon a ruling by the Deputy Director would OSMRE conduct a

Federal inspection, *id.*, after which OSMRE may decide that other enforcement actions under SMCRA are warranted. But any damages occurring at that hypothetical future date could be addressed then and are therefore not irreparable now. And, in any event, any such injury could be addressed then and, therefore, is not irreparable now.

2. *The 2024 TDN Rule will not increase Petitioners' administrative burdens.*

The 2024 TDN Rule provides an efficient mechanism for States to address potential SMCRA violations as early as possible. There is no practical benefit to waiting until operators begin mining under a defective permit before sending a TDN. *See* 89 Fed. Reg. at 24724. And Petitioners have not demonstrated how such a delay would do anything other than increase sunk costs, delay resolution, and potentially cause environmental damage.

Petitioners' proffered harms from increased administrative burden are highly speculative. Tellingly, only eight of the Petitioner States offered declarations in support of their alleged irreparable harm. ECF No. 24-2, Pet'rs' Exhibit 2. Accepting the assertions in the declarations as true for present purposes, six of these eight States have not received any TDNs since the 2024 TDN Rule went into effect. Decl. of Kathy H. Love, ¶ 16, ECF No. 24-2 at 6 (Alabama has received one TDN in the last ten years); Decl. of Steven J. Weinzapfel, ¶ 19, ECF No. 24-2 at 11 (Indiana's most recent TDN was in 2016); Decl. of Stephen Lee ¶ 7, ECF No. 24-2 at 15 (Louisiana's most recent TDN was 2010); Decl. of Randy Christmann, ¶ 10, ECF No. 24-2 at 19 (North Dakota's most recent TDN was in 2010); Decl. of Dana Dean ¶ 19, ECF No. 24-2 at 25 (Utah's most recent TDN was in 2016); Decl. of Marshall Moore ¶ 18, ECF No. 24-2 at 32 (Virginia's most recent TDN was in 2018).[9] Only one State declarant has even identified

---

[9] The declarant for Wyoming did not specify when that State's regulatory authority received its most recent TDN. Decl. of Kyle Wendtland, ECF No. 24-2 at 43.

receiving a TDN since the new rule took effect. Decl. of Jonathan Rorrer ¶ 20, ECF No. 24-2 at

40 ("Rorrer Decl.") (West Virginia has received 11 TDNs since the 2024 TDN Rule's effective

date). Though Mr. Rorrer states that West Virginia has received TDNs at a higher rate since the

2024 TDN Rule went into effect, he makes no effort to explain how many of the 11 TDNs the

State claims it received could have been issued under the 2020 Rule or whether any of the TDNs

led either the State or OSMRE to order the permittees to take corrective action to enforce

SMCRA. Rorrer Decl. ¶¶ 20–21. Absent such a showing, there is no indication that any of West

Virginia's Division of Mining and Reclamation alleged workload pressures would be remedied

by a preliminary injunction. Nor does Mr. Rorrer specify how many of the claimed 11 TDNs, if

any, were issued for State regulatory program issues, such that his staff would need to work on

action plans. *See* Rorrer Decl. ¶ 25. For all the other States, there is no indication that they will

need to respond to any TDNs during the pendency of this litigation—never mind a permit defect

TDN. This failure to show actual or imminent harm precludes a finding of irreparable injury.

Even if State regulatory authorities did face workload pressures from the 2024 TDN

Rule, those pressures are not irreparable. The States could commit more resources to their State

regulatory authorities or seek additional federal grants. *See* 85 Fed. Reg. 75177 (citing 30 C.F.R.

pt. 735 and OSMRE's Federal Assistance Manual, Chapter 5–200, The Application Process for a

Regulatory Grant); *see also* 30 U.S.C. § 1295(a). Moreover, the State declarants' proffered

workload pressures are hypothetical and insufficient to support a preliminary injunction.

Ultimately, if the State regulatory authority fails to respond to a TDN, or if their response is

arbitrary, capricious, or an abuse of discretion, OSMRE will conduct a Federal inspection. 89

Fed. Reg. at 24715. Such an inspection could lead to an enforcement action against a permittee,

30 U.S.C. § 1271(a)(2)–(4), but it would not lead to any action against the State regulatory

authority unless OSMRE decided that that the State was not adequately implementing its State program and took further action under § 1271(b) and 43 C.F.R. part 733. Petitioners do not explain how an inspection will harm them, and, indeed, such an inspection should help them by devoting federal resources to a possible violation the State would otherwise need to address.

