# UNITED STATES DISTRICT COURT

# FOR THE

# DISTRICT OF COLUMBIA

No. 1:24-cv-01665

State of Indiana, Indiana Department of Natural Resources, State of West Virginia, West Virginia Department of Environmental Protection, *et al*., Petitioners

v.

Deb Haaland, in her official capacity as Secretary of the Interior, *et al*., Respondent

## BRIEF OF THE AMICUS CURIAE
## NATIONAL MINING ASSOCIATION

## IN SUPPORT OF PETITIONERS



RECEIVED

DEC 26 2024

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

**INTEREST OF AMICUS CURIAE**

The National Mining Association ("NMA") respectfully submits this brief as amicus curiae in support of Petitioners. The NMA is the primary national trade association representing the mining industry in the United States, including companies that conduct surface coal mining operations regulated under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). NMA's membership encompasses the majority of coal producers who operate under SMCRA permits across multiple states, from Appalachia to the Western United States.

NMA's members work daily with both state regulatory authorities and the Office of Surface Mining Reclamation and Enforcement ("OSMRE"). This dual interface gives the NMA unique insight into the practical functioning of SMCRA's cooperative federalism framework. NMA's members invest substantial resources in environmental compliance, including extensive permitting processes, and maintain sophisticated environmental monitoring programs that must satisfy both state and federal requirements.

The Final Rule on "Ten-Day Notices and Corrective Action for State Regulatory Program Issues," 89 Fed. Reg. 24,714 (Apr. 9, 2024) (the "Rule"), directly affects NMA's members by fundamentally altering the regulatory framework under which they operate. The Rule threatens to disrupt long-established permitting processes, create regulatory uncertainty, and potentially subject mining

#513636866_v8

operations to conflicting state and federal directives. NMA's members have concrete experience with how the previous regulatory frameworks functioned and unique perspective on the practical implications of the changes imposed by the Rule.

#513636866_v8

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ...............................................................................1

BACKGROUND ..............................................................................................2

ARGUMENT ...................................................................................................6

    I.    THE RULE UNLAWFULLY TRANSFORMS TDN FROM A COMPLIANCE TOOL INTO A PUNITIVE MECHANISM AGAINST OPERATORS WHO FOLLOW STATE LAW. ...............................................................................6

    II.    THE RULE UNLAWFULLY CREATES A NEW FEDERAL CHANNEL FOR COLLATERAL ATTACKS ON STATE DECISIONS. ...........................................10

    III.    THE RULE'S REVERSAL OF LONGSTANDING POLICY VIOLATES BASIC REQUIREMENTS OF REASONED DECISION-MAKING. ...................................15

CONCLUSION ...............................................................................................24

#513636866_v8

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bragg v. W. Virginia Coal Ass'n*,
248 F.3d 275 (4th Cir. 2001) .........................................................................3, 15

*Bus. Roundtable v. S.E.C.*,
647 F.3d 1144 (D.C. Cir. 2011)...........................................................................20

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).................................................................................16, 23,

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).............................................................................................16

*Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981)...............................................................................................3

*Michigan v. EPA*,
576 U.S. 743 (2015).............................................................................................21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.*,
463 U.S. 29 (1983)........................................................................................17, 24

*Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*,
297 F.3d 310 (3d Cir. 2002) .................................................................................4

*In re Permanent Surface Min. Regul. Litig.*,
653 F.2d 514 (D.C. Cir. 1981)..............................................................................9

#513636866_v8

## Statutes

30 U.S.C.

§ 1201(f)............................................................................................3, 4, 15

§ 1202(a) .................................................................................................2

§ 1253(a) .........................................................................................*passim*

§ 1256.....................................................................................................4

§ 1259.....................................................................................................4

§ 1260.....................................................................................................4

§ 1267(a) ................................................................................................4

§ 1267(c) ................................................................................................4

§ 1271(a)(1) .......................................................................................4, 7

§ 1271(b).........................................................................................4, 5, 9

§ 1272(e) ................................................................................................9

§ 1291(19)........................................................................................7, 17

§ 1291(22)..............................................................................................7

§ 1291(24)............................................................................................17

§ 1291(26)........................................................................................7, 17

## Other Authorities

72 Fed. Reg. ...........................................................................................18

85 Fed. Reg. (Nov. 24, 2020)...........................................................5, 6, 19

89 Fed. Reg. .....................................................................................*passim*

#513636866_v8

## SUMMARY OF ARGUMENT

The Rule represents both an unlawful expansion of agency authority and a fundamental threat to the surface mining industry's ability to operate effectively under SMCRA's cooperative federalism framework. The Rule's fundamental flaws fall into three critical categories.