3. *Possible impacts on mining are purely speculative.*

Nothing in the 2024 TDN Rule interferes with State processes to issue permits for surface coal mining operations. Petitioners speculate that certain TDNs may overwhelm the State regulatory authority and slow its permitting program. Pet'rs' Br. 42. Petitioners further speculate that permitting delays could cause operators to fail to meet their contractual expectations. *Id*. This in turn could affect energy production. *Id*. This scenario is built upon layers of speculation and cannot form the basis for an irreparable injury, which must be actually and imminently impending. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Even if it were impending, Petitioners do not explain why utilities, who are not party to this suit, would be unable to remedy such a coal shortfall except by an injunction of the 2024 TDN Rule. Nor do Petitioners explain how any theoretical electrical disruptions would irreparably harm them. The Court should reject Petitioners' attempts to parlay alleged administrative resource shortages into irreparable injury. The 2024 TDN Rule provides no "certain and great" danger to Petitioners. *Id*. at 297.

**VI.  The balance of the equities and the public interest weigh against enjoining the 2024 TDN Rule.**

The 2024 TDN Rule is designed to advance OSMRE's mission to keep coal mining communities and their environment safe from the risks of surface coal mining and reclamation operations. "One of the primary purposes of SMCRA is to protect society and the environment from the harmful effects of surface coal mining operations[.]" 85 Fed. Reg. 75174; *see also* 30 U.S.C. § 1201(k). In addition, a House of Representatives Report, dated April 22, 1977, that

preceded the enactment of SMCRA, emphasized the role of citizen participation in the SMCRA enforcement process. For example, the report states: "The success or failure of a national coal surface mining regulation program will depend, to a significant extent, on the role played by citizens in the regulatory process." H.R. Rep. No. 95-218, at 88 (1977), *reprinted in* 1977 U.S.C.C.A.N. 593, 625. An injunction would force OSMRE to return to a regulatory program that was not working and did not afford citizens their proper role in implementation of SMCRA.

OSMRE's Program Assistance Division Chief, William R. Winters, explains the damage that Petitioners requested relief would cause the agency and the public in his attached declaration. Ex. A, Decl. of William R. Winters. A preliminary injunction would create uncertainty for OSMRE on how to process citizen complaints and how to address permit defects and confusion for citizens about who to notify of possible violations, and ultimately undermine the purposes of SMCRA. *Id*. ¶¶ 11–14, 17. Such an injunction would also hamper OSMRE's efforts "to make the TDN process more effective and efficient." *Id*. ¶ 15. Because the TDN is a communication mechanism that does not adversely affect the States, *id*. ¶ 15–16, the balance of equities and the public interest weigh against Petitioners.

**VII.    Any relief should be appropriately limited.**

If this Court were to determine that Petitioners are entitled to preliminary injunctive relief, any resulting injunction should be no broader than necessary to remedy any demonstrated irreparable harm to any Petitioner. The 2024 TDN Rule's changes to parts 842 and 733 are severable from each other. 89 Fed. Reg. at 24733. Severance is particularly warranted where a petitioner seeks preliminary injunctive relief, as fundamental "principles of equity jurisprudence" dictate that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete"—and in this case, temporary—"relief to the Petitioners." *Califano v.*

*Yamasaki*, 442 U.S. 682, 702 (1979). By the same token, any injunction should be limited to the "specific parties" who have demonstrated that they will be irreparably harmed by the 2024 TDN Rule. *California v. Texas*, 593 U.S. 659, 672 (2021).

<u>Conclusion</u>

Petitioners have failed to demonstrate the Court's jurisdiction over this action. Should it nevertheless decide to reach the merits of Petitioner's motion, the Court should do so under the traditional four-part test for preliminary injunctions outlined by the Supreme Court. *See Winter*, 555 U.S. at 20. Petitioners fail to demonstrate a likelihood of success on the merits because the 2024 TDN Rule is consistent with SMCRA and a reasonable exercise of OSMRE's authority. And they fail to demonstrate an irreparable injury because they cannot show how they will be harmed by a communication mechanism. Further, the balance of the equities and public interest weigh against enjoining the 2024 TDN Rule, which was painstakingly developed to better protect the public from the risks of surface coal mining and reclamation operations.

The 2024 TDN Rule has been in effect for over four months. Many of the changes Petitioners decry had been in effect for decades before the 2020 Rule. Petitioners will not be irreparably harmed by waiting until the administrative record is lodged before briefing the merits of the case.

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/Erik Van de Stouwe*

PAUL TURCKE
Trial Attorney
ERIK VAN DE STOUWE

45

Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
4 Constitution Square
150 M Street, N.E., Suite 3.206
Washington, D.C. 20002
Paul.Turcke@usdoj.gov
Erik.Van.de.Stouwe@usdoj.gov
Phone: (202) 532-5994 (Turcke)
        (202) 305-0247 (Van de Stouwe)

Attorneys of Record for Respondents

September 13, 2024