First, the Rule impermissibly transforms the ten-day notice ("TDN") provision from its intended role—addressing specific on-the-ground violations—into a weapon for federal second-guessing of state regulatory decisions. This transformation effectively creates a dynamic where mine operators are held hostage in disputes between federal and state regulators. Under the Rule, even when operators fully comply with state permits and regulatory interpretations, they nonetheless face federal enforcement actions and penalties if OSMRE disagrees with state decisions. Congress never intended Section 521(a) to create such jeopardy for operators acting in good faith compliance with state requirements.

Second, the Rule's new citizen complaint procedures create an unprecedented mechanism for collaterally attacking state permitting and regulatory decisions. By allowing citizens to bypass state authorities and challenge state decisions through federal channels—even years after state appeal periods have expired—the Rule obliterates the finality and certainty that operators require for business planning and investment decisions. This end-run around state administrative procedures directly

1

contravenes SMCRA's careful allocation of authority between state and federal regulators.

Third, OSMRE has failed to provide any reasoned explanation for reversing decades of consistent interpretation regarding the scope of TDNs  and the role of state regulators. The agency identifies no evidence of problems under the prior rules, offers no substantive response to extensive industry comments, and relies instead on conclusory statements to justify dramatic changes. This cursory approach to fundamental regulatory changes epitomizes arbitrary and capricious rulemaking under the Administrative Procedure Act ("APA").

These defects are not mere technical violations that could be cured on remand. Rather, they reflect an impermissible attempt to rewrite SMCRA's statutory scheme through regulation. Only vacatur can protect the careful balance Congress struck between federal oversight and state primacy in regulating surface mining operations.

For these reasons, and those detailed in the arguments below, this Court should vacate the Rule as contrary to law and arbitrary and capricious under the APA.

## BACKGROUND

Congress enacted SMCRA in 1977 to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). The Act established the first comprehensive

2

federal regulatory framework for surface coal mining, but with a critical distinction from other environmental statutes: Congress explicitly designed SMCRA to give states the primary role in its implementation and enforcement. *See Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 289 (1981) (explaining "[SMCRA] establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs.").

This state-centered approach reflected Congress's recognition that "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations . . . should rest with the States." 30 U.S.C. § 1201(f). Congress implemented this principle by creating a system that gives states with federally approved regulatory programs "*exclusive jurisdiction* over the regulation of surface coal mining and reclamation operations" within their borders. *Id*. § 1253(a) (emphasis added); *see also Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 293-94 (4th Cir. 2001) (comparing other cooperative federalism statutes and finding that SMCRA "exhibits extraordinary deference to the States. . . SMRCA provides explicitly that when State regulate, they do so exclusively").

3

Under this system, a state may assume regulatory authority by demonstrating that it has a program "capable of carrying out" SMCRA and "meeting its purposes." 30 U.S.C. § 1253(a). Once approved, the state assumes control over all aspects of surface mining regulation—from permitting and bonding decisions to site inspections and enforcement actions. 30 U.S.C. §§ 1256, 1260, 1259; monitoring, and enforcement actions, *id*. § 1267(c). This authority extends to crucial environmental determinations like evaluating hydrologic impacts, setting reclamation requirements, and establishing monitoring protocols tailored to local conditions. *Id*. § 1201(f).

SMCRA provides the Secretary of the Interior ("Secretary"), acting through OSMRE, with limited oversight authority through specific statutory mechanisms. First, OSMRE may conduct inspections to "evaluate the administration of approved State programs." *Id*. § 1267(a). Second, when OSMRE has "reason to believe that any person is in violation" of SMCRA or a permit condition, it may issue a "ten-day notice" to the state regulatory authority. *Id*. § 1271(a)(1). This notice triggers an obligation for the state to take appropriate action or show good cause for not doing so within ten days. Third, if OSMRE believes a state is systematically failing to enforce its program effectively, it may initiate proceedings to assume federal control—but only after providing public notice, holding a hearing, and making specific findings. *Id*. § 1271(b); *see also Pennsylvania Fed'n of Sportsmen's Clubs,*

4

*Inc. v. Hess*, 297 F.3d 310, 331 (3d Cir. 2002) (noting that only upon the states "failure in whole or in part of a state program" does SMCRA "provide[] for the OSM[RE] to take over").

Historically, TDNs served as a targeted mechanism for addressing specific violations at mining sites—such as permit violations, reclamation failures, or environmental impacts that required immediate attention. These notices were not used nor intended to challenge state permitting decisions or to address broader programmatic issues. Instead, Congress provided a separate mechanism in Section 521(b) for addressing systematic concerns with state programs, requiring public notice, hearings, and specific findings before federal intervention. *Id*. § 1271(b).

In 2020, the Secretary promulgated regulations that codified this long-standing understanding of TDNs. *See* TDN and State Regulatory Program Oversight, 85 Fed. Reg. 75,150, 75,151 (Nov. 24, 2020) ("2020 Rule"). The 2020 Rule addressed targeted misuse of the process, including attempts to bootstrap TDNs beyond their intended scope to challenge state permitting decisions and programmatic issues. The 2020 Rule ensured the integrity of the cooperative federalism framework by establishing clear procedures requiring citizens to first contact state regulators with their concerns, recognizing states' front-line role and superior knowledge of local conditions. *Id*. at 75,157 ("including a State regulatory authority early in the process is advantageous to both the State regulatory authority

5

and OSMRE because it reduces duplicative efforts to address potential violations.").
It also explicitly authorized OSMRE to consider readily available information from state authorities before issuing notices, preventing unnecessary federal intervention when states had already addressed the concern. *Id*. at 75,151.

The Rule issued in 2024 fundamentally alters this established approach. It expands TDNs beyond their traditional scope to encompass state permitting decisions and programmatic issues. It eliminates requirements for citizen coordination with state regulators and restricts OSMRE's ability to consider state-provided information when evaluating potential violations. The Rule also imposes new deadlines for state investigations that apply regardless of the technical complexity involved. This significant departure from decades of successful regulatory practice raises substantial questions about both statutory authority and administrative procedure that form the basis for this challenge.

## ARGUMENT

### I. The Rule Unlawfully Transforms TDNs From a Compliance Tool into a Punitive Mechanism Against Operators Who Follow State Law.

The Rule's most fundamental flaw lies in its unprecedented expansion of TDNs beyond their narrow statutory purpose—addressing specific on-the-ground violations—into a mechanism that turns mine operators into pawns in disputes between federal and state regulators. Through definitional sleight-of-hand, the Rule

6

subjects operators to federal enforcement actions not for their own conduct, but for following state permits and interpretations that OSMRE later decides to question.

### A. The Rule Impermissibly Converts State-Federal Regulatory Disputes into "Violations" by Operators

Congress carefully circumscribed the scope of TDNs in Section 521(a), authorizing them only when the Secretary has "reason to believe that any person is in violation of any requirement" of SMCRA or permit conditions. 30 U.S.C. § 1271(a)(1). The statute explicitly defines "person" to encompass regulated entities—including corporations and other business organizations—while deliberately excluding state regulatory authorities from this definition. *See id.* § 1291(19), (22), (26). This careful drafting reflects Congress's intent to treat actual violations by operators differently from disagreements about state regulatory decisions.

Yet the Rule obliterates this distinction by treating any federal disagreement with state permitting decisions or regulatory interpretations as a "violation" subject to the TDN process. This creates an absurd result where operators face federal enforcement action despite full compliance with the requirements of state regulators who are given exclusive jurisdiction to regulate under SMCRA. *See* 30 U.S.C. § 1253(a). Consider a typical scenario: A mining company invests millions in environmental studies and technical analyses to obtain a state permit, begins operations in reliance on that permit, enters into coal supply contracts, hires workers,

7

#513636866_v8

and purchases equipment—only to have OSMRE later challenge the state's permit decision through a TDN. The operator faces potential cessation orders and penalties while state and federal regulators dispute the permit's validity, despite having done nothing more than follow state law under a state program already approved by the Secretary. *See* Weinzapfel Decl. ¶¶ 28-29, ECF No. 45-4 (describing how permit delays jeopardize contractual obligations).

The real-world impact of this regulatory overreach is already evident. In West Virginia, after receiving only 7 TDNs in the five years from 2018-2022, state regulators received 11 notices in just the first two months after the Rule took effect— a 47-fold increase in the rate of federal second-guessing. *See* Rorrer Decl. ¶¶ 20-21, ECF No. 45-3. This dramatic surge validates industry concerns that the Rule would subject routine state permitting and enforcement decisions made by a state regulatory authority under a federally approved state program to constant federal disruption.

## B. The Rule Circumvents SMCRA's Carefully Crafted Oversight Structure

This expansion of TDNs not only harms operators but also circumvents the specific procedures Congress established for addressing concerns with state regulatory programs. Section 521(b) creates a separate mechanism for such issues, requiring public notice, a hearing, and specific findings before federal intervention. 30 U.S.C. § 1271(b). These procedural requirements are not mere formalities—they

8

protect both state authority and operator reliance interests from casual federal interference.

The Rule's attempt to bypass these protections by recharacterizing programmatic disagreements as "violations" is particularly egregious given SMCRA's express grant of "exclusive jurisdiction" over permitting to state regulatory authorities. 30 U.S.C. § 1253(a). As the D.C. Circuit has recognized, states "exercise[] front-line supervision, and the Secretary will not intervene unless its discretion is abused." *In re Permanent Surface Min. Regul. Litig.*, 653 F.2d 514, 523 (D.C. Cir. 1981). Throughout SMCRA, where Congress intended to limit state permitting authority, it did so explicitly—as in Section 522(e)'s designation of certain lands as unsuitable for mining. 30 U.S.C. § 1272(e). The absence of any similar limitation regarding TDNs confirms that Congress never intended this process to become a vehicle for federal second-guessing of state permitting decisions.

### C. OSMRE Has Failed to Justify This Radical Departure from Decades of Practice

What makes this expansion particularly arbitrary is OSMRE's failure to identify any actual problems under the prior approach that would justify such a dramatic change. The agency's own Annual Evaluation Reports of state programs have been silent regarding any systematic deficiencies that would warrant this unprecedented federal intrusion into state decision-making. *See* Christmann Decl.

9

#513636866_v8

¶ 8, ECF No. 45-2 (noting most recent evaluation found state program effective with no issues requiring corrective action). Instead, the Rule appears driven by a preference for federal control that Congress explicitly rejected when crafting SMCRA's careful balance between federal oversight and state primacy.

Mine operators face severe and immediate operational consequences from the Rule. Operators face a triple bind: they must simultaneously comply with state requirements to maintain their permits, respond to federal enforcement actions triggered by following those same state requirements, and attempt to maintain operations amidst this regulatory uncertainty. *See* Declaration of Steven J. Weinzapfel Decl. ¶¶ 27-28, ECF No. 45-4.

For existing operations, the costs of this uncertainty cascade throughout their business. When permits are delayed, operators cannot fulfill coal supply contracts but must still cover fixed costs—including payroll for their workforce and payments on idle equipment. Moreover, these operators may need to conduct additional technical studies to satisfy federal regulators who lack the state agencies' detailed understanding of local conditions.

## II. The Rule Unlawfully Creates a New Federal Channel for Collateral Attacks on State Decisions.

Beyond improperly expanding the TDNs, the Rule compounds its statutory violations by creating an unprecedented mechanism for citizens to bypass and undermine state authority. By allowing citizens to challenge state permitting and

10

regulatory decisions through federal channels—even after state appeal periods have expired—the Rule effectively nullifies SMCRA's careful balancing of authority between state and federal regulators.

### A. The Rule Creates an Improper End-Run Around State Administrative Procedures

State regulatory authorities make complex technical determinations through established administrative processes, with detailed procedures for public participation and appeal rights under state law. These procedures, approved by the Secretary when granting primacy, reflect Congress's decision to give states "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations." 30 U.S.C. § 1253(a). The Rule undermines this structure by allowing citizens to challenge state decisions through federal channels regardless of whether they pursued—or failed to pursue—their state remedies.

Consider a typical scenario: A state authority issues a permit after thorough technical review and public comment. Any party objecting to that permit has clear appeal rights under state law, with deadlines and procedures designed to ensure both due process and finality. Yet under the Rule, even years after those appeal periods expire, a party can attempt to invalidate the permit by filing a citizen complaint with OSMRE characterizing the state's decision as a "violation." This creates perpetual uncertainty for operators who have invested millions in reliance on state permits and decisions.

11

#513636866_v8

**B. The Rule Eliminates Important State-Federal Coordination Without Justification**

The Rule's removal of requirements that citizens first contact state regulators is particularly arbitrary given the demonstrated success of state-first procedures. The Secretary has failed to identify any evidence that citizens were hesitant to contact the State regulatory authority or that state-first procedures impeded effective enforcement. *See* DOI-016059 (Wyoming Dept. of Environmental Quality Comment at 7) (disclaiming the existence of any evidence suggesting that citizens "were hesitant to contact the State regulatory authority."); DOI-014764 (explaining that "State inspectors" visit sites "at least once a month" and have "best, most current information" about conditions); DOI-016066 (Montana comment explaining State is "aptly positioned to answer OSMRE questions"); DOI-005456 (documenting that State regulatory authorities "know and understand better than OSMRE the circumstances surrounding a citizen complaint which allows the state to timely and proactively address the reported matter"). Instead, state regulators have consistently demonstrated their ability to address citizen concerns promptly and effectively through their intimate knowledge of local conditions and established relationships with operators.

The practical impact of this change will be to create parallel, uncoordinated enforcement tracks that waste both state and federal resources while burdening operators with potentially conflicting directives. State regulators, who conduct

12

#513636866_v8

monthly inspections and maintain detailed site knowledge, may determine that no violation exists or that a particular approach best addresses local conditions. Yet under the Rule, OSMRE can simultaneously pursue enforcement based on the same complaint without the benefit of the state's expertise or ongoing compliance efforts. *See* Rorrer Decl. ¶¶ 12-13, ECF No. 45-3 (describing how bypassing state authority creates duplicative efforts and delays resolution).

### C. The Rule Creates Perpetual Uncertainty for State Permitting Decisions

Perhaps most problematically, the Rule effectively eliminates any repose period for state permitting and regulatory decisions. Mining operations require massive capital investments based on the understanding that once state permits are final and appeal periods have run, those authorizations provide a reliable basis for business planning. The Rule demolishes this foundational principle by allowing collateral attacks on state decisions at any time through the TDN process.

This perpetual uncertainty undermines virtually every aspect of mining operations' business planning and development. Operators face severe challenges in entering into long-term coal supply contracts with utilities and other customers, as they cannot guarantee their ability to fulfill these obligations under the shadow of potential federal intervention. The uncertainty also impairs operators' ability to secure necessary financing for capital investments and expansions, as lenders question the stability of state-issued permits. Critical operational decisions, from

13

#513636866_v8

workforce hiring to equipment purchases and deployments, become exponentially more difficult when state authorizations could be questioned at any time. Perhaps most concerning, operators struggle to develop accurate reclamation timelines and cost estimates—a crucial aspect of environmental compliance—when facing potential retroactive changes to their operating parameters.

### D. The Rule's Bypass Mechanism Contravenes SMCRA's Core Feature of Cooperative Federalism

The Rule's creation of a federal bypass mechanism cannot be reconciled with SMCRA's fundamental design. Congress deliberately crafted SMCRA to give states "primary governmental responsibility" for regulation, recognizing that "because of the diversity in terrain, climate, biologic, chemical, and other physical conditions in areas subject to mining operations," state authorities are best positioned to make these technical determinations. 30 U.S.C. § 1201(f).

The established regulatory framework implements this principle through a carefully structured balance of authority and oversight. At the core of this framework, states exercise primary authority over permitting and enforcement activities, reflecting Congress's intent for localized control. This state-centered approach is complemented by robust citizen participation rights, ensuring that the public can meaningfully engage in state regulatory processes and pursue appeals of state decisions. The federal role is intentionally circumscribed, focusing on systematic program issues rather than intervening in individual permit decisions.

14

#513636866_v8

This tiered structure culminates in the Secretary's authority to address state program failures, but only through the formal procedures established in Section 521(b)—a mechanism that provides clear boundaries for federal intervention while respecting state primacy.

The Rule disrupts this carefully crafted structure by treating every citizen complaint as a potential trigger for federal intervention, regardless of whether state processes have been followed or state appeals exhausted. This approach effectively writes out of the statute Congress's express grant of "exclusive jurisdiction" to state authorities. *See Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 293-94 (4th Cir. 2001) (emphasizing that SMCRA "exhibits extraordinary deference to the States").

Rather than promoting environmental protection, this regulatory disorder diverts resources from actual compliance efforts to address duplicative federal proceedings. The Secretary has offered no factual basis that this upheaval of established state primacy serves any legitimate purpose.

III.    **The Rule's Reversal of Longstanding Policy Violates Basic Requirements of Reasoned Decision-Making.**

The Rule's substantive flaws are compounded by the Secretary's failure to provide the reasoned explanation required for such a dramatic shift in regulatory approach. In reversing decades of successful state-led regulation, the Secretary offers only two conclusory justifications: (1) that the changes will "enhance efficiency and effectiveness of the TDN process, while honoring State primacy";

15

and (2) that they "more closely adhere to the language, spirit, and intent of SMCRA's statutory requirements." 89 Fed. Reg. at 24,715. As detailed below, both rationales fail scrutiny.

When an agency reverses longstanding policy, it must provide a "reasoned explanation" that acknowledges the change and demonstrates why it is warranted. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This requirement is particularly stringent when, as here, the change disrupts serious reliance interests. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). Yet OSMRE has failed to meet even the basic requirement of acknowledging—much less justifying— its dramatic departures from policies established in 1988, 2007, and 2020.

### A. OSMRE's Statutory Interpretation Is Fundamentally Flawed and Ignores Critical Regulatory Realities

The Rule's expansion of the TDN authority fails on multiple levels: it rests on a fundamentally flawed interpretation of SMCRA's key terms that the agency itself rejected for over 40 years, and it systematically ignores crucial aspects of surface mining regulation that the agency must consider under the APA. As the Supreme Court has made clear, an agency rule is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

16

First, OSMRE's new interpretation contradicts SMCRA's clear text and structure. The term "person" as used in Section 521(a)'s phrase "any person is in violation" has traditionally been understood to refer to permittees or operators—not state regulatory authorities, unless acting as a permit holder. Congress carefully defined "person" to encompass only regulated entities while separately defining and distinctly mentioning "state" and "state regulatory authority" throughout SMCRA's provisions. *Compare* 30 U.S.C. § 1291(19) ("person' means an individual, partnership, association, society, joint stock company, firm, company, corporation, or other business organization") to *id.* at § 1291(24) (defining "State") and *id.* at § 1291(26) (defining "State regulatory authority"). When Congress intended to address state performance issues, it did so through explicit mechanisms like Section 521(b), not through the TDN process.

This longstanding interpretation is reinforced by Section 521(a)(1)'s explicit reference to "the surface coal mining operation at which the alleged violation is occurring." The provision's requirement that citizens be allowed to accompany inspectors confirms that Congress intended this process to address actual on-the-ground violations that can be physically observed. As OSMRE itself recognized in rulemakings from 1988 through 2020, the inspection and enforcement provisions relate to conditions at mine sites, not permitting or policy decisions. *See* DOI-014475-76. The Secretary's reasoning in the Rule fails basic logical scrutiny. Rather

than providing a reasoned justification for expanding TDNs to cover state permitting decisions, the Secretary merely assumes the conclusion—asserting that reviewing permits is necessary for enforcement, therefore OSMRE must have authority over permitting decisions themselves. 89 Fed. Reg. at 24,722-23. This disregards Congress's careful distinction between oversight of specific violations and broader programmatic review, and contradicts the Secretary's previous recognition that "Congress did not intend for OSM to second guess a State's permitting decisions." 72 Fed. Reg. at 68,025. But this brief explanation does not provide any basis for departing from the reasonable policy and fulsome rationale supporting the conclusion in the 2020 Rule that "Congress intended the section 521(a) TDN process to be limited to violations at a specific site," while relying on section 521(b) to address "State regulatory program issues" that "do not result in site specific violations of the approved State program." 2020 Rule, 85 Fed. Reg. at 75,151.

Second, OSMRE's rulemaking systematically ignored critical operational realities that it was required to consider. The agency failed to meaningfully analyze how operators could reliably plan operations when state permit decisions could be questioned at any time through the TDN process. It never addressed the practical impossibility of operators trying to comply with potentially conflicting state and federal directives. The agency also ignored the technical complexity of mining investigations, which routinely require seasonal sampling, detailed geological

18

analyses, and coordination among multiple specialists—all of which can be complicated by weather and site access considerations. *See* Weinzapfel Decl. ¶¶ 24-26, ECF No. 45-4.

Perhaps most significantly, OSMRE failed to consider how this regulatory uncertainty would impact operators' ability to meet contractual obligations to supply coal to customers. When permits face potential federal reversal through the TDN process, operators must somehow maintain idle equipment and workforce during regulatory disputes while still trying to fulfill their supply contracts. *See* Weinzapfel Decl. ¶¶ 28-29, ECF No. 45-4. This disconnect between regulatory requirements and operational reality exemplifies the type of unreasoned decision-making that courts have consistently found violates the APA's basic requirements. *See Bus. Roundtable v. S.E.C.*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (finding rule arbitrary where agency failed to adequately assess economic consequences).

The real-world evidence validates industry's concerns. The dramatic surge in federal interventions following the Rule's implementation—exemplified by West Virginia's experience of receiving more TDNs in two months than in the previous five years—demonstrates exactly the type of regulatory chaos that NMA predicted. *See* Rorrer Decl. ¶¶ 19-21, ECF No. 45-3. Yet OSMRE's rulemaking analysis never seriously considered how this dramatic increase in federal second-guessing would impact either state regulatory programs or operator compliance efforts, rendering its

19

#513636866_v8

analysis fundamentally deficient under the APA's requirement for reasoned decision-making.

### B. The Rule Relies on Conclusory Statements Rather Than Evidence and Fails to Justify Its Departure from Established Policy

OSMRE claims that this transformative Rule is necessary to "enhance efficiency and effectiveness of the TDN process, while honoring State primacy." 89 Fed. Reg. at 24,715. However, the agency's own record contradicts its claimed justifications for the change. OSMRE's Annual Evaluation Reports, which provide detailed performance statistics and results of state program evaluations, have consistently shown effective state enforcement under the existing framework. *See* Christmann Decl. ¶ 8, ECF No. 45-2. Rather than providing evidence that the changes would improve efficiency or effectiveness, the Secretary relies on conclusory assertions while ignoring decades of successful state-led regulation, despite the NMA raising this precise concern in its comments. *See* 89 Fed. Reg. at 24,724 (offering only conclusory statement that changes would allow OSMRE to "proceed more quickly and efficiently" without addressing evidence of state effectiveness). *See Michigan v. EPA*, 576 U.S. 743, 750 (2015) (agency cannot "entirely fail to consider an important aspect of the problem").

The Rule's reliance on unsupported assertions about claimed deficiencies in state enforcement results in regulatory decisions that are not reasonable or rational and therefore fail the basic requirements of reasoned decision-making. First, the

20

Rule prohibits OSMRE from considering readily available state information when evaluating potential violations, claiming this somehow promotes faster enforcement. 89 Fed. Reg. at 24,715 (limiting OSMRE to considering only "information received from a citizen complaint," "information available in OSMRE files" at the time of the complaint, and "publicly available electronic information"). This conclusion defies both logic and experience, as state regulators often have information that could immediately resolve whether a violation exists. *See* DOI-014764 ("State inspectors" visit sites "at least once a month" and have "best, most current information" about conditions); DOI-016066 (Montana "is aptly positioned to answer OSMRE questions"); DOI-005456 (explaining that "State regulatory authorities know and understand better than OSMRE the circumstances surrounding a citizen complaint which allows the state to timely and proactively address the reported matter"). The Secretary entirely failed to explain how ignoring readily available information from the most knowledgeable sources could promote efficiency or improve environmental protection, particularly given the record evidence that increased coordination between federal and state regulators has "improved response times." *See* DOI-016048; *see also* DOI-014791 ("significant improvements in the ability to expeditiously address violations"). *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) (agency must provide reasoned explanation for disregarding facts and circumstances that underlay prior policy).

21

#513636866_v8

**C. The Rule Disregards Substantial Concerns Raised During Rulemaking Without Adequate Explanation**

In addition to ignoring operational realities, OSMRE failed to meaningfully engage with the detailed technical and legal objections that industry stakeholders presented during the rulemaking process. The NMA's comprehensive comments explained how the proposed changes would improperly transform TDNs from a compliance tool into a mechanism for second-guessing state regulatory decisions. *See* DOI-014472. This transformation, the NMA warned, would create precisely the type of regulatory uncertainty that has now materialized—with operators caught between state and federal requirements while trying to maintain operations and meet contractual obligations.

OSMRE's response to these substantial concerns consisted largely of conclusory statements that discounted the severity of the fundamental issues raised. *See, e.g.*, 89 Fed. Reg. at 24724 (stating without analysis that allowing OSMRE to proceed "more quickly and efficiently" while failing to address evidence of increased delays); *id*. at 24722 (asserting Section 521 is merely "an exception to a State's otherwise-exclusive jurisdiction" without explaining how this squares with the Act's structure); *id*. at 24721 (claiming changes would "best comport[]" with the Act while ignoring contrary statutory provisions); *id*. at 24715 (stating process will "enhance efficiency and effectiveness" without evidence). This failure to engage with significant issues raised by directly affected stakeholders epitomizes the type

22

#513636866_v8

of cursory analysis courts have found insufficient under the APA. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem").

### D. The Deficient Federalism Analysis Reflects Broader Analytical Failures

While a flawed federalism analysis alone might not doom a rulemaking, here OSMRE's cursory treatment of federalism concerns exemplifies its broader failure to engage in reasoned decision-making. Throughout the rulemaking process, both state regulators and industry stakeholders emphasized how the proposed changes would fundamentally alter SMCRA's cooperative federalism framework. The NMA's comments specifically detailed how converting federal-state regulatory disagreements into "violations" subject to the TDN process would effectively nullify Congress's grant of "exclusive jurisdiction" to state authorities. *See* DOI-014461-65, 014470-76. Yet OSMRE's response to these fundamental concerns consisted mainly of abstract assertions about maintaining environmental protection, without meaningfully addressing how undermining state primacy would affect the regulatory system Congress designed. *See* 89 Fed. Reg. at 24722 (merely asserting Section 521 is "an exception to a State's otherwise-exclusive jurisdiction"); *id*. at 24721 (claiming changes would "best comport[]" with the Act while ignoring contrary statutory provisions). OSMRE's failure to analyze these reliance interests—or

23

explain why disrupting them is justified—renders the Rule arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (agencies must provide heightened justification when new rules disrupt serious reliance interests).

The practical consequences of these analytical failures are already manifest. In the wake of the Rule becoming effective, States have now faced an overwhelming surge in federal interventions that divert resources from actual environmental protection to address duplicative federal proceedings. Operators must navigate conflicting directives while attempting to maintain operations and meet contractual obligations. Yet OSMRE's rulemaking analysis never meaningfully engaged with how this regulatory chaos serves any legitimate environmental protection goal that the existing system failed to achieve. This combination of ignored evidence, dismissed stakeholder input, and disregard for statutory design renders the Rule a paradigmatic example of arbitrary and capricious rulemaking that cannot survive APA review.

## CONCLUSION

The Rule represents a fundamental departure from SMCRA's carefully crafted regulatory structure that cannot be justified under either statutory or administrative law principles. By transforming TDN from a targeted compliance tool into a mechanism for federal second-guessing of state decisions, the Rule makes operators pawns in federal-state regulatory disputes. By allowing collateral attacks

24

#513636866_v8

on state permitting decisions through the citizen complaint process, it creates perpetual uncertainty that undermines the very regulatory stability Congress sought to create. And by dismissing substantial concerns raised during rulemaking with conclusory statements and circular reasoning, it violates the most basic administrative law requirements for reasoned decision-making.

These flaws are not mere technical deficiencies that could be cured through better explanation on remand. The Secretary has acted unlawfully in promulgating this arbitrary and capricious rulemaking, and the fundamental defects in the Rule's approach to TDNs cannot be cured through better explanation on remand because the provisions exceed the Secretary's lawful authority under SMCRA. Rather, they reflect OSMRE's attempt to rewrite SMCRA's cooperative federalism framework through regulation—an effort that exceeds the agency's statutory authority and threatens the regulatory certainty essential for responsible resource development.

The regulated community has operated successfully for decades under a system that respects state primacy while maintaining appropriate federal oversight. OSMRE has identified no actual deficiencies in environmental protection that would justify abandoning this proven approach. For these reasons, and those outlined in detail above, this Court should vacate the Rule and maintain the cooperative federalism framework that Congress established in SMCRA.

Dated: December 23, 2024

#513636866_v8

Respectfully submitted,

**HOLLAND & KNIGHT LLP**

By: */s/Jason A. Hill*
    Jason A. Hill
    DC Bar No. 477543
    jason.hill@hklaw.com
    Nic Martell
    DC Bar No. 1671221
    nicolas.martell@hklaw.com
    Kamran Mohiuddin
    Texas Bar No. 2413447
    kamran.mohiuddin@hklaw.com
    811 Main Street, Suite 2500
    Houston, TX 77002
    Telephone: 713.244.6861
    Facsimile: 713.821.7001

Certificate of Compliance

I hereby certify that this Amicus Brief does not exceed 25 pages, as calculated by Microsoft Word for Office 365, in accordance with Local Rule 7 (o).

*/s/Jason A. Hill*
Jason A. Hill

26

#513636866_v8

<u>Certificate of Service</u>

I certify that I served a true and correct copy of the foregoing on all counsel, by electronic transmission to the electronic mail address on file with the electronic filing manager system. Service was made on all parties on December 23, 2024.

*/s/Jason A. Hill*
Jason A. Hill

27

#513636866_v